## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## ELKINS DIVISION

| | |
|---|---|
| **STATE OF WEST VIRGINIA**, <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES DEPARTMENT OF HOMELAND SECURITY;** and <br><br> **ALEJANDRO MAYORKAS**, in his official capacity as the Secretary of the United States Department of Homeland Security, <br><br> Defendants. | ELECTRONICALLY FILED <br> 08/19/2021 <br> U.S. DISTRICT COURT <br> Northern District of WV <br><br> Case No. 2:21-cv-22 (Kleeh) <br><br> COMPLAINT |

## COMPLAINT

Plaintiff, STATE OF WEST VIRGINIA, files this lawsuit seeking judicial review of the decision of the United States Department of Homeland Security (DHS) and Secretary Alejandro Mayorkas, in his official capacity, to terminate a critical border security program without considering the consequences for the ongoing devastating deadly flood of fentanyl across the Southwest border into this country.

## NATURE OF ACTION

1.  The United States today is suffering from an unprecedented and increasing surge of drug overdose deaths resulting from industrial production of fentanyl in Mexico that is trafficked into this country across the Southwest border both at and between ports of entry.

2.  Despite this pressing emergency, Secretary Mayorkas terminated a critical border security program without considering the impact that this decision would have on fentanyl trafficking across the Southwest border and the ensuing addiction and death that would result, in direct violation of the requirements of the Administrative Procedure Act.

3.   The DHS established the Migrant Protection Protocols (MPP) on December 20, 2018, in order to deter individuals without legal authorization or valid asylum claims from seeking to enter the United States by crossing the Southwest border.

4.   Under the MPP program, asylum applicants attempting to cross the Southwest border were returned to Mexico during expedited processing of their claims, as authorized by Section 235(b)(2)(C) of the Immigration and Nationality Act, 8 U.S.C. § 1225(b)(2)(C), rather than held in detention, or, as was most common, paroled into the United States.

5.   By dramatically reducing the number of individuals without valid asylum claims paroled into the United States pending adjudications (that take years and often result in absentia removal), DHS aimed at "reduc[ing] illegal migration by removing one of the key incentives that encourages people from taking the dangerous journey to the United States in the first place." DHS, *Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration* (Dec 20, 2018), https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration.

6.   One of the stated purposes of this deterrence program was to increase DHS's ability to focus resources and personnel on securing the border against threats such as drug trafficking.

7.   The MPP was suspended in January 2021 and then formally terminated by the Secretary on June 1, 2021, without any consideration of how the termination would impact drug trafficking and the flow of fentanyl across the Southwest border into this country, despite this precise issue being raised to the Secretary prior to the termination.

8.   On June 7, 2021, West Virginia Attorney General Patrick Morrisey objected by letter to this dereliction of duty and violation of the Administrative Procedure Act, and requested that DHS

respond by June 20, 2021. Attorney General Morrisey admonished that "[t]here should be no need for a lawsuit to make ending the fentanyl flood one of your priorities."

9.   Nearly two months later, there has been no response, necessitating the filing of this lawsuit.

10. West Virginia requests this Court declare the termination of MPP arbitrary, capricious, and an abuse of discretion, and remand the termination to the DHS for consideration of the impact of the termination on trafficking of fentanyl into our country.

## JURISDICTION AND VENUE

11. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities, the State of West Virginia is a resident of this judicial district, and no real property is involved in the action.

## PARTIES

13. The State of West Virginia is a sovereign State of the United States of America. Attorney General Morrisey has state constitutional and statutory authority to represent the State in federal court. W. Va. Const. art. VII, § 1; W. Va. Code § 5-3-2; *see also* Syl. Pt. 4, *State ex rel. McGraw v. Burton*, 569 S.E.2d 99 (W. Va. 2002).

14. The Department of Homeland Security is an agency of the United States.

15. Alejandro Mayorkas is Secretary of the Department of Homeland Security and is named as a party in his official capacity.

16. The Secretary is responsible for securing and managing our nation's borders and is empowered to issue regulations necessary to do so.

## STANDING

17. West Virginia has standing to seek judicial review of DHS's arbitrary and capricious termination of the MPP without consideration of the impact of the decision on fentanyl trafficking into the country. *Cf.  Department of Commerce v. New York*, 139 S. Ct. 2551, 2565-2566 (2019).

18. Fentanyl is produced in Mexico, trafficked across the border into the United States, transported to West Virginia, and consumed wittingly or unwittingly by West Virginians.

19. Fentanyl from Mexico routinely kills West Virginians on a daily basis.

20. Increased fentanyl smuggling across the border increases the amount of fentanyl consumed in West Virginia and in turn the number of West Virginians killed by this lethal poison.

21. DHS's termination of the MPP is a major change that increases the "pull factor" attracting individuals without a lawful right to enter the United States or a legitimate asylum claim to nonetheless travel to and across the Southern border into this country, requiring the attention and resources of the Border Patrol.

22. By its consequences burdening and distracting the Border Patrol, the termination of the MPP decreases the security of the border against fentanyl trafficking between ports of entry, leading directly to both increased numbers of smuggling attempts and increased rates of success in evading Border Patrol.

23. The impact of the MPP on the flow of migrants to the border will dramatically increase as soon as the pandemic-related Title 42 protocols are withdrawn, thereby greatly exacerbating the reduction in the security of the border against fentanyl trafficking.

24. An order remanding the termination of the MPP to DHS for consideration of the fentanyl trafficking issue will likely lead to DHS either making a different decision with respect to the MPP

or taking other steps in order to ameliorate the problem caused by the decision, redressing the harm to West Virginia.

## FACTUAL ALLEGATIONS

25. West Virginia has battled an opioid epidemic within the state for many years. The CDC determined West Virginia had the highest rate of drug overdose deaths in the nation in 2014. Rose Rudd, et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, (Jan. 1, 2016), www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm.

26. West Virginia continued to have the highest drug overdose death rate from 2015 to 2019. CDC, *Drug Overdose Mortality Rate by State*, (Feb. 12, 2021), www.cdc.gov/nchs/pressroom/sosmap/drug_poisoning_mortality/drug_poisoning.htm.

27. In recent years, fentanyl has become the deadliest drug in the State of West Virginia. Deaths related to fentanyl in 2020 totaled more than 700% of fentanyl-related deaths in 2015, and, in 2020, 74.5% of all drug-related deaths in West Virginia were connected with fentanyl. *Fatal Overdoses in West Virginia – An Overview*, DHHR.WV.GOV, dhhr.wv.gov/office-of-drug-control-policy/datadashboard/Pages/default.aspx (select "Fatal Overdoses in West Virginia) (last visited August 19, 2021).

28. Fentanyl is about 100 times more potent than morphine. DEA, *Facts about Fentanyl,* www.dea.gov/resources/facts-about-fentanyl (last visited August 19, 2021). A lethal dose of fentanyl can be as small as two milligrams depending on the person's body size, tolerance, and past usage. *Id.* That means one kilogram (equivalent to 2.2 pounds) of fentanyl contains up to 500,000 potentially lethal doses.

29. Drug trafficking organizations have a tremendous motivation to produce and traffic fentanyl. Due to the potency of fentanyl, drug traffickers can bring in massive profits from relatively small amounts.

30. According to the DEA's 2017 Drug Threat Assessment, one kilogram of pure fentanyl can result in revenues of $1.28 million to $1.92 million, as compared to only $80,000 in revenue for one kilogram of heroin. DEA, 2017 National Drug Threat Assessment at 62 (Oct. 2017), *available at* https://www.dea.gov/sites/default/files/2018-07/DIR-040-17_2017-NDTA.pdf.

31. This results from the potency of pure fentanyl, as one kilogram of pure fentanyl can be diluted down into 16 to 24 kilograms that are equivalent in value to one kilogram of heroin. *Id.*

32. On information and belief, fentanyl smuggled in vehicles at ports of entry into this country are typically already diluted bricks or pressed into pills, given low concern over space and weight.

33. However, a new and pressing threat comes in the form of pure fentanyl backpacked across the Southwest border in between points of entry.

34. A single backpack can easily contain 10 kilograms or more of pure fentanyl, with a street value of nearly $20 million and enough potentially lethal doses to kill 5,000,000 Americans.

35. With industrial-scale illegal fentanyl production now occurring in Mexico, these backpack loads can cost less $50,000 for drug cartels to produce. *Id*.

36. Seizure statistics show dramatic increases in fentanyl seizures both at and between points of entry.

37. Importantly, CBP statistics do not adjust for purity of the seized substance, so one pound reported seized between ports of entry of pure fentanyl can be equivalent to nearly 25 pounds of diluted fentanyl bricks or fentanyl pills reported as seized at a port of entry.

38. The threat of fentanyl backpacked between ports of entry is not hypothetical.

39. On December 19, 2020, CBP's Integrated Fixed Tower system detected "three subjects traveling northbound from a drainage gate along the International Boundary Fence . . . between the United States and Mexico." Criminal Complaint, *U.S. v. Morales Rodriguez*, No. 21-941 (D. Ariz. Dec. 21, 2020).

40. A Border Patrol Agent was dispatched to intercept them. *Id.* As he approached within a half mile of their coordinates, the Integrated Fixed Tower system camera operator observed the three individuals stop walking. *Id.*

41. The camera operator guided the agent to the location where the three individuals had last been seen. *Id.*

42. When he arrived, the agent found "three individuals dressed in camouflage clothing," "wearing carpet booties" (used to disguise footprints in the desert) and "attempting to conceal themselves under some brush." *Id.*

43. The three subjects "then got up and ran in different locations." *Id.*

44. The agent apprehended one of the individuals and the backpack he was carrying which contained 14.32 kilograms of methamphetamine. *Id.*

45. The agent also seized a second backpack that likely had been carried by one of the two individuals that escaped. CBP, *Border Patrol Seizes $3M in Narcotics* (Dec. 21, 2020), *available at* cbp.gov/newsroom/local-media-release/border-patrol-seizes-3m-narcotics.

46. The second backpack contained over 6 kilograms of fentanyl wrapped in cellophane and brown packing tape, along with a large quantity of methamphetamine as well. *Id.*

47. These are the two backpacks seized by the agent that day:



48. It is unknown whether there was a third backpack that got away with the two individuals who were not apprehended.

49. From 2016 to today, DHS and CBP have targeted an apprehension rate of "detected illegal entrants" "along the Southwest border between ports of entry" of 81%. DHS, *U.S. Customs and Border Protection Budget Overview Fiscal Year 2022 Congressional Justification* at CBP-3 (2021), https://www.dhs.gov/publication/congressional-budget-justification-fy-2022 (select "U.S. Customs and Border Protection"). In practice, DHS actually apprehended 82.7%, 78.9%, 79.7%, 86.3%, and 79.4% of detected illegal entrants from Fiscal Year 2016 through Fiscal Year 2020. *Id.*

50. The 81% target, and these actual apprehension rates achieved in practice, reflect previous experience that hard narcotics trafficking occurred primarily through bulk vehicle shipments at points of entry, as opposed to between points of entry.

51. But industrial-scale fentanyl production by Mexican drug cartels changes everything.

52. Thus, in making major changes to policies that affect the deployment of resources both at and between points of entry, DHS must consider (1) the acceptability of an interdiction goal of just 4 in 5 or less (since drug backpackers are far more likely to try to evade interdiction and succeed), (2) whether changes will divert border patrol and result in even lower interdiction rates, (3) and whether changes will make it harder to fully secure the border against drug backpackers that can each bring in  millions of potentially fatal doses of fentanyl worth millions of dollars, at very little cost to Mexican drug cartels.

53. On December 20, 2018, the DHS announced MPP with the goal of freeing up "[p]recious border security personnel and resources . . . to focus on protecting our territory[.]" DHS, *Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration* (Dec 20, 2018).

54. The DHS elaborated on the purpose of MPP on January 25, 2019. DHS, *Migrant Protection Protocols* (Jan 25, 2019), https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols#. In a section titled "Why is the DHS Instituting MPP?" the DHS stated "[h]uman smugglers and traffickers exploit migrants and seek to turn human misery into profit. Transnational criminal organizations and gangs are also deliberately exploiting the situation to bring drugs, violence, and illicit goods into American communities." *Id.* The DHS went on to state one of the anticipated benefits of MPP was "migrants with non-meritorious or even fraudulent claims will no longer have an incentive for making the journey" to the U.S. *Id*.

55. On January 20, 2021, the Acting Secretary of DHS suspended MPP. DHS, *Memorandum on Termination of the Migrant Protection Protocols Program* (June 1, 2021), https://www.dhs.gov/sites/default/files/publications/21_0601_termination_of_mpp_program.pdf.

56. On February 2, 2021, President Biden issued an Executive Order directing the Secretary of DHS "to promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols." Executive Order 14010 of February 2, 2021, § 4(ii)(B), 86 Fed. Reg. 8267, 8269 (Feb. 2, 2021). The President instructed the Secretary to review MPP and take appropriate actions "consistent with public health and safety." *Id.* at § 4(i).

57. While the Secretary's review of MPP was underway, the concern of fentanyl coming across the Southwest border was brought directly to the attention of the Secretary by Senator Rick Scott of Florida at the Senate Hearing on Unaccompanied Minors at US-Mexico Border on May 13, 2021. *DHS Actions to Address Unaccompanied Minors at the Southern Border: Hearing Before the U.S. Senate Comm. on Homeland Sec. & Gov. Affairs*, 117th Cong. (2021) (statement of Senator Rick Scott).

58. At another hearing on May 26, 2021, after stating that the Secretary was responsible for "opioid and drug interdiction," Senator Shelly Moore Capito of West Virginia, ranking member of the Homeland Security Appropriations Subcommittee, again brought the issue of fentanyl to the attention of the Secretary. *Hearing on The FY 2022 Dept. of Homeland Sec. Budget Before the Subcomm. On Homeland Sec.* 117th Cong. (2021) (statement by Senator Shelley Moore Capito).

59. Senator Capito informed Secretary Mayorkas "[t]his is a big issue for me. Drugs continue to pour across our border, including record amounts of fentanyl, which are devastating states like West Virginia and killing a lot of our people." *Id*.

60. On June 1, 2021, DHS Secretary Alejandro Mayorkas terminated the Migrant Protection Protocols Program with a seven page memorandum. DHS, *Memorandum on Termination of the Migrant Protection Protocols Program* (June 1, 2021).

61. The termination memorandum did not acknowledge or discuss how terminating MPP would affect drug trafficking across the border. *See generally id.*

62. In a closely analogous, high-profile case decided just one year before DHS terminated MPP, the Supreme Court held DHS acted arbitrarily and capriciously in terminating the Deferred Action for Childhood Arrivals Program because DHS failed to consider an important aspect of the problem. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020).

63. Despite the alarms raised by Senator Scott and Senator Capito, the prominence of the *DHS v. Regents* decision, and the President's instructions to consider public health and safety, the Secretary failed to consider drug trafficking in his decision to terminate MPP.

64. West Virginia Attorney General Patrick Morrisey objected to this failure in a letter to the Secretary on June 7, 2020. Letter from Patrick Morrisey to Alejandro Mayorkas, (June 7, 2021).

65. Attorney General Morrisey's letter informed the Secretary that his "action and accompanying justification memorandum entirely overlook[ed] a critical aspect of a major problem facing our country, the issue of illegal drug trafficking and fentanyl." *Id.*

66. Attorney General Morrisey requested a response from the Secretary by June 20, 2021, and emphasized that litigation should not have to be required to resolve the matter. *Id.*

67. Nearly two months since receiving the letter, DHS has failed entirely to respond. *Id.*

68. Meanwhile, the concerns of Attorney General Morrisey and others that the termination of MPP will aggravate the fentanyl trafficking problem are already realized more and more each day. Gloria Chavez, Chief Border Patrol Agent for the El Paso Sector, recently emphasized that "[f]or

11

the first time, we're starting to see these tactics where fentanyl is being smuggled between ports of entry" at that portion of the border. Gabe Gutierrez & Al Henkel, *Fentanyl seizures at U.S. southern border rise dramatically,* NBC NEWS (June 29, 2021), www.nbcnews.com/politics/immigration/fentanyl-seizures-u-s-southern-border-rise-dramatically-n1272676.

69. In addition, the full impact of the termination of MPP will begin to be felt when DHS separately rescinds the general closure of the border under Title 42 due to COVID-19.

70. As Attorney General Morrisey emphasized in his letter, "[t]his is a pressing and urgent matter impacting West Virginia and every State suffering from fentanyl abuse and illegal drug trafficking," "[l]ives are being lost every day," and "[t]here is no time for delay." Letter from Patrick Morrisey to Alejandro Mayorkas, (June 7, 2021).

## CAUSE OF ACTION

71. Plaintiff realleges, adopts, and incorporates by reference the foregoing paragraphs as though fully set forth herein.

72. The APA requires the Court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion. 5 U.S.C. § 706(2).

73. Defendants' termination of MPP was arbitrarily, capricious, and an abuse of discretion, because defendants failed entirely to consider an important aspect of the problem: the impact of their decision on the ability of DHS to secure the border against deadly fentanyl trafficking.

## PRAYER FOR RELIEF

**WHEREFORE**, the West Virginia respectfully requests that the Court:

A.  Declare the Secretary's termination of MPP to be arbitrary, capricious, and an abuse of discretion in violation of 5 U.S.C § 706;

B.  Remand the termination of MPP with instructions for Defendants to consider the impact the termination of MPP has on border security and the trafficking of fentanyl across the Southwest border into the United States; and

C.  Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

PATRICK MORRISEY
  *West Virginia Attorney General*

/s/ *Curtis R.A. Capehart*

Douglas P. Buffington II (WV Bar # 8157)
  *Chief Deputy Attorney General*
Brent Wolfingbarger (WV Bar # 6402)
  *Senior Deputy Attorney General*
Curtis R.A. Capehart (WV Bar # 9876)
  *Deputy Attorney General*

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
State Capitol
Building 1, Room E-26
Charleston, WV 25305-0220
Telephone: (304) 558-2021
Facsimile: (304) 558-0140
Email: Curtis.R.A.Capehart@wvago.gov

DATE: August 19, 2021