# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### ELKINS DIVISION

| | |
|---|---|
| **STATE OF WEST VIRGINIA**, | |
| Plaintiff, | |
| v. | |
| **UNITED STATES DEPARTMENT OF HOMELAND SECURITY;** and | Case No. 2:21-CV-22 |
| | (Judge Kleeh) |
| **ALEJANDRO MAYORKAS**, in his official capacity as the Secretary of the United States Department of Homeland Security | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Plaintiff, STATE OF WEST VIRGINIA, files this lawsuit seeking judicial review of the decision of the United States Department of Homeland Security ("DHS") and Secretary Alejandro Mayorkas, in his official capacity (the "Secretary") to terminate a critical border security program without considering the consequences for the ongoing devastating deadly flood of fentanyl across the Southwest border into this country.

## NATURE OF ACTION

1. The United States today is suffering from an unprecedented and increasing surge of drug overdose deaths resulting from fentanyl trafficked into this country across the Southwest border from Mexico, both at and between ports of entry.

2. Despite this pressing emergency, DHS suspended and then terminated a critical border security program without considering the impact that this decision would have on fentanyl trafficking across the Southwest border and into the rest of the Country and the ensuing addiction, death, and related consequences, in direct violation of the requirements of the Administrative

Procedure Act (the "APA").

3. The DHS established the Migrant Protection Protocols ("MPP") on December 20, 2018, in order to deter individuals without legal authorization or valid asylum claims from seeking to enter the United States by crossing the Southwest border.

4. Under the MPP program, asylum applicants attempting to cross the Southwest border were returned to Mexico for expedited processing of their claims, as authorized by Section 235(b)(2)(C) of the Immigration and Nationality Act, 8 U.S.C. § 1225(b)(2)(C), rather than held in detention or, as was most common, released into the United States under the guise of a statutory "parole."

5. By dramatically reducing the number of individuals without valid asylum claims released into the United States pending adjudications taking years and often resulting in individuals not appearing or in absentia removal, DHS—via the MPP—aimed at "reduc[ing] illegal migration by removing one of the key incentives that encourages people from taking the dangerous journey to the United States in the first place."[1]

6. One of the stated purposes of this deterrence program was to increase DHS's ability to focus resources and personnel on securing the border against threats such as drug trafficking.

**The Biden Administration Impermissibly Revoked the MPP**

7. The MPP was first suspended on January 20, 2021 (the "Suspension Decision"), and then formally terminated by the Secretary on June 1, 2021 (the "Termination Decision"), without any consideration of how the termination would impact drug trafficking and the flow of fentanyl across the Southwest border into this country, despite this precise issue being raised to the Secretary prior to the termination.

8. A seven page memorandum was issued explaining the Termination Decision on June 1,

---

[1] DHS, *Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration* (Dec 20, 2018), https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration.

2021, as well.  *See* DHS, *Memorandum on Termination of the Migrant Protection Protocols Program* (June 1, 2021) (the "June Termination Memorandum").[2]

9. After the Suspension Decision, Texas and Missouri sued President Biden and other federal official in their official capacities, as well as related agencies, on April 13, 2021, to enjoin the suspension of the MPP.  *See Texas v. Biden*, No. 2:21-cv-00067 (N.D. Tex. Aug. 13, 2021) (the "Texas Case").  That action was later modified to focus on the Termination Decision, which superseded the Suspension Decision.

10. On June 7, 2021, West Virginia Attorney General Patrick Morrisey objected by letter to the dereliction of duty and violation of the Administrative Procedure Act embodied in the Termination Decision, and requested that DHS respond by June 20, 2021.  *See* Letter from Patrick Morrisey to Alejandro Mayorkas (June 7, 2021) ("Morrisey Letter").  Attorney General Morrisey admonished that "[t]here should be no need for a lawsuit to make ending the fentanyl flood one of your priorities."  DHS never responded to this letter.

11. On August 13, 2021, the court in the Texas Case determined that the Termination Decision was, among other things, arbitrary and capricious and issued an injunction against the enforcement of the decision to terminate the MPP (the "Texas Court Order").  DHS then appealed that ruling.

12. Having received no response to the Morrisey Letter, the State of West Virginia consequently filed its original Complaint on August 19, 2021.  *See* Complaint, ECF No. 1.

13. On September 29, 2021, DHS issued a press release stating it was going to terminate MPP.[3]

14. On October 15, 2021, DHS' announced, via Twitter, that "DHS will be issuing a memo terminating MPP…"

---

[2] DHS, *Memorandum on Termination of the Migrant Protection Protocols Program* (June 1, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_0601_termination_of_mpp_program.pdf.
[3] DHS, *DHS Announces Intention to Issue New Memo Terminating MPP* (Sept. 29, 2021), *available at* https://www.dhs.gov/news/2021/09/29/dhs-announces-intention-issue-new-memo-terminating-mpp

15. On October 29, 2021, DHS issued a memorandum with the subject "Termination of the Migrant Protection Protocols" (the "October Termination Memorandum") which stated that Secretary Mayorkas "once more assessed whether MPP should be maintained, terminated, or modified" and concluded that he is "hereby terminating MPP."[4]

16. On October 29, 2021, Secretary Mayorkas also issued a 39-page memorandum titled "Explanation of the Decision to Terminate the Migrant Protection Protocol" (the "Explanation Memorandum").[5]

17. The Defendants did not file a responsive pleading to the original Complaint, in November seeking additional time based on the publication of the October 29, 2021, memoranda.

18. In light of these filings and after conferring with the Defendants per the Court's direction, the State was granted leave to amend its Complaint.

19. On December 2, 2021, DHS issued "Guidance Regarding the Court-Ordered Reimplementation of the Migrant Protection Protocols" (the "Reimplementation Guidance") that purported to reinstate the MPP program.[6]

20. DHS' termination of MPP—through the Termination Decision and the various memoranda issued addressing termination of MPP—does not properly consider the impact of the MPP termination on trafficking of fentanyl into our country and is arbitrary, capricious, and an abuse of discretion.

21. DHS' attempted rehabilitation of this failing and maneuver to moot this action—namely

---

[4] DHS, *Memorandum on Termination of the Migrant Protection Protocols* (Oct. 29, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_1029_mpp-termination-memo.pdf.

[5] DHS, *Explanation of the Decision to Terminate the Migrant Protection Protocols* (Oct. 29, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_1029_mpp-termination-justification-memo.pdf.

[6] DHS, *Memorandum on Guidance Regarding the Court-Ordered Reimplementation of the Migrant Protection Protocols* (Dec. 2, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_1202_plcy_mpp-policy-guidance_508.pdf.

the issuance of the October memoranda—is inherently flawed. Its October documents demonstrate its belief in "the power to implement a massive policy reversal—affecting billions of dollars and countless people—simply by typing out a new Word document and posting it on the internet." *Texas v. Biden*, No. 21-10806, 2021 WL 5882670, at *1 (5th Cir. Dec. 13, 2021). This is something that a federal agency cannot do. *Id*.

22. Furthermore, the Reimplementation Guidance contains loopholes and exceptions that go beyond the statutory authority of DHS and drastically undermine the reimplementation of the MPP program.

23. This Court should invalidate the termination of the MPP program and require DHS to reestablish and continue the MPP program properly and not pursuant to the Reimplementation Guidance.

## JURISDICTION AND VENUE

24. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

25. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities, the State of West Virginia is a resident of this judicial district, and no real property is involved in the action.

## PARTIES

26. The State of West Virginia is a sovereign State of the United States of America. Attorney General Morrisey has state constitutional and statutory authority to represent the State in federal court. W. Va. Const. art. VII, § 1; W. Va. Code § 5-3-2; *see also* Syl. Pt. 4, *State ex rel. McGraw v. Burton*, 569 S.E.2d 99 (W. Va. 2002).

27. The Department of Homeland Security is an agency of the United States.

28. Alejandro Mayorkas is Secretary of the Department of Homeland Security and is named as a party in his official capacity.

29. The Secretary is responsible for securing and managing our nation's borders and is empowered to issue regulations necessary to do so.

## STANDING

30. West Virginia has standing to seek judicial review of DHS's arbitrary and capricious termination of the MPP without considering the impact of the decision on fentanyl trafficking into the country. *Cf.  Department of Commerce v. New York*, 139 S. Ct. 2551, 2565-2566 (2019).

31. West Virginia further has standing under the special solicitude doctrine.

### West Virginia Has Been Injured By Increased Fentanyl Crossing The Border And Flowing To West Virginia.

32. Fentanyl is produced in Mexico and, trafficked across the border into the United States.[7]

33. While much of the fentanyl is manufactured in China, it still reaches the U.S. through the Mexican border.  *Id*. at 9.

34. Once in the US, a typical distribution path is to Chicago, and then to "Toledo, Columbus, Cincinnati and south to West Virginia."  *Id.* at 31-32.

35. Upon information and belief, increased fentanyl smuggling across the border in turn increases the amount of fentanyl consumed in West Virginia and in turn the number of West Virginians killed or otherwise harmed by this lethal poison.

36. As a result, West Virginia has suffered financial damages by virtue of (i) increased medical care costs of the State to take care of those who overdose on fentanyl (such as EMS response, hospital care, drug treatment centers and naloxone/narcan treatments); (ii) increased foster care

---

[7] Wilson Center Mexico Institute, *Mexico's Role in the Deadly Rise of Fentanyl* 12 (February 2019), https://www.wilsoncenter.org/sites/default/files/media/documents/publication/fentanyl_insight_crime_final_19-02-11.pdf.

6

costs resulting from parental deaths from overdoses; (iii) increased law enforcement costs to track down, arrest, prosecute and incarcerate fentanyl dealers; and (iv) costs to care for babies born with addictions.

37. Fentanyl from Mexico kills West Virginians every single day.  In 2020 alone, 992 West Virginian's died from fentanyl overdoses.[8]  This was approximately 75% of the 1,336 total drug overdose deaths in West Virginia during 2020.  Nationally, in 2020, there were approximately 57,550 fentanyl related deaths.[9]  In other words, in one year, Mexican fentanyl killed nearly as many Americans as died in the 20 years of the Vietnam War.

38. In addition to the 992 fentanyl overdose deaths in West Virginia, there were untold additional non-lethal fentanyl overdoses.

39. In 2020, EMS responded to 7,561 suspected drug overdoses (and 3,775 in 2021 through August).  Moreover there were 7,233 emergency room visits related to drug overdoses in 2020 and 6,188 in 2021 through September 2021.[10]  Based on the data above showing fentanyl related overdose deaths of 75% of all overdose deaths, it is also likely that about 75% of the EMS and ER responses are in response to fentanyl usage.

40. The typical costs for each EMS response is about $1,211[11] and the typical emergency room visit cost, without admission or treatment, related to drug overdoses is at least $504.  If admitted,

---

[8] WV DHHR, *Fatal Overdoses in West Virginia – Overview*, https://dhhr.wv.gov/office-of-drug-control-policy/datadashboard/Pages/default.aspx (last visited Dec. 20, 2021).
[9] Jesse C. Baumgartner and David C. Radley, *The Drug Overdose Mortality Toll in 2020 and Near-Term Actions for Addressing It*, Commonwealth Fund: To the Point (Aug. 16, 2021), https://www.commonwealthfund.org/blog/2021/drug-overdose-toll-2020-and-near-term-actions-addressing-it.
[10] WV DHHR, *Emergency Room (ER) Visits Related to Overdoses*, https://dhhr.wv.gov/office-of-drug-control-policy/datadashboard/Pages/default.aspx (last visited Dec. 20, 2021).
[11] Andrew Hurst, *Ambulance Rides Have Cost $1,189 on Average Since 2010 – Totaling More Than $46 Billion*, ValuePenguin (Sept. 13, 2021), https://www.valuepenguin.com/cost-ambulance-services.

the cost can be between \$11,731 and \$20,500.[12]

41. Based on those figures, the immediate costs from these 2 categories are massive.  EMS costs from fentanyl for 2020 were likely about \$6,867,278.  Costs for fentanyl ER visits were likely between \$2,734,074 and \$111,207,375.  It is likely that the State would bear much of these costs because drug users often have no insurance to cover these costs.

42. In 2020, over 7,100 West Virginia children were in foster care during an average month,[13] at least 85% of which resulted from drug use.[14]  As of 2020, nearly 75% of drug overdose deaths resulted from fentanyl or fentanyl analogs.[15]  While explicit percentage statistics on fentanyl usage resulting in placement in foster care are not available, a conservative estimate of even 50% would suggest that about 3,000 foster care placements result from fentanyl usage.  Because of the large number of placements, some of these are out-of-state placements, which cost the State between \$300 and \$1,500 per day per child.[16]  In-state placements are less expensive and the total daily expenditure is harder to calculate, but the cost of payments to the foster care families alone (excluding medical care, therapy and administrative costs) is at least \$26 per day per child.[17]

43. In addition, the approximate cost to care for babies born with opioid addiction (as of 2017)

---

[12] *Opioid Overdoses Costing U.S. Hospitals an Estimated \$11 Billion Annually*, Premier Inc. (Jan. 3, 2019), https://www.premierinc.com/newsroom/press-releases/opioid-overdoses-costing-u-s-hospitals-an-estimated-11-billion-annually.
[13] WV DHHR, *Foster Care Placements Report*, https://dhhr.wv.gov/bcf/Reports/Documents/2021%20January%20Legislative%20Foster%20Care%20Placements%20Report.pdf (last visited Dec. 20, 2021).
[14] WV DHHR, *West Virginia 2021 Annual Progress and Services Review* 241, *available at* https://dhhr.wv.gov/bcf/Reports/Documents/West%20Virginia%20APSR%202021.pdf (last visited Dec. 20, 2021).
[15] National Institute on Drug Abuse, *West Virginia: Opioid-Involved Deaths and Related Harms*, https://www.drugabuse.gov/drug-topics/opioids/opioid-summaries-by-state/west-virginia-opioid-involved-deaths-related-harms (last visited Dec. 20, 2021).
[16] Amelia Ferrell Knisely et al., *West Virginia's Reliance On Out-Of-State Group Homes Leaves Some Foster Kids In Unsafe, Abusive Situations*, WV Public Broadcasting (Sept. 21, 2021, 12:54 PM), https://www.wvpublic.org/government/2021-09-21/west-virginias-reliance-on-out-of-state-group-homes-leaves-some-foster-kids-in-unsafe-abusive-situations
[17] Erin Beck, *WV Senate Restores Funding, Rights To Foster Care Bill*, The Register-Herald (Mar. 6, 2020), https://www.register-herald.com/wv-senate-restores-funding-rights-to-foster-care-bill/article_d62045d8-6012-11ea-8c6c-6f1fbed99f3a.html.

was $66,000 per year[18], most of which is paid by the State of West Virginia.  In 2019, there were 761[19] such addicted babies, many of which (probably 75% based on the above cited statistics) suffered addiction from fentanyl-related maternal addictions, resulting in a cost to the State of as much as $54,120,000.

44. Law enforcement time, resource use, and other costs from increased fentanyl entering the State are difficult to quantify, but are real.

45. As an example, the West Virginia state-wide average cost per inmate for FY 2018 was $70.90 per day.[20]    The specific number of inmates whose incarceration stems from fentanyl-related activity is unspecified at present, but it is certainly a number that is significant.

46. The cost and impact on families affected by each fentanyl illegal usage, overdose, or death, while not a cost to the State, is immeasurable.

**The  MPP Program Decreased Irregular Border Crossings And Drug Smuggling**

47. DHS has "presumed" that the MPP program "resulted in a significant decrease in irregular border crossings and persons approaching the U.S. border to pursue non-meritorious asylum claims."  *See* October Termination Memorandum at 3.

48.  More pointedly, though, "DHS has previously acknowledged that 'MPP implementation contribute[d] to decreasing the volume of inadmissible aliens arriving in the United States on land from Mexico.' AR 555. MPP removed the 'perverse incentives' which enticed aliens with 'a free

---

[18] *The Opioid Crisis: Impact on Child. and Fams.: Hearing Before the S. Comm. On Health, Educ., Labor, and Pensions*, 135th Cong. (2018) (statement by Senator Lamar Alexander), *available at* https://www.govinfo.gov/content/pkg/CHRG-115shrg28659/html/CHRG-115shrg28659.htm (last visited Dec. 10, 2021).

[19] U.S. Dep't of Health and Hum. Servs. – Agency for Healthcare Rsch. And Quality, *Neonatal Abstinence Syndrome (NAS) Among Newborn Hospitalizations*, https://www.hcup-us.ahrq.gov/faststats/NASServlet?radio-2=on&location1=WV&characteristic1=05C11&location2=US&characteristic2=01C11&expansionInfoState=hide& dataTablesState=hide&definitionsState=hide&exportState=hide (last visited Dec. 20, 2021).

[20]    WV    Div.    of    Corr.,    *Annual    Report:    FY2018*    42    (Dec.    2018), https://dcr.wv.gov/resources/Documents/annual_reports/WVDOC%2018%20Annual%20Report.pdf.    These costs might be assessed against the defendant, but realistically, many defendants will never pay those costs.

ticket into the United States.' AR 684, 687; Trial Tr. 147:23–25" *Texas v. Biden*, 2021 WL 3603341, at *9 (N.D. Tex. Aug. 13, 2021), *enforcement granted in part*, No. 2:21-CV-067-Z, 2021 WL 5399844 (N.D. Tex. Nov. 18, 2021), and *aff'd*, No. 21-10806, 2021 WL 5882670 (5th Cir. Dec. 13, 2021).

49. Indeed, there has been a drastic uptick in illegal immigration across the Mexican border in 2021, which coincides with the cancellation of the MPP as measured by U.S. Customs and Border Patrol (CPB) encounters.  The encounters jumped from in 78,414 in January 2021 to 213,593 in July 2021, staying over 200,000 per month until September 2021 when encounters ebbed slightly to 192,001.[21]  Notably, in 2021, about 65% of these illegal entrants were single adults, not families or children.  *Id.*

50. By contrast, in September 2020, the total encounters was only 57,674.  *Id.*

51. Federal agents have "seen a staggering 4,000 percent increase in fentanyl seizures over the last three years" and "[t]hose busts are not at ports of entry, where most smuggled drugs are typically found."[22]

52. The suspension of the MPP program in January 2021 coincides with the drastic increase in fentanyl seizures at the border.  "A record setting 1,300 pounds of fentanyl has been seized at the Texas-Mexico border. This is compared to only 200 pounds seized in 2020."[23]

**This Court Can Redress This Problem**

53. The Court can order DHS to reinstitute the MPP program, which will help alleviate the

---

[21] *Stats and Summaries: Southwest Land Border Encounters*, CBP, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last modified Dec. 17, 2021)

[22] Gabe Gutierrez and Al Henkel, *Fentanyl Seizures At U.S. Southern Border Rise Dramatically*, NBC News (June 29, 2021, 7:59 PM), https://www.nbcnews.com/politics/immigration/fentanyl-seizures-u-s-southern-border-rise-dramatically-n1272676.

[23] *1.3K Lbs. Of Fentanyl Seized At Texas Border This Year*, One America News Network (Dec. 10, 2021, 10:12 AM), https://www.oann.com/1-3k-lbs-of-fentanyl-seized-at-texas-border-this-year/?utm_source=rss&utm_medium=rss&utm_campaign=1-3k-lbs-of-fentanyl-seized-at-texas-border-this-year.

fentanyl smuggling across the Mexico-U.S. border and thereby help to alleviate the harm to West Virginia.

## West Virginia Has Standing Based On Its Special Solicitude

54. West Virginia, like other States, is not a "normal litigant[] for purposes of invoking federal jurisdiction," *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007), but is instead entitled to "special solicitude" in the standing analysis.

55. States, including West Virginia, cannot legislate or regulate immigration. *See Arizona v. United States*, 567 U.S. 387, 401 (2012).

56. Because of the federal government's monopoly on legislating and regulating policy and law regarding immigration, West Virginia does not have the ability to control illegal immigration into the State or the control the consequences thereof.

57. Large quantities of fentanyl are smuggled into the country from Mexico, via illegal immigration.

58. This illegal fentanyl injures West Virginia financially, as well as health and wellbeing of West Virginia's residents.

59. The federal government has the statutory obligation to control immigration.

60. The federal government also has the statutory obligation to follow proper regulatory processes, especially the APA.

61. The State has a quasi-sovereign interest in controlling and protecting its state finances and its citizens' health and safety. "The police power of a state is an attribute of sovereignty, co-extensive therewith" and [w]ithin constitutional limits, the police power may be exercised to promote the safety, health, morals, and general welfare of society." *Hinebaugh v. James*, 119 W. Va. 162, 192 S.E. 177, 178 (1937).

62. The federal government's failure to properly control immigration and properly follow the APA damages the State's interest in protecting its own residents, its obligation to protect them, and its interest in its own financial wellbeing.

63. West Virginia is entitled to the same 'special solicitude' as was Massachusetts and therefore is entitled to standing to pursue the federal government's violation of the APA. *See also Texas v. Biden*, 2021 WL 5882670 at *25.

## FACTUAL ALLEGATIONS

### The Purpose of DHS and ICE

64. The statutory authority and mission of DHS, as set forth in 6 U.S.C.A. §111, focuses almost exclusively on protecting the homeland. That statute further provides that DHS will "monitor connections between illegal drug trafficking and terrorism, coordinate efforts to sever such connections, and otherwise contribute to efforts to interdict illegal drug trafficking." 6 U.S.C. §111(b)(1)(H).

65. The mission statement of the U.S. Immigration and Customs Enforcement ("ICE") (part of DHS) "is to protect America from the cross-border crime and illegal immigration that threaten national security and public safety. This mission is executed through the enforcement of more than 400 federal statutes and focuses on immigration enforcement and combating transnational crime." ICE's Mission, https://www.ice.gov/mission (last visited Dec. 20, 2021).

### The Migrant Protection Protocols Effectively Implemented These Purposes

66. The purpose of MPP was to confront the border crisis of illegal migration and reduce the rate of illegal crossings which in turn would reduce the amount of drug smuggling across the border.

67. On December 20, 2018, DHS announced MPP with the goal of freeing up "[p]recious

border security personnel and resources . . . to focus on protecting our territory[.]"[24]

68. The DHS elaborated on the purpose of MPP on Jan 25, 2019. In a section titled "Why is the DHS Instituting MPP?," the DHS stated "[h]uman smugglers and traffickers exploit migrants and seek to turn human misery into profit.  Transnational criminal organizations and gangs are also deliberately exploiting the situation to bring drugs, violence, and illicit goods into American communities."  The DHS went on to state one of the anticipated benefits of MPP was "migrants with non-meritorious or even fraudulent claims will no longer have an incentive for making the journey" to the U.S. [25]

## Mexican Fentanyl is Killing West Virginians

69. West Virginia has battled an opioid epidemic within the state for many years.

70. The CDC determined West Virginia had the highest rate of drug overdose deaths in the nation in 2014.[26]  West Virginia continued to have the highest drug overdose death rate from 2015 to 2019.[27]

71. In recent years, fentanyl has become the deadliest drug in the State of West Virginia.  In 2020, 74.5% of all drug-related deaths in West Virginia were connected with fentanyl. Further, fentanyl-related deaths in 2020 had increased by 700% over fentanyl-related deaths in 2015.[28]

72. Fentanyl is about 100 times more potent than morphine.  A lethal dose of fentanyl can be as small as two milligrams depending on the person's body size, tolerance, and past usage.  That means one kilogram (equivalent to 2.2 pounds) of fentanyl contains up to 500,000 potentially lethal

---

[24] *See supra* note 1.
[25] DHS, *Migrant Protection Protocols* (Jan 25, 2019), https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols#.
[26] Rose Rudd et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, (Jan. 1, 2016), www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm.
[27] CDC, *Drug Overdose Mortality Rate by State*, (Feb. 12, 2021), www.cdc.gov/nchs/pressroom/sosmap/drug_poisoning_mortality/drug_poisoning.htm.
[28] *See supra* note 8.

doses.[29]

73. Drug trafficking organizations have a tremendous motivation to produce and traffic fentanyl. Due to the potency of fentanyl, drug traffickers can bring in massive profits from relatively small amounts.

74. According to the DEA's 2017 Drug Threat Assessment, one kilogram of pure fentanyl can result in revenues of $1.28 million to $1.92 million, as compared to only $80,000 in revenue for one kilogram of heroin.[30]

75. This results from the potency of pure fentanyl, as one kilogram of pure fentanyl can be diluted to generate 16 to 24 kilograms of product, each of which is equivalent in value to one kilogram of heroin. *Id.*

76. Upon information and belief, fentanyl smuggled in vehicles at ports of entry into this country are typically already diluted bricks or pressed into pills, given low concern over space and weight.

77. However, a new and pressing threat comes in the form of pure fentanyl carried by individuals, typically in backpacks, across the Southwest border *between* points of entry.

78. A single backpack can easily contain 10 kilograms or more of pure fentanyl, with a street value of nearly $20 million and enough potentially lethal doses to kill 5,000,000 Americans.

79. With industrial-scale illegal fentanyl production now occurring in Mexico, these backpack loads can cost less than $50,000 for drug cartels to produce.[31]

80. Seizure statistics show dramatic increases in fentanyl seizures both at and between points

---

[29] DEA, *Facts about Fentanyl,* www.dea.gov/resources/facts-about-fentanyl (last visited Dec. 20, 2021)
[30] DEA, 2017 National Drug Threat Assessment 62 (Oct. 2017), *available at* https://www.dea.gov/sites/default/files/2018-07/DIR-040-17_2017-NDTA.pdf.
[31] DHS, *U.S. Customs and Border Protection Budget Overview Fiscal Year 2022 Congressional Justification* CBP-3, https://www.dhs.gov/sites/default/files/publications/u.s._customs_and_border_protection_0.pdf (last visited Dec. 20, 2021).

of entry.

81. Importantly, CBP statistics do not adjust for purity of the seized substance, so one pound reported seized between ports of entry of pure fentanyl can be equivalent to nearly 25 pounds of diluted fentanyl bricks or fentanyl pills reported as seized at a port of entry.

82. The threat of fentanyl backpacked between ports of entry is not hypothetical.

83. For example, on December 19, 2020, CBP's Integrated Fixed Tower system detected "three subjects traveling northbound from a drainage gate along the International Boundary Fence . . . between the United States and Mexico."  Criminal Complaint, *U.S. v. Morales Rodriguez*, No. 21-941 (D. Ariz. Dec. 21, 2020).

84. A Border Patrol Agent was dispatched to intercept them.  *Id.*  As he approached within a half mile of their coordinates, the Integrated Fixed Tower system camera operator observed the three individuals stop walking.  *Id.*

85. The camera operator guided the agent to the location where the three individuals had last been seen.  *Id.*

86. When he arrived, the agent found "three individuals dressed in camouflage clothing," "wearing carpet booties" (used to disguise footprints in the desert) and "attempting to conceal themselves under some brush."  *Id.*

87. The three subjects "then got up and ran in different locations."  *Id.* The agent apprehended one of the individuals and the backpack he was carrying, which contained 14.32 kilograms of methamphetamine.  *Id.*

88. The agent also seized a second backpack that likely had been carried by one of the two individuals that escaped.[32]

---

[32] CBP, *Border Patrol Seizes $3M in Narcotics* (Dec. 21, 2020), *available at* cbp.gov/newsroom/local-media-release/border-patrol-seizes-3m-narcotics.

89. The second backpack contained over 6 kilograms of fentanyl wrapped in cellophane and brown packing tape, along with a large quantity of methamphetamine as well.  *Id.*  The fentanyl alone was worth potentially $1.1 **billion** and is enough to potentially kill as many as 3,000,000 people.

These are the two backpacks seized by the agent that day:[33]



90. It is unknown whether there was a third backpack that got away with the two individuals who were not apprehended.

91. From 2016 to today, DHS and CBP have *targeted* an apprehension rate of "detected illegal entrants" "along the Southwest border between ports of entry" of 81%.  In practice, DHS actually

---

[33] *See supra* note 32.

apprehended 82.7%, 78.9%, 79.7%, 86.3%, and 79.4% of *detected* illegal entrants from Fiscal Year 2016 through Fiscal Year 2020.[34]

92. The 81% target, and these actual apprehension rates achieved in practice, reflect previous experience that hard narcotics trafficking occurred primarily through bulk vehicle shipments at points of entry, as opposed to *between* points of entry.

93. But industrial-scale fentanyl production by Mexican drug cartels and the current dynamics of between-the-ports-of-entry smuggling changes everything.

### The Biden Administration Improperly and Without Analysis Terminated the MPP

94. During his 2020 presidential campaign, then-candidate Joe Biden "vowed to end Trump's restrictive asylum policies, beginning with a program known as 'remain in Mexico.'"[35]   Once elected, the Biden administration had already predetermined that it would terminate the MPP.

95. Indeed, on January 20, 2021, the first day of the Biden administration, without any time for any internal review or analysis of the MPP program, the Acting Secretary of DHS fulfilled President Biden's campaign promise.  He immediately, *that very day,* suspended MPP.[36]

96. Many months after this immediate suspension, DHS subsequently stated on multiple occasions that "[t]he U.S. Government . . . cannot reimplement MPP without the Government of Mexico ("GOM") making an independent decision to accept the return of individuals enrolled in the program."  Reimplementation Guidance at 2;[37] *see also* Explanation Memorandum at 29.

---

[34] *See supra* note 31.

[35] Ted Hesson, *Factbox: Here Are Six Things Joe Biden Will Likely Do On Immigration*, Thomson Reuters, https://www.reuters.com/article/us-usa-immigration-biden-factbox/factbox-here-are-six-things-joe-biden-will-likely-do-on-immigration-idUSKBN27O00R (last visited Dec. 20, 2021).

[36] DHS, *DHS Statement on the Suspension of New Enrollment in the Migrant Protection Protocols Program* (Jan. 21, 2021), *available at* https://www.dhs.gov/news/2021/01/20/dhs-statement-suspension-new-enrollments-migrant-protection-protocols-program.

[37] Memorandum from Robert Silvers, Under Secretary, DHS Off. of Strategy, Pol'y, and Plans, to CBP, ICE, CIS, and Off. of Operations Coordination (Dec. 2, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_1202_plcy_mpp-policy-guidance_508.pdf.

97. Upon information and belief, at the time of the action on January 20, 2021, DHS' Acting Secretary knew of the foregoing issue and, as a logical consequence of this, knew that his "suspension" would effectively terminate the MPP program because the suspension functionally ceased operations consistent with the agreement with the GOM facilitating MPP. Consequently— and as now repeatedly mentioned by DHS—restarting MPP would require the administration to negotiate a new agreement with the GOM.

98. On February 2, 2021, President Biden issued an Executive Order directing the Secretary of DHS "to promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols." Executive Order 14010 of February 2, 2021, § 4(ii)(B), 86 Fed. Reg. 8267, 8269 (Feb. 2, 2021). The President instructed the Secretary to review MPP and take appropriate actions "consistent with public health and safety." *Id.* at § 4(i).

99. Upon information and belief, DHS had improperly predetermined that it would terminate the MPP, regardless of any such review.

100. While the Secretary's review of MPP was underway, the concern of fentanyl coming across the Southwest border was brought directly to the attention of the Secretary by Senator Rick Scott of Florida at the Senate Hearing on Unaccompanied Minors at US-Mexico Border on May 13, 2021.[38]

101. At another hearing on May 26, 2021, after stating that the Secretary was responsible for "opioid and drug interdiction," Senator Shelly Moore Capito of West Virginia, ranking member of the Homeland Security Appropriations Subcommittee, again brought the issue of fentanyl to the attention of the Secretary. Senator Capito informed Secretary Mayorkas "[t]his is a big issue for me. Drugs continue to pour across our border, including record amounts of fentanyl, which are

---

[38] *DHS Actions to Address Unaccompanied Minors at the Southern Border: Hearing Before the Comm. on Homeland Sec. & Gov. Affairs*, 117th Cong. (2021) (statement of Senator Rick Scott).

devastating states like West Virginia and killing a lot of our people."[39]

102. On June 1, 2021, DHS Secretary Alejandro Mayorkas terminated the Migrant Protection Protocols Program, providing some discussion and explanation of the Termination Decision in the June Termination Memorandum.[40]

103. DHS's termination of the MPP was a major change that increased the "pull factor" attracting individuals without a lawful right to enter the United States or a legitimate asylum claim to nonetheless travel to and across the Southern border into this country, requiring the attention and limited resources of the Border Patrol.

104. By thusly burdening and distracting the Border Patrol, the termination of the MPP decreased the security of the border against fentanyl trafficking between ports of entry, leading directly to both increased numbers of smuggling attempts and increased rates of success in evading Border Patrol.

105. The June Termination Memorandum did not acknowledge or discuss how terminating MPP would affect drug trafficking across the border.

106. In an analogous, high-profile case decided just one year before DHS terminated MPP, the Supreme Court held DHS acted arbitrarily and capriciously in terminating the Deferred Action for Childhood Arrivals Program because DHS failed to consider an important aspect of the problem. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020).

107. Despite the alarms raised by Senator Scott and Senator Capito, the prominence of the *Regents* decision, and the President's instructions in his Executive Order to consider public health and safety (the "EO Health and Safety Directive"), DHS failed to consider fentanyl drug trafficking

---

[39] *Hearing on The FY 2022 Dept. of Homeland Sec. Budget Before the Subcomm. On Homeland Sec.* 117th Cong. (2021) (statement by Senator Shelley Moore Capito).
[40] *See supra* note 2.

in the Termination Decision and the June Termination Memorandum.

108. West Virginia Attorney General Patrick Morrisey objected to this failure in a letter to the Secretary on June 7, 2020.  *See* Morrisey Letter.  Attorney General Morrisey's letter informed the Secretary that his "action and accompanying justification memorandum entirely overlook[ed] a critical aspect of a major problem facing our country, the issue of illegal drug trafficking and fentanyl."  *Id.*

109. Meanwhile, the concerns of Attorney General Morrisey and others that the formal termination of MPP would aggravate the fentanyl trafficking problem began to be borne out almost immediately.  Not long after Attorney General Morrisey's letter, Gloria Chavez, Chief Border Patrol Agent for the El Paso Sector, emphasized that "[f]or the first time, we're starting to see these tactics where fentanyl is being smuggled *between* ports of entry"  at that portion of the border.[41]

110. As emphasized in Attorney General Morrisey's letter, "[t]his is a pressing and urgent matter impacting West Virginia and every State suffering from fentanyl abuse and illegal drug trafficking," "[l]ives are being lost every day," and "[t]here is no time for delay."  *See* Morrisey Letter.

111. On August 13, 2021, the Texas court issued an injunction against the enforcement of the decision to terminate the MPP (the "Texas Court Order"), finding it to be, among other things, arbitrary and capricious.[42]

112. After issuance of the Texas Court Order on August 13, 2021, DHS had to either abandon its termination of the MPP or it had to take one of two actions:

    a.  Give a fuller explanation of the Agency's reasoning at the time of the original

---

[41] *See supra* note 22 (emphasis added).
[42] Memorandum Opinion and Order, Texas v. Biden, No. 2:21-CV-067-Z (N.D. Texas Aug. 13, 2021), ECF No. 94, 2021 WL 3603341.

agency action; or

    b.  Take new agency action, which means full compliance with relevant sections of the APA and engaging in *new* reasoned decision making without a pre-determined outcome.  The agency is "bound to deal with the problem afresh, performing the function delegated to it by Congress." *Sec. & Exch. Comm'n v. Chenery Corp*., 332 U.S. 194, 201, 67 S. Ct. 1575, 1579, 91 L. Ed. 1995 (1947); *see also Islander E. Pipeline Co., LLC v. Connecticut Dep't of Env't Prot.*, 482 F.3d 79, 105 (2d Cir. 2006) ("Any effort by the [agency] to pursue a "strategy" to justify a foreordained [conclusion] would be incompatible with a reviewing agency's mandate to use its expertise to come to a reasoned decision supported by substantial evidence. . . .  To the extent some evidence indicates a greater concern with mounting a public relations campaign . . . than with neutrally evaluating the record evidence, that evidence further supports the conclusion that the Denial was arbitrary and capricious.")

113. DHS purported to follow the second option in its October Termination Memorandum, stating that "the Secretary has *considered anew* whether MPP should be maintained, terminated or modified…"  October Termination Memorandum at 2, 4 (emphasis added).

114. However, in what appears to have been a reflection of a predetermined outcome, DHS announced its decision to terminate MPP well before it published new memoranda on October 29, 2021, or could have fully completed the analysis purportedly reflected in those documents.

115. Specifically, on September 29, 2021—a full month in advance of its October memoranda—DHS very clearly stated that it *was* going to terminate MPP.[43]

---

[43] *See supra* note 3.

116. This plan and decision was repeated on October 15, 2021, when DHS' twitter feed announced that "DHS will be issuing a memo terminating MPP…"

117. Media reported on this, as well.  For example, on October 19, 2021, Catholic news services reported DHS' predetermined intention to terminate MPP: "On Twitter, DHS said that "separately, as announced previously, DHS also will be issuing a memo terminating MPP[.]"[44]

118. However, DHS could not have completed its "new" analysis by October 15, 2021—let alone September 29, 2021, when its decision was disclosed online—because DHS did not at that time have the data relied upon in the October Termination Memorandum. *See, e.g.,* Explanation Memorandum at 25 ns. 103-106 (referencing data obtained on Oct. 28, 2021).

119. DHS did not consider the impact on U.S. citizens or DHS' core statutory mission cited above to "monitor connections between illegal drug trafficking and terrorism, coordinate efforts to sever such connections, and otherwise contribute to efforts to interdict illegal drug trafficking," or even the EO Health and Safety Directive.

120. In the October Termination Memorandum, DHS spent only one page out of 39 pages addressing the core mission of DHS and ICE (i.e. protecting the homeland) and dismissed all concerns with a wave of the hand and very little hard data.  And the data provided is either misleading or insufficient as it addresses fentanyl and other drug problems.

121. Further, only two sentences in the entire document even mention the deadly fentanyl epidemic:  "Meanwhile, hard narcotics, including cocaine, methamphetamine, heroin, and fentanyl, are historically smuggled through ports of entry and thus have very little connection to MPP's implementation.  Seizure trends for hard drugs at ports of entry have been mixed, with

---

[44] Rhina Guidos, *After Court Order, DHS Officials Aim To Resume 'Remain In Mexico' Policy*, National Catholic Reporter (Oct. 19, 2021), https://www.ncronline.org/news/justice/after-court-order-dhs-officials-aim-resume-remain-mexico-policy.

fentanyl and methamphetamine seizures increasing substantially year on year since FY18, cocaine seizures remaining largely flat, and heroin seizures substantially higher in FY19 and FY21 than in FY18 and FY20."  October Termination Memorandum at 25-26.

122. However, that data as to fentanyl is inaccurate, out of date, or otherwise false.  Fentanyl is now smuggled largely between ports of entry.  *See* ¶¶ 45, 46, 75 and 109.  Further, as alleged in Paragraphs 66-84, even very small amounts of fentanyl smuggled between ports of entry are vastly stronger, more lethal, and much more valuable than copious amounts of marijuana or other narcotics that have typically been smuggled between ports of entry.  The October Termination Memorandum virtually ignores this and the resulting harm to Americans generally and West Virginians specifically.

123. The October Termination Memorandum also dismisses the State's reliance concerns without any discussion or analysis.

124. The States must rely on DHS to protect them from the dangers that DHS and ICE are charged with confronting per their respective mission statements, in particular to enforce immigration law and protect the States from the harmful consequences of illegal immigration.  *See Arizona*, 567 U.S. at 394-400.  With the power to regulate immigration, comes the responsibility to enforce it.  *Id.* at 416.

125. By virtue of the federal government's role and responsibilities vis-à-vis border security and immigration, West Virginia has no option but to rely on the federal government to actually enforce the law.  DHS's mission includes the obligation to "contribute to efforts to interdict illegal drug trafficking," and it failed to do so here to the detriment of West Virginia.

126. Indeed, Attorney General Morrisey explained West Virginia's reliance interest in his June 7 Letter, writing, "[a]s a State, West Virginia must rely on the federal government to secure the

border against this deadly scourge [of fentanyl]."

127. The October Termination Memorandum dismissed this most fundamental reliance interest, even though the illegal drug trafficking across the Southwest border and its obvious real consequences to lives and resources have not slackened but seemingly increased.

128. The October Termination Memorandum justifies its conclusion to terminate MPP not based on the values of DHS' and ICE's missions or harm to the American public and the States, but rather on the MPP program as being difficult to administer, taking away resources from other border control efforts, and presenting an unacceptable risk of harm to anyone remaining in Mexico while their asylum claims were being processed and evaluated.

129. In the event that DHS now claims that the October Termination Memorandum is nothing more than a fuller explanation of its reasoning at the time of the Termination Decision, it is still invalid.

130. As a fuller explanation, DHS is limited to the original rationale and cannot add *post hoc* rationalizations.  "If the October 29 Memoranda are post hoc rationalizations, they are powerless to cure the June 1 Termination Decision's problems." *Texas v. Biden*, No. 21-10806, 2021 WL 5882670, at *17 (5th Cir. Dec. 13, 2021).

## **CAUSES OF ACTION**

## **COUNT I –TERMINATION OF MPP VIOLATED THE APA**

131. Plaintiff realleges, adopts, and incorporates by reference the foregoing paragraphs as though fully set forth herein.

132. The APA requires a court to "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2).

133. Defendants' Termination Decision, as explained by the June Termination Memorandum,

and/or the October 29, 2021, memoranda was arbitrary, capricious, an abuse of discretion.  It failed to consider a critical aspect of discontinuing the MPP: the impact of such a decision on deadly fentanyl trafficking, the consequences and costs of that impact on trafficking, and the ability of DHS to secure the border against that trafficking.

### COUNT II - THE REIMPLEMENTATION MEMORANDUM IS INVALID

134. Plaintiff realleges, adopts, and incorporates by reference the foregoing paragraphs as though fully set forth herein.

135. DHS was to reinstate or re-implement the MPP program per the Texas Court Order.  Over three months later, in December 2021, DHS issued its Reimplementation Guidance.

136. The Reimplementation Guidance purports to comply with the Texas Court Order and to follow U.S. law.  It does neither.  Rather, it seems designed more as an effort to *appear* to restore MPP, while in actuality it does nothing of the sort.

137. The Reimplementation Guidance asserts that DHS will "begin to enroll certain non-citizens into MPP and processing them for return to Mexico."  *See* Reimplementation Guidance at 2.

138. The Reimplementation Guidance adds multiple exceptions that are inconsistent with the law, including broad, undefined and vague exceptions for the following categories that will not be returned to Mexico:

    a.   Those with a known mental or  physical health issue, including a disability or a medical condition related to pregnancy;

    b.   Those with particular vulnerabilities given their advanced age; and

    c.   Those at increased risk of harm in Mexico due their sexual orientation or gender identity.

*See Id.* at 5.

139. While these exemptions are compassionate, the Reimplementation Guidance does not cite any provisions of the U.S. immigration law that would support these exemptions.

140. The Reimplementation Guidance appears to rely heavily on various international conventions and protocols.

141. The Reimplementation Guidance states that the United States will follow Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), which states "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are *substantial grounds* for believing that he would be in danger of being subjected to torture." *See Id.* at 2 (emphasis added).

142. However, the Reimplementation Guidance unlawfully changes this standard.

143. The Reimplementation Guidance requires CBP officials to "proactively ask questions upon initial enrollment to determine whether an individual being considered for enrollment in MPP possesses a fear of return to Mexico." *Id.* at 5.

144. A person answering in the affirmative will be given an interview within 24 hours and "[i]ndividuals who establish that there is a 'reasonable possibility'" "that they will be tortured in Mexico are not subject to MPP and will not be returned to Mexico." The standard of "*reasonable possibility*" is a much lower standard than the more objective CAT standard of "there are *substantial grounds* for believing." The former may only require an individual to assert "I believe it is a reasonable possibility that I will be tortured if I return to Mexico" whereas "substantial grounds for believing" requires that the CBP—not the immigrant—actually believes this based on "substantial grounds."

145. The Reimplementation Guidance also requires CBP to provide "legal resource packets"

26

to MPP enrollees, which, upon information and belief, will provide enrollees with clear direction on how to avoid being returned to Mexico—effectively avoiding the focus of MPP—simply by communicating "I believe there is a reasonable possibility that I will be tortured if I return to Mexico."[45]

146. Similarly, the Reimplementation Guidance misstates and misapplies Article 33 of the 1951 Convention Relating to the Status of Refugees (the "1951 Convention"), which states that: "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Reimplementation Guidance at 2 n.1.

147. This requires a *determination* that the refugee's *life or freedom* would be threatened based on one of *five* categories.

148. The Reimplementation Guidance greatly expands this exception arising from the 1951 Convention.  The Reimplementation Guidance would prevent an individual's return to Mexico (a) not if there is a "determination" of the threat to his "life or freedom," but rather if the individual can just establish "a reasonable possibility," (b) not if there is a "threat" to his life or freedom, but rather if there is a reasonable possibility of "persecution," and finally, (c) not based on just the *five* enumerated grounds, but rather on account of any "*statutorily protected ground*."  These expansions are beyond the authority of DHS.

149. The Reimplementation Guidance fails to address the provisions of the 1951 Convention, Article 32(1) which allows the United States to expel a refugee "on grounds of national security or public order," such as a positive COVID test, mass migration undermining public order,

---

[45] See supra note 6.

trespassing on private property, or other crimes harming others' property or persons.

150. The Reimplementation Guidance fails to provide for informing the refugee of the *duty* that "he conform to [the country's] laws and regulations as well as to measures taken for the maintenance of public order." *See* 1951 Convention, Article 2.

151. The Reimplementation Guidance fails to account for the provisional measures in the 1951 Convention providing for provisional measures "essential to the national security in the case of a particular person, pending a determination by the Contracting State that that person is in fact a refugee and that the continuance of such measures is necessary in his case in the interests of national security," such as the increased influx of lethal dosages of fentanyl. *See* 1951 Convention, Article 9.

152. Keeping all refugees outside the boundaries of the United States pending confirmation that they do not pose a threat at this time of COVID and fatal fentanyl smuggling is a reasonable provisional measure that the Reimplementation Guidance does not consider.

153. The Reimplementation Guidance fails to address the limitation of the number of refugees allowed into the United States as required by 8 U.S.C. § 1157.

154. The Reimplementation Guidance appears to bind the Agency and also notifies third parties—illegal immigrants—of their newly-created rights enunciated in the Reimplementation Guidance.

155. Further, nothing in the Reimplementation Guidance genuinely leaves the agency and its [employees] free to exercise discretion.

156. The Reimplementation Guidance is invalid because it exceeds DHS' authority and otherwise violates 5 U.S.C § 706 and the APA.

## COUNT III – VIOLATION OF 8 U.S.C. SECTION 1225

157. Plaintiff realleges, adopts, and incorporates by reference the foregoing paragraphs as though fully set forth herein.

158. APA prohibits agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A) and (C).

159. Federal law directs the government to detain virtually all aliens applying for admission into the United States.  The government "shall ... detain[]" any alien who is not "clearly and beyond a doubt entitled to be admitted" pending removal proceedings.  8 U.S.C. § 1225(b)(2)(A).  For aliens "arriving on land ... from a foreign territory contiguous to the United States," the government may opt to "return the alien to that territory pending" removal proceedings.  8 U.S.C. § 1225(b)(2)(C).  These provisions give the government an exclusive choice for aliens not "clearly and beyond a doubt entitled to be admitted" who "arriv[e] on land ... from a foreign territory contiguous to the United States": either detain the alien pending removal proceedings, or otherwise return the alien to the country from which he or she arrived pending removal proceedings.

160. Indeed, "Congress expressly authorized the MPP program by [this] statute." *Texas v. Biden*, 2021 WL 5882670, at *3.

161. The government claims that it lacks the capacity to detain the vast majority of the tens of thousands of aliens now arriving on land from Mexico, a foreign territory contiguous to the United States, who are not clearly and beyond a doubt entitled to admission to the United States.

162. Through MPP, the government was capable of addressing this dilemma by electing to return aliens not clearly and beyond a doubt entitled to admission to Mexico pending removal proceedings.  By discontinuing the MPP, DHS has created its own problem, causing it to fail to

meet its statutory obligations to detain or otherwise return aliens pending removal proceedings.

163. Because the government cannot detain many of these aliens, tens of thousands will instead be released into the United States and fail to show up for statutorily required removal proceedings. 83 Fed. Reg. 55,946.

164. This likelihood or near certainty of release incentivizes illegal immigration by allowing aliens to remain in the United States during immigration proceedings even if they do not have a valid asylum claim and, in many instances, never appear for court dates, simply disappearing into the United States—notwithstanding that these aliens have not shown that they are "clearly and beyond a doubt" entitled to enter the country, much less remain in it.

165. The June Termination Memorandum, the October Termination Memorandum, and the Reinstatement Guidance confirm that Defendants will unlawfully fail to detain illegal aliens and unlawfully release illegal aliens into the interior of the United States, notwithstanding Section 1225's directives and the ability to avoid these statutory violations through full reimplementation of MPP.

166. Federal statute allows for the Attorney General to temporarily parole certain aliens "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). DHS cannot use that power to parole aliens *en masse*; that is entirely contrary to the "case-by-case" requirement that Congress embedded in the statute. DHS cannot use this code provision as an exception to its enforcement of Section 1225.

167. Terminating MPP therefore violates 8 U.S.C. § 1225.

## COUNT IV – FAILURE TO TAKE CARE TO ENFORCE THE LAW

168. Plaintiff realleges, adopts, and incorporates by reference the foregoing paragraphs as though fully set forth herein.

169. The Constitution requires the President to "take Care that the Laws be faithfully executed," (the "Take Care Clause"). U.S. CONST. art. II, § 3.

170. DHS and its officers are bound by this directive. *See* U.S. CONST. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President).

171. DHS' suspension, discontinuation, or evasion of the MPP violates the Take Care Clause. It does this by (a) violating a statutory framework obligating DHS to detain or otherwise return aliens, and (b) predictably allowing (and encouraging) more aliens to illegally enter into the United States.  This then results in more aliens violating immigration law requirements once released into the interior without first going through the statutory methodology for qualifying refugees before such release.

172. "The duty to execute the laws faithfully means that the President may not—whether by revocation, suspension, dispensation, inaction, or otherwise—fail to honor and enforce statutes to which he or his predecessors have assented, or which may have been enacted over his objection." Christopher N. May, *Presidential Defiance of "Unconstitutional" Laws: Reviving the Royal Prerogative*, 21 Hastings Const. L.Q. 865, 873-74 (1994).

173. U.S. immigration law requires that the government detain any alien who is not "clearly and beyond a doubt entitled to be admitted" pending removal proceedings, 8 U.S.C. § 1225(b)(2)(A), or, alternatively for aliens "arriving on land ... from a foreign territory contiguous to the United States," optionally "return the alien to that territory pending" removal proceedings, 8 U.S.C. § 1225(b)(2)(C).

174. The October Termination Memorandum and the Reimplementation Guidance confirm that Defendants will unlawfully prioritize alternatives to detention, unlawfully fail to detain illegal immigrants, and unlawfully release illegal aliens into the interior of the United States,

notwithstanding the directives in Section 1225(b)(2)(C) and the ability to avoid these statutory violations through MPP.

175. Unconstitutional agency action or inaction violates the APA.  *See* 5 U.S.C. § 706.

176. This constitutional violation is also actionable independent of the APA.  Federal courts have long exercised the power to enjoin federal officers from violating the Constitution, pursuant to their inherent equitable powers. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England").

## PRAYER FOR RELIEF

**WHEREFORE**, the State of West Virginia respectfully requests that the Court:

A.  Declare that the termination of MPP violates 5 U.S.C. § 706, because, among other things, it is (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; and (c) in excess of statutory jurisdiction, authority, limitations, or short of statutory right and violates 8 U.S.C. § 1225;

B.  Declare that the Reimplementation Guidance violates 5 U.S.C. § 706 because, among other things, it  is (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; and (c) in excess of statutory jurisdiction, authority, limitations, or short of statutory right and violates 8 U.S.C. § 1225;

C.  Issue preliminary and permanent injunctive relief against the Termination Decision and all related or consequent memoranda, including but not limited to the June Termination Memorandum and October Termination Memorandum;

D.  Issue preliminary and permanent injunctive relief requiring the Defendants to fully and in good faith implement the MPP, including the removal from its Reimplementation Guidance and

any future guidance those exceptions that are unsupported by U.S. immigration law;

E.  Order the Defendants to take care to follow the law, specifically 8 U.S.C. § 1225.

F.  Award Plaintiff costs and attorneys' fees; and

G.  Grant such other relief as the Court may deem just and proper.


Respectfully submitted,

PATRICK MORRISEY
  *West Virginia Attorney General*

/s/ *Curtis R.A. Capehart*

Douglas P. Buffington II (WV Bar # 8157)
  *Chief Deputy Attorney General*
Brent Wolfingbarger (WV Bar # 6402)
  *Senior Deputy Attorney General*
Curtis R.A. Capehart (WV Bar # 9876)
  *Deputy Attorney General*
OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
State Capitol
Building 1, Room E-26
Charleston, WV 25305-0220
Telephone: (304) 558-2021
Facsimile: (304) 558-0140
Email: Curtis.R.A.Capehart@wvago.gov

*Counsel for Plaintiff, STATE OF WEST VIRGINIA*

DATE: December 22, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS DIVISION

**STATE OF WEST VIRGINIA**,

    Plaintiff,

           v.

**UNITED STATES DEPARTMENT OF
HOMELAND SECURITY;** and

**ALEJANDRO MAYORKAS**, in his official
capacity as the Secretary of the United States
Department of Homeland Security,

    Defendants.

Case No. 2:21-CV-22

(Judge Kleeh)

### CERTIFICATE OF SERVICE

I hereby certify that, on this 22nd day of December 2021, I electronically filed the foregoing "*Amended Complaint*" with the Clerk of Court and all parties using the CM/ECF System.

/s/ Curtis R. A. Capehart
Douglas P. Buffington II (WV Bar # 8157)
  *Chief Deputy Attorney General*
Brent Wolfingbarger (WV Bar # 6402)
  *Senior Deputy Attorney General*
Curtis R.A. Capehart (WV Bar # 9876)
  *Deputy Attorney General*
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305-0220
Email: Curtis.R.A.Capehart@wvago.gov
Telephone: (304) 558-2021
Facsimile: (304) 558-0140

*Counsel for Plaintiff, STATE OF WEST VIRGINIA*