**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS DIVISION**

| | |
|---|---|
| **STATE OF WEST VIRGINIA**, | |
| Plaintiff, | |
| v. | Case No. 2:21-cv-22 |
| **UNITED STATES DEPARTMENT OF HOMELAND SECURITY**, and | (Judge Kleeh) |
| **ALEJANDRO MAYORKAS**, in his official capacity as the Secretary of the United States Department of Homeland Security | |
| Defendants. | |

**MEMORANDUM OF LAW SUPPORTING
MOTION TO HOLD UNLAWFUL AND SET ASIDE AGENCY ACTION
AND FOR PRELIMINARY INJUNCTION**

In support of its Motion to Hold Unlawful and Set Aside Agency Action and for Preliminary Injunction, the State of West Virginia states as follows.

## INTRODUCTION

This case is about whether the Department of Homeland Security (DHS) can terminate a successful deterrent to illegal migration across the United States' southwestern border with scant regard to a national crisis inextricably tied to cross-border activity: illegal fentanyl trafficking. In early 2019, DHS announced the implementation of the Migrant Protection Protocols (MPP), which required certain migrants to remain in Mexico during their immigration proceedings. MPP was a critical component of a successful strategy to alleviate an illegal migration crisis, thus allowing DHS to dedicate more personnel to fulfill its other statutory missions, such as combating drug trafficking.

Yet, on January 20, 2021, DHS suspended MPP without explanation.  The southwestern border quickly precipitated into crisis.  Illegal migration reached record levels, and border personnel were overwhelmed carrying out DHS's humanitarian and law enforcement mission of processing migrants.  Meanwhile, the illegal fentanyl trafficking trade of the Mexican drug cartels flourished.  Even though DHS had fewer personnel fighting drug trafficking, fentanyl seizures soared.  So too did fentanyl overdose deaths throughout the country.  Nevertheless, when DHS provided its explanation for officially terminating MPP on October 29, 2021, it ignored the crisis at the border that followed its suspension decision, used misleading or outdated data to disavow any connection between cross-border traffic and fentanyl, and failed to account for any reliance interests of the States and the citizens in better policing of drug trafficking at the border.  For these reasons, the court should find that DHS's termination of MPP was arbitrary and capricious, vacate it, and preliminarily enjoin DHS to engage in a good-faith effort to re-implement MPP or similar program.[1]

## BACKGROUND

### I.  The opioid epidemic and fentanyl

The United States is facing a national crisis fueled by the illegal trafficking of fentanyl across the nation's southwestern border with Mexico.  In February 2022, the Commission on Combating Synthetic Opioid Trafficking ("Opioid Commission") summarized the current opioid epidemic and its "primary driver," fentanyl, as "a slow-motion weapon of mass destruction":

> Cumulatively since 1999, drug overdoses have killed approximately 1 million Americans.  That number exceeds the number of U.S. service members who have died in battle in all wars fought by the

---

[1] On December 15, 2022, the Northern District of Texas entered an order postponing DHS's termination of MPP.  *See* Op. & Order, Texas v. Biden, No. 2:21-cv-067-Z (N.D. Tex. Dec. 15, 2022), ECF No. 178.  That order should not interfere with this court's consideration of the State's motion because issues presented to the Northern District of Texas are different than those before this court.  *See id.* at 7.

United States.  Even worse is that the United States has never experienced the level of drug overdose fatalities seen right now.  In just the 12 months between June 2020 and May 2021, more than 100,000 Americans died from drug overdose—more than twice the number of U.S. traffic fatalities or gun-violence deaths during that period.  Some two-thirds of these deaths—about 170 fatalities each day, primarily among those ages 18 to 45—involved synthetic opioids.  The primary driver of the opioid epidemic today is illicit fentanyl . . . .

Comm'n on Combating Synthetic Opioid Trafficking, *Final Report*, at ix (Feb. 2022) (hereinafter

"*Opioid Comm'n Final Report*") (footnotes omitted), https://tinyurl.com/3ctjx3b2.[2]

"Fentanyl is a potent synthetic opioid drug" that is "approximately 100 times more potent

than morphine and 50 times more potent than heroin."  DEA, *Drug Fact Sheet: Fentanyl* (Apr.

2020), https://tinyurl.com/jjfhkb6n.  That means fentanyl is also much more lethal: as little as 2

milligrams can deliver a fatal dose.  *Opioid Comm'n Final Report*, *supra*, 3 n.†.  For perspective,

"[o]ne kilogram of fentanyl has the potential to kill 500,000 people."  *Facts about Fentanyl*, DEA,

https://tinyurl.com/3mvf24jd (last visited Mar. 10, 2023); *see also* Cassidy Morrison, *Rising*

*fentanyl seizures signal overdose crisis is worsening*, Wash. Examiner (July 6, 2022, 2:26 p.m.),

https://tinyurl.com/bdfcrhsr (reporting that police seized in one instance "114 pounds of the

[fentanyl] in 48 1-kilo bricks," which is "enough fentanyl to kill nearly 26 million people").

The toxic mixture of fentanyl's potency and the ease with which it can be produced,

concealed, and distributed has led to the drug's rapid ascendancy to the top of the United States'

illegal drug markets.  *See Opioid Comm'n Final Report*, *supra*, 1–3; *see also id.* at 20 tbl. 4.1

(summarizing advantages of fentanyl over heroin to drug traffickers).  Fentanyl is cheaper to make

---

[2] The Opioid Commission was "established under Section 7221 of the National Defense Authorization Act for Fiscal Year 2020[ and] was charged with examining aspects of the synthetic opioid threat to the United States."  *Opioid Comm'n Final Report*, *supra*, at iii.  The Opioid Commission was composed of bipartisan members of Congress, executive branch officials, and private sector researchers. *Id.*

than traditional opioids like heroin.  It requires less labor, less space (making laboratories and other facilities easier to hide), and less precursor substances.  *Id.* at 19, 24.  Fentanyl's potency allows smaller volumes to meet demand, making fentanyl easier to smuggle and distribute.  *Id.* at 22.  And fentanyl is frequently sold laced into other drugs or diluents in various forms, such as counterfeit pills or tablets that look like candy, allowing for easier concealment.  *Id.* at ix–x, 3, 25; Press Release, DEA Warns of Brightly-Colored Fentanyl Used to Target Young Americans (Aug. 30, 2022), https://tinyurl.com/ys59rwd5.  Drug traffickers and dealers often surreptitiously lace those pills and tablets with fentanyl to inflict addiction on unwary drug users to increase demand.  *See* Grace Reader, *'My son did not want to die': How (and why) fentanyl is ending up in pills*, KXAN News (May 12, 2022, 4:55 p.m.), https://tinyurl.com/bdd8kdbe.  In short, synthetic opioids like fentanyl are far more profitable to drug traffickers than traditional opioids like heroin and prescription pain medication.  *Opioid Comm'n Final Report*, *supra*, at xi–xiii; *see also* Caroline MacGregor, *Fentanyl Used to Drive Addiction In W.Va.: Youth Increasingly Targeted*, W. Va. Public Broad. (Sept. 27, 2022, 10:55 a.m.), https://tinyurl.com/da6vvm48 (reporting that "a kilogram of fentanyl can be turned into 500 thousand pills with a profit of $1.5 million" while "a kilogram of heroin is worth around $65,000").

Synthetic opioid deaths in the United States "started to grow dramatically around 2014" and "have continued to rise almost unimpeded."  Comm'n on Combating Synthetic Opioid Trafficking, *Technical Appendixes*, at B-3 to -4 (Feb. 2022) (hereinafter "*Opioid Comm'n Final Report Appendixes*"), https://tinyurl.com/57y5atr6; *see also Opioid Comm'n Final Report*, at 13–14.  In 2021, about 107,573 Americans died of a drug overdose.  *Provisional Drug Overdose Death Counts Dashboard*, CDC, https://tinyurl.com/3z3t74ny (last visited Mar. 10, 2023) (this website is best viewed in Microsoft Edge web browser; select "12 Month-ending Provisional Counts and

Percent Change of Drug Overdose Deaths" from "Options" dropdown menu, and click "Update Dashboard"). Synthetic opioids like fentanyl accounted for about 71,143, or about two-thirds, of those fatal overdoses. *Id.* (this website is best viewed in Microsoft Edge web browser; select "12 Month-ending Provisional Number of Drug Overdose Deaths by Drug or Drug Class" from "Options" dropdown menu, click "Update Dashboard," and check "Synthetic opioids" from "Select drug class" dropdown menu). Both figures are substantial increases over 2020. *Id.* Seizures of fentanyl have substantially increased over the same timeframe. *Drug Seizure Statistics*, U.S. Customs & Border Protection, https://tinyurl.com/kbft2jzt (last visited Mar. 10, 2023) (check "Fentanyl" from "Drug Type" dropdown menu).

The societal cost of the fentanyl crisis is immense. Fentanyl is now the leading cause of death in the United States for adults ages 18 through 45. *Opioid Comm'n Final Report*, *supra*, at 1. The Opioid Commission "estimate[d] that drug overdoses are now costing the United States approximately $1 trillion annually." *Opioid Comm'n Final Report*, *supra*, at ix; *see also id.* at 1 (explaining that "[t]his staggering amount derives predominantly from lost productivity (the result of early death) and from increases in health care and criminal justice costs"); *Opioid Comm'n Final Report Appendixes*, *supra*, at B-8 ("The vast majority of [the cost of the overdose crisis is] attributed to lost productivity due to premature death in those ages 25 to 55, the most economically active and productive age range."). The human cost—individual suffering, loss of agency, broken families—is incalculable but undeniably enormous and irreparable. Recognizing the crisis, "[t]he President declared the illicit drug trade a national emergency in a December 15, 2021, executive order." *Opioid Comm'n Final Report*, *supra*, at ix. Likewise, "the [Opioid] Commission finds the trafficking of synthetic drugs," most prominently fentanyl, "to be not just a public health

emergency but a national emergency that threatens both the national security and economic well-being of the country." *Id.*

Against this backdrop, West Virginia tragically stands out. *See Opioid Comm'n Final Report Appendixes*, *supra*, at B-61 fig.B.32 (rate of heroin and synthetic opioid observations by state), B-62 fig.B.33 (rate of heroin and synthetic opioid seizures by state among those most affected). West Virginia had the highest drug overdose mortality rate in the nation from at least 2014 through 2020. *Drug Overdose Mortality by State*, CDC, https://tinyurl.com/67p5zpdp (last visited Mar. 10, 2023). In 2021, 1,507 West Virginias died of a drug overdose. *Data Dashboard*, W. Va. DHHR, https://tinyurl.com/bdz4v8x8 (last visited Mar. 10, 2023) (select "Historical Overdose Fatality Data," and check "2021" under "Select a Year" dropdown menu).[3]  Fentanyl caused 1,134 of those deaths. *Id.*  In terms of dollars, it stands to reason that in 2021 alone, deaths caused by fentanyl cost West Virginia up to $16 billion, or nearly $9,000 per capita.[4]

The human cost of fentanyl addiction and death cannot be reduced to a dollar figure. For example, at the end of 2021, there were 6,644 West Virginia children in foster care. *Foster Care Placements Report*, W. Va. DHHR, https://bit.ly/3ZEkjWg  (last visited Mar. 10, 2023). Although statistics on fentanyl usage resulting in placement in foster care are not available, it is safe to

---

[3] At the time of writing, the W. Va. DHHR Office of Drug Control Policy's Data Dashboard suggests that data are subject to change.

[4] The $16 billion figure was calculated by dividing the total estimated cost ($1 trillion) by the reported number of synthetic opioid deaths for 2021 nationwide (71,074), multiplied by fentanyl deaths for 2021 in West Virginia (1,134). The $9,000 figure was calculated by dividing that product by West Virginia's approximate 2021 population (1,782,959). *See QuickFacts: West Virginia Population Estimates, July 1, 2021*, U.S. Census Bureau, https://tinyurl.com/2s6j3ead. An April 16, 2021, study published in the Center for Disease Control and Prevention's Morbidity and Mortality Weekly Report used similar methodology to estimate that per capita cost of fatal fentanyl overdose to West Virginia in 2017, when fentanyl-related deaths were lower, was $5,298. *See* Feijun Luo et al., *State-Level Economic Costs of Opioid Use Disorder and Fatal Opioid Overdose—United States, 2017*, 70 Morbidity & Mortality Wkly. Rep. 541, 541–46 (2021), https://tinyurl.com/2mzvd92j. In any event, the cost to West Virginia is doubtlessly substantial.

conclude that fentanyl abuse bears a substantial relationship to the number of children in foster care. Moreover, a 2018 study showed that, in 2017, West Virginia's "annual incidence rate of [neonatal abstinence syndrome] was 51.3 per 1000 live births." Amna Umer et al., *Capturing the statewide incidence of neonatal abstinence syndrome in real time: the West Virginia experience*, 85 Pediatric Rsrch. 607, 607 (2019), https://tinyurl.com/mr3z5xzm. "[Neonatal abstinence syndrome] is a group of conditions that can occur when newborns withdraw from certain substances, including opioids [like fentanyl], that they were exposed to before birth." *About Opioid Use During Pregnancy*, CDC, https://tinyurl.com/ye62we9e (last visited Mar. 10, 2023). Among other things, neonatal abstinence syndrome can contribute to poor fetal growth, birth defects, and premature birth. *Id.* Updated statistics are unavailable, but again, fentanyl is doubtlessly a substantial cause of neonatal abstinence syndrome in West Virginia.

## II.     Fentanyl and the southwestern border

The fentanyl crisis and the United States' southwestern border with Mexico are inextricably linked. Mexican cartels are the principal suppliers of fentanyl in the United States, and they traffic fentanyl into the country "primarily across the southwestern border" with Mexico. *Opioid Comm'n Final Report*, *supra*, at 5; *see also id.* at xi, 8–9. After crossing the border, fentanyl is distributed throughout the country, including into West Virginia. One publication found that fentanyl smuggled from Mexico is commonly transported to "Chicago and then spreads to cities like Toledo, Columbus, Cincinnati, and south to West Virginia." Steven Dudley et al., Wilson Ctr.: Mex. Inst. & InSight Crime, *Mexico's Role in the Deadly Rise of Fentanyl* 31–32 (Feb. 2019), https://tinyurl.com/3cfvubpz.

Cross-border trafficking is divided into two categories based on location: at ports of entry and between ports of entry. *See Opioid Comm'n Final Report Appendixes*, *supra*, at C-19. A port of entry (POE) is a designated place where goods and individuals may lawfully enter the country

through a checkpoint. *See Port of Entry*, Merriam-Webster, *available at* https://tinyurl.com/3fzazhux. According to the Drug Enforcement Agency, drug traffickers "most common[ly]" smuggle drugs "through land POEs in passenger vehicles with concealed compartments or commingled with legitimate goods on tractor trailers." *Opioid Comm'n Final Report Appendixes*, *supra*, at G-22. Fentanyl seizures at POEs have substantially increased every fiscal year since at least FY2019. *Drug Seizure Statistics*, *supra* (check "Office of Field Operations" from "Component" dropdown menu).[5]

The area between POEs includes the remainder of the United States' 1,954-mile land border with Mexico. Drug traffickers use persons, including illegal migrants, crossing into the United States between POEs by foot to smuggle drugs into the country. Andrew R. Arthur, *NPR Can't Figure Out Link Between Illicit Drugs and Illegal Migrant Tsunami*, Ctr. for Immigr. Stud. (Aug. 23, 2022), https://tinyurl.com/y62yr9h9 (collecting reports discussing use of persons crossing border to smuggle drugs). Reports indicate that this practice is increasing. *Id.* Indeed, fentanyl seizures by U.S. Border Patrol between POEs have risen every fiscal year since at least FY2019. *Drug Seizure Statistics*, *supra* (check "U.S. Border Patrol" from "Component" dropdown menu).

### III. Border crisis and the Migrant Protection Protocols

Congress has charged the Department of Homeland Security (DHS) with primary responsibility for administering and enforcing the nation's laws related to its international borders. *See* 6 U.S.C.A. § 111(b)(1); 8 U.S.C.A. § 1103(a)(1)(5). Under DHS is U.S. Customs and Border Protection, an agency tasked with policing illegal border crossings and drug trafficking. 6 U.S.C.A. § 211(c). The Office of Field Operations is a sub-agency charged with policing border

---

[5] As shown below, the Office of Field Operations is the federal law enforcement agency tasked with securing the United States' borders at POEs, while U.S. Border Patrol is tasked with securing the borders between POEs.

crossings and drug trafficking at POEs, *id.* § 211(g)(3), while U.S. Border Patrol is a sub-agency charged with the same responsibilities between POEs, *id.* § 211(e)(3).  The relationship between those core functions—policing illegal border crossings and drug trafficking—is well-established.  "The more migrants overwhelm the system, the more this distracts from the task of cracking down on drugs."  *Joe Biden faces a humanitarian crisis at the southern border*, Economist (Mar. 18, 2021), https://tinyurl.com/3u4547x2.

In 2018, the United States faced a crisis at its southwest border with Mexico.  Federal officials were encountering on average about 2,000 inadmissible persons per day, mostly between POEs, and faced large caravans of thousands more on the way.  Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934, 55,935 (Nov. 9, 2018).  And the crisis was compounded by a new phenomenon: a large increase in the percentage of people asserting an intent to apply for asylum in the United States.  *Id.*  A person applying for asylum would be referred for proceedings in immigration court.  *Id.*  Once in the United States, however, "significant" numbers of those asylum-seekers never followed through on their legal asylum claim and only few who did complete the legal process were found to have a meritorious claim.  *Id.*  The strain on the country's immigration system had become overwhelming.  *Id.*; *see also Migrant Protection Protocols*, DHS (Jan. 24, 2019), https://tinyurl.com/yc6tf3xy.[6]  Worse still, drug traffickers were exploiting the crisis to smuggle drugs into the country.  83 Fed. Reg. at 55,935

In response, on January 24, 2019, DHS announced the implementation of the Migrant Protection Protocols (MPP).  *Migrant Protection Protocols, supra.*  Under MPP, "certain foreign

---

[6] For additional discussion on the southwestern border crisis the United States faced in 2018, see the Declaration of Wyatt Suling, filed June 8, 2021, in a civil action in the Northern District of Texas, *Texas v. Biden*, No. 2:21-cv-00067-Z.

individuals entering or seeking admission to the U.S. from Mexico—illegally or without proper documentation—may be returned to Mexico and wait outside of the U.S. for the duration of their immigration proceedings." *Id.* MPP's goal was to "provide a safer and more orderly process that will discourage individuals from attempting illegal entry and making false claims to stay in the U.S." *Id.* That would in turn "free[] up personnel and resources to better protect our sovereignty and the rule of law" and "more effectively assist legitimate asylum-seekers." *Id.*

## IV. Termination of the Migrant Protection Protocols and resurgence of the border crisis

MPP was a success. DHS assessed that apprehensions fell 65 percent from a peak in May 2019 through September 2019. DHS, *Assessment of the Migrant Protection Protocols (MPP)* 2 (Oct. 28, 2019), https://tinyurl.com/yeyus2bd. Individuals processed under MPP could "be granted relief or protection within months, rather than remaining in limbo for years." *Id.* Mark Morgan, Acting Secretary of U.S. Customs and Border Protection from July 5, 2019, to January 20, 2021, concluded that MPP deterred illegal entry into the United States and meritless asylum claims, "shut down the driving force behind the . . . illegal immigration crisis, [and] allowed the government to better focus its resources on individuals who ha[d] legitimate asylum claims." Decl. of Mark Morgan ¶ 24, attached as Ex. 1.[7]

But on January 20, 2021, DHS announced the suspension of MPP without justification (the January Suspension). Press Release, *DHS Statement on the Suspension of New Enrollments in the Migrant Protection Protocols Program* (Jan. 20, 2021), https://tinyurl.com/4w637vet. On October 29, 2021, DHS formally terminated MPP in final agency action, issuing two memoranda, one announcing the decision and the other explaining it (the October 29 Memoranda). Memorandum

---

[7] The Declaration of Mark Morgan was filed June 8, 2021, in the Northern District of Texas, *Texas v. Biden*, No. 2:21-cv-00067-Z.

from Alejandro Mayorkas to Tae Johnson, et al. on the Termination of the Migrant Protection Protocols (Oct. 29, 2021), *available at* https://tinyurl.com/3jrf4fek; DHS, *Explanation of the Decision to Terminate the Migrant Protection Protocols* (Oct. 29, 2021) (hereinafter "*Explanation Memo*"), https://tinyurl.com/vv6rafdt.   Because of legal challenges to DHS's decision, the termination of MPP did not take effect until August 8, 2022.  *Court Ordered Reimplementation of the Migrant Protection Protocols*, DHS (last updated Aug. 8, 2022), https://tinyurl.com/3fmc78yc.[8]

Mr. Morgan states that he and other career officials within U.S. Customs and Border Protection explained to the Biden Transition Team prior to January 20, 2021, "the effectiveness of the MPP program and the border crisis that would occur if it were to be suspended."  Decl. of Mark Morgan ¶ 32; *see also id.* ¶ 31.  Specifically, Mr. Morgan recounts that "Biden transition personnel were specifically warned that the suspension of the MPP, along with other policies, would lead to a resurgence of illegal aliens attempting to illegally enter [across the southwestern border].  They were warned smuggling organizations would exploit the rescission and convince migrants the U.S. borders are open.  They were warned the increased volume was predictable and would overwhelm Border Patrol's capacity and facilities, as well as [Health and Human Services] facilities."  *Id.* ¶ 33.

---

[8] For a procedural history of DHS's termination of MPP and prior legal challenges, *see Biden v. Texas*, 142 S. Ct. 2528 (2022).  DHS initially attempted to terminate MPP in a June 1, 2021, final agency action, but that action was vacated by a district court.  *Id.* at 2536.  While appealing the district court's order, DHS also issued the October 29 Memoranda.  *Id.* at 2537.  The Supreme Court found that the October 29 Memoranda constituted final agency action that superseded, rather than supplemented, the June 1 action.  *Id.* at 2544–45.

In *Biden v. Texas*, the Supreme Court left open the issue of whether the October 29 Memoranda are impermissibly arbitrary and capricious under the Administrative Procedure Act.  *Id.* at 2548 ("On remand, the District Court should consider in the first instance whether the October 29 Memoranda comply with section 706 of the APA.").

And that is precisely what happened after DHS announced the January Suspension.  U.S. Customs and Border Protection data show an overwhelming increase in apprehensions at the southwestern border.  *See Southwest Land Border Encounters*, U.S. Customs & Border Protection, https://tinyurl.com/yc2rccna (last visited Mar. 10, 2023).  Almost immediately, apprehensions far surpassed the crisis levels of 2018 and 2019, and fiscal year 2022 is on pace to shatter the previous record for encounters at the southwestern border.  Callie Patteson, *US shatters record for border stops in single year—despite June drop*, N.Y. Post (July 18, 2022, 9:15 a.m.), https://tinyurl.com/57xe2cbw.  This includes historic levels of encounters at and between POEs. *See Southwest Land Border Encounters*, *supra* (individually check "Office of Field Operations" and "U.S. Border Patrol" under "Component" dropdown menu).

The use of more law enforcement resources—virtually all, by some accounts—to apprehend and process illegal migrants at the southwestern border has predictably led to lax policing of drug trafficking.  Joel Rose, *Border Patrol apprehensions hit a record high. But that's only part of the story*, NPR (Oct. 23, 2021, 7:47 a.m.), https://tinyurl.com/2p8np9ac; Anna Giaritelli, *Border Patrol agents warn of morale collapse amid crisis: 'Downtrodden, almost dead inside'*, Wash. Exam'r (Aug. 22, 2021, 6:01 a.m.), https://tinyurl.com/37vbwzdw.  By comparison, a DHS report concerning the 2018 illegal crossings crisis when apprehensions were much lower found that 40 percent of U.S. Customs and Border Protection officers at the southwestern border were occupied in dealing with the crisis.  Homeland Sec. Advisory Council: CBP Fams. and Child. Care Panel, *Final Emergency Interim Report* 1, 8 (Apr. 16, 2019), https://tinyurl.com/fbdckz5c. That included the necessary reassignment of Office of Field Operations officers from POEs to assist with the processing of migrants.  *Id.* at 8.  The report concluded that U.S. Border patrol "[was] not able to effectively manage its other border security missions," including "monitoring

the border for drug smuggling and other contraband," because of the amount of migration seen in 2018 and 2019. *Id.* at 1. If illegal crossings climbed to higher levels, the report warned that DHS "[would] need to re-assign an increasing number of [officers from POEs] to assist [U.S. Border Patrol] in handing the surge in . . . migration," which would increasingly interfere with security at POEs. *Id.*; *see also id.* at 8, 12 n.14.

Lax security is not lost on the cartels. They are exploiting the crisis, and in some cases manipulating it, to traffic greater amounts of fentanyl into the country. Letter from Rodney S. Scott, Former Chief, U.S. Border Patrol, to United States Congress (Sept. 11, 2021), https://tinyurl.com/2p8rans5; Yami Virgin, *DEA: Drug cartels exploit the migrant surge at the border*, KABB News (Oct. 5, 2021), https://tinyurl.com/bdfzjx8d; Gabe Gutierrez & Al Henkel, *Fentanyl seizures at U.S. southern border rise dramatically*, NBC News (June 29, 2021), https://tinyurl.com/2s3sv9uf; Janet Shamlian, *Fentanyl seizures skyrocket along U.S.-Mexico border*, CBS News (June 9, 2021, 7:59 p.m.), https://tinyurl.com/sha2ch9d. Even with less manpower dedicated to combating drug trafficking, the amount of fentanyl seized at and between POEs since the January Suspension has skyrocketed. *See Drug Seizure Statistics*, *supra*.

On June 7, 2021, the Attorney General of West Virginia, Patrick Morrisey, sent a letter to Secretary Mayorkas explaining that, "[a]s a State, West Virginia must rely on the federal government to secure the border against [fentanyl trafficking]." Letter from Patrick Morrisey, West Virginia Attorney General, to Alejandro Mayorkas, Secretary, DHS 1 (June 7, 2021), attached as Ex. 2. Attorney General Morrisey alerted Secretary Mayorkas "that local law enforcement has seen 'an unbelievable increase in fentanyl' since January of [2021]." *Id.* at 2 (*see Senate Hearing on Unaccompanied Minors at U.S.-Mexico Border*, C-SPAN (May 13, 2021), https://tinyurl.com/2p8swnfc (quoting Sen. Rick Scott)). Attorney General Morrisey emphasized

fentanyl trafficking "is a pressing and urgent matter impacting West Virginia and every State suffering from fentanyl abuse and illegal drug trafficking."  Ex. 2 at 3.

Yet, in the October 29 Memoranda, DHS claimed that it "ha[d] not seen any evidence that MPP had any effect on human trafficking and crime, including drug trafficking."  *Explanation Memo*, *supra*, at 25.  Specifically, DHS claimed that MPP—which DHS "presumed" had a role in decreasing illegal border crossings from crisis levels, *id.* at 23—bore no relationship to fentanyl trafficking:

> [DHS] also has carefully reviewed the available information and has not seen any evidence that MPP had any effect on human trafficking and crime, including drug trafficking.  Seizures of narcotics, while not necessarily indicative of trafficking activity, are nonetheless the best available data, and do not show any impact related to MPP's implementation.  Seizure of narcotics between [POEs] have declined steadily from FY18 to FY21, including a decline of almost 40 percent since the point in time when MPP was fully implemented, through FY21, a time MPP was largely not being implemented.  These declines have been driven by a substantial decrease in marijuana smuggling.  Meanwhile, hard narcotics, including . . . fentanyl, are historically smuggled through [POEs] and thus have very little connection to MPP's implementation.  Seizure trends for hard drugs at [POEs] have been mixed, with fentanyl . . . seizures increasing substantially year on year since FY18 . . . .

*Id.* at 25–26 (footnote omitted).

## DISCUSSION

**I.    The October 29 Memoranda are arbitrary and capricious under the APA and should be set aside**

Section 706 of the Administrative Procedure Act (APA) requires district courts to "hold unlawful and set aside agency action" that is "arbitrary" and "capricious."  5 U.S.C.A. § 706(2)(A).  "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  That is, agency action must reflect "reasoned decisionmaking."  *Michigan v. EPA*, 576 U.S. 743, 750

(2015).  And reasoned decisionmaking is not present when an agency fails to account for "the relevant factors" or exhibits "a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

Although arbitrary-and-capricious review is "deferential," *Prometheus Radio*, 141 S. Ct. at 1158, "it is not toothless," *Ortez-Cruz v. Barr*, 951 F.3d 190, 198 (4th Cir. 2020).  *See also Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 856 (5th Cir. 2022) (stating that after the Supreme Court's decision in *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020), district court review of agency action "has serious bite").  Courts should "engage in a searching and careful inquiry" of whether the agency:

> [r]elied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Mayor of Balt. v. Azar*, 973 F.3d 258, 275 (4th Cir. 2020) (en banc).  In promulgating a rule or enacting a new policy, an agency has the burden to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quotation marks omitted).

### A.  DHS failed to adequately consider its actual experience after suspending the Migrant Protection Protocols

The October 29 Memoranda failed to account for the most relevant factor before it: actual experience at the southwestern border after DHS issued the January Suspension.  If a federal agency is evaluating a policy change, then there should be no better guide than nine months of experience after having provisionally implemented that change.  But at no point do the October 29 Memoranda square with the experience at the southwestern border after the January Suspension.

For example, DHS complained that "[n]ot only has MPP failed to deliver many of its promised benefits, but the burden and attention required to reimplement and maintain MPP will undermine [DHS's] efforts to address irregular migration and achieve lasting reform of the asylum system through other means." *Explanation Memo*, *supra*, at 30. Thus, in terminating MPP, DHS aspired to, among other things, better manage the flow of illegal migration and implement a more orderly asylum process. *See id.* at 30–36.

On those measures, reality after the January Suspension draws DHS's reasoning into serious question as the circumstances on the ground had worsened significantly. Illegal border crossings rapidly reached record levels, and reports and prior experience with crisis-level border encounters indicated that DHS personnel at the border were overwhelmed with migrants and asylum seekers. Additionally, policing of drug trafficking declined, and the cartels exploited the illegal migration crisis to traffic greater amounts of fentanyl into the country.

DHS had all of these data and reports at its disposal but proceeded in the October 29 Memoranda as though it were starting from scratch and without the benefit of the known negative consequences from suspending MPP. The October 29 Memoranda state that DHS "has considered anew whether MPP should be maintained, terminated, or modified." *Explanation Memo*, *supra*, at 4; *see also Biden v. Texas*, 142 S. Ct. at 2544 (finding that the October 29 Memoranda were "new agency action" that "mark[ed] the consummation of the agency's decisionmaking process" and "dealt with the problem afresh" (emphasis and quotation marks omitted) (alteration in original)). But considering the problem anew does not mean writing on a blank slate. Rather, reasoned decisionmaking required DHS to consider "the relevant data" before it. *Mayor of Balt.*, 973 F.3d at 275; *cf. Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) (explaining that "an agency cannot ignore evidence contradicting its position"). Indeed, the Supreme Court

recently admonished DHS for a separate attempt to shift policy without regard to circumstances arising after the policy's implementation.  *See Regents*, 140 S. Ct. at 1915 (stating that DHS was "not writing on a blank slate" when it changed policy).

The most relevant data before DHS was its experience at the border after suspending MPP. DHS's failure to account for that data makes the October 29 Memoranda arbitrary and capricious. *Cf. Wild Va. v. U.S. Forest Serv.*, 24 F.4th 915, 928 (4th Cir. 2022) (faulting agency for "erroneously fail[ing] to account for real-world data" that ran counter to the reasons for its action).

> **B.    DHS failed to adequately consider the relationship between the Migrant Protection Protocols and fentanyl trafficking**

There are multifaceted problems with DHS's conclusion in the October 29 Memoranda that MPP and fentanyl trafficking are unrelated.  *Explanation Memo*, *supra*, at 25–26.  Below are three examples of how the DHS failed to engage in reasoned decisionmaking when analyzing how the October 29 Memoranda would affect fentanyl trafficking at the southwestern border.

*First*, DHS measured trafficking activity through the arbitrarily narrow lens of amounts seized at the border.  In fact, DHS admitted that the amount seized is "not necessarily indicative of trafficking data"—the very problem DHS purported to analyze.  *Id.* at 25.  In other words, DHS concedes the irrelevance of seizure amounts as a measure of aggregate trafficking activity.  That concession alone is enough to conclude that DHS failed to draw a "rational connection between the facts found and the choice made."  *Mayor of Balt.*, 973 F.3d at 275.

The amount of fentanyl seized is a poor indicator of trafficking activity for a number of reasons.  The Opioid Commission explains that "drug seizure data are not random samples," *Opioid Comm'n Final Report Appendixes*, *supra*, at B-25, which is the hallmark of reliability. Instead, the amount seized is "likely to be biased as seizure events are a function of the flows of drugs, the interdiction efforts in any given day, and traffickers' countermeasures."  *Id.*  Further, the

Opioid Commission notes that measuring trafficking by the amount seized is "not well positioned to the synthetic opioid problem" because "the ever-changing nature of chemical variations" and the relatively smaller volume of fentanyl smuggled make fentanyl trafficking more amenable to countermeasures to avoid detection.  *Id.* at B-25 to -26.  DHS's past experience in having to shift personnel and relax trafficking enforcement as it encounters more illegal aliens at the border also suggests that drug seizure data will be less reliable as a reflection of overall activity and trafficking activity will increase.  DHS's sole focus on seizures at the border is therefore unreasonably and inexplicably narrow.

To comply with the APA, DHS was required to account for a variety of other data relevant to trafficking activity at the southwestern border.  For example, overdose rates provide insight about the demand for fentanyl trafficked by the cartels.  Rates of law enforcement and health care response costs are also useful indicators of fentanyl consumption and activity traceable to the border.  Seizure amounts in the interior of the country reflect the amount of fentanyl trafficked across the southwestern border undetected.  Moreover, contemporary statements by DHS personnel and representatives claim that trafficking volumes have increased along with the surge in illegal border crossings.  DHS's failure to consider other data indicative of trafficking activity at the southwestern border arbitrarily limited its ability to truly evaluate the problem of drug trafficking.  *Roe v. Dep't of Def.*, 947 F.3d 207, 220 (4th Cir. 2020) (explaining that an "agency must examine the relevant data" to comply with the APA).  Such a narrow view of the problem prevented it from engaging in the "reasoned decisionmaking" required by the APA.  *Michigan*, 576 U.S. at 750.

*Second*, DHS used outdated information to falsely suggest that fentanyl is not smuggled between POEs.  If an agency chooses to rely on "data [that] are either outdated or inaccurate, it

should, at the very least, analyze the new data or explain why it nevertheless chose to rely on the older data." *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 473 (4th Cir. 2013). Otherwise, the agency will have "fail[ed] to consider important aspects of the issue before the agency" in violation of the APA. *Defenders of Wildlife v. Dep't of the Interior*, 931 F.3d 339, 360 (4th Cir. 2019) (finding agency action violated the APA because it relied upon outdated data). At bottom, "an agency cannot ignore new and better data." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) (emphasis omitted).

The October 29 Memoranda state that "fentanyl[ is] *historically* smuggled through [POEs] and thus ha[s] very little connection to MPP's implementation." *Explanation Memo*, *supra*, at 25 (emphasis added). That may (or may not) have been the case historically; DHS did not show its work on historical fentanyl smuggling. But by the time DHS issued the October 29 Memoranda, data and reports from DHS agencies showed that traffickers were smuggling substantial and increasing amounts of fentanyl between POEs. DHS's failure to consider smuggling between POEs, or to explain why it relied on historical rather than contemporaneous data, shows a "fail[ure] to consider an important aspect of the problem" in violation of the APA's arbitrary-and-capricious requirement. *Mayor of Balt.*, 973 F.3d at 275.

*Third*, and relatedly, DHS masked the seizure of fentanyl between POEs by lumping fentanyl together with all narcotics. In doing so, DHS created a false impression that not only is fentanyl not being smuggled between POEs, but also that the entire problem of drug smuggling between POEs is becoming less severe. But the DHS "cannot simply . . . ignore inconvenient facts." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009); *cf. Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 619 (D.C. Cir. 2017) ("Reliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking."). It

is certainly "an important aspect of the problem" that traffickers are increasingly smuggling fentanyl, the nation's number one overdose killer, between POEs.  *Mayor of Balt.*, 973 F.3d at 275.

**C.**     **DHS failed to adequately consider how terminating the Migrant Protection Protocols would affect its ability to fulfill its statutory duties**

The October 29 Memoranda claim that "fentanyl[ is] historically smuggled through [POEs] and thus ha[s] very little connection to MPP's implementation." *Explanation Memo*, *supra*, at 25. The October 29 Memoranda also "presumed—as is likely—that MPP contributed to a decrease in migration flows."  *Id.* at 23.  It thus appears that DHS also presumed that the rate of illegal border crossings is uncorrelated with the Office of Field Operations' ability to carry out its statutory mandate to police POEs.  *See* 6 U.S.C.A. § 211(g)(3)(C) (providing that it is the duty of the Office of Field Operations to "prevent illicit drugs . . . from entering the United States").  Indeed, in a section titled "Relationship between Implementation of MPP and Statutory Mandates," DHS failed to mention any statutory mandate related to drug trafficking.  *See Explanation Memo*, *supra*, at 26–29.

Contrary to the October 29 Memoranda, experience shows that crisis-level illegal border crossings directly affect the Office of Field Operations' ability to staff POEs and carry out its law enforcement mission.  During the 2018 and 2019 border crisis, Office of Field Operations officers were reassigned from border security to assist with processing individual migrants, and DHS warned that higher rates of border crossings would increasingly hamper the Office of Field Operations' ability to police POEs.  Indeed, in light of the unprecedented increase in encounters at the border after the January Suspension, reports suggest DHS's ability to process migrants has been overrun since at least mid-2021 (i.e. prior to the October 29 Memoranda).

Ultimately, DHS failed to grapple with the principle that, as an institution with finite resources, increasing resources allocated to process illegal border crossers—which was predicted

20

and which DHS experienced following the January Suspension—necessarily means decreasing resources allocated to other functions, like policing for drug trafficking.  The Office of Field Operations is not excepted from that principle.  DHS's "[c]onclusory explanation[] for" why terminating MPP would not affect its ability to police drug trafficking at POEs "do[es] not suffice to meet the deferential standards of [the court's] review."  *Genuine Parts Co.*, 890 F.3d at 312.

### D.     DHS failed to adequately consider the reliance interests that the States, including West Virginia, have in DHS's policing of fentanyl trafficking

"When an agency changes course," like DHS did when it terminated MPP, "it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account."  *Regents*, 140 S. Ct. at 1913 (quotation marks omitted).  "It would be arbitrary and capricious to ignore such matters."  *Id.*

The October 29 Memoranda denied that there were any fentanyl-related reliance interests associated with MPP.  *See Explanation Memo*, *supra*, at 25.  That, as detailed above, is false. Fentanyl is principally trafficked—in greater amounts and with greater ease since DHS suspended MPP—across the southwestern border, causing untold financial cost and human suffering.  As Attorney General Morrisey explained to Secretary Mayorkas, West Virginia is facing a worsening fentanyl crisis, and the States must rely on DHS to enforce the nation's laws at the southwestern border.  Secretary Mayorkas, for his part, did not speak with any state or local official from West Virginia about what the State's reliance interests might be.  *See id.* at 24 (stating that Secretary Mayorkas spoke with only "state and local officials from across the [southwestern border]").  The October 29 Memoranda's "because we said so" approach for discarding West Virginia's fentanyl-related reliance interests is not enough to satisfy the APA.  *Id.*; *see also Texas v. United States*, 40 F.4th 205, 228 (5th Cir. 2022) (per curiam) ("Stating that a factor was considered . . . is not a

substitute for considering it." (alteration in original)).  "It [was] arbitrary and capricious to ignore" fentanyl-related reliance interests associated with MPP. *Regents*, 140 S. Ct. at 1913.

Otherwise, the October 29 Memoranda pay short shrift only to generalized reliance interests of the States, which DHS might contend encompasses those related to fentanyl.  The October 29 Memoranda flatly announce DHS's "judgment" that any cost borne by the States because of its termination of MPP is "marginal," especially in light of DHS's "view that the other policies and initiatives being pursued by this Administration will ultimately yield better outcomes than MPP." *Explanation Memo*, *supra*, at 26.  However, considering only financial impact, fentanyl alone cost West Virginia up to $16 billion in 2021. *See Background Part I*, *supra*.  While it would be unfair to attribute that entire figure to relaxed border security following the January Suspension, it is fair to say that the States have more than just a "marginal" reliance interest in DHS's efforts at policing fentanyl trafficking at its source.  DHS's diminished efforts at the border naturally lead to increased costs borne by the States.  "[A]gainst the weight of all the evidence before it," DHS "cannot simply state it believes"—or simply judges or views—the States' reliance interests and costs to be small or unjustified "without further support." *Mayor of Balt.*, 973 F.3d at 276 (quotation marks omitted).

Additionally, DHS attempts categorically to minimize any reliance interest on MPP's efficacy. *Explanation Memo*, *supra*, at 26.  DHS states it is "unaware of any State that has materially taken any action in reliance on" MPP. *Id.*  That position shows a fundamental misunderstanding of the nature of reliance interests at stake when an agency takes action.  In *Regents*, the Supreme Court described the gamut of reliance interests related to DHS's Deferred Action for Childhood Arrivals (DACA) program, spanning from financial interests to personal hardship to conferred benefits. *See* 140 S. Ct. at 1913–14; *cf. Arizona v. United States*, 567 U.S.

22

387, 397–98 (2012) (explaining some of the myriad ways illegal migration creates consequences borne by the States).  Reliance interests are intrinsically abstract: they must be "legitimate" and "significant."  *Regents*, 140 S. Ct. at 1913, 1915.  The financial and human costs suffered by West Virginia and its citizens from fentanyl trafficking and abuse, as well as resources spent in mitigation efforts, certainly engender legitimate and significant reliance interests in DHS's better policing of the border under MPP.

DHS similarly claims that the States' reliance interests are categorically "undermined" by the "discretionary" nature of MPP.  *Id.*  In *Regents*, however the Supreme Court recognized that DACA was a discretionary program but still faulted DHS for failing to consider reliance interests. *Id.* at 1910, 1913–15.  Additionally, DHS insists that the "small percentage of noncitizens encountered along the [southwestern border] who were enrolled in MPP . . . undercut[s] any claimed reliance interest."  *Explanation Memo*, *supra*, at 26.  But DHS's assertion is itself undercut by the October 29 Memoranda's recognition that MPP was instrumental in deterring migrants from attempting to cross the southwestern border in the first place.  *Id.* at 23.  "It [was] arbitrary and capricious" for DHS "to ignore" West Virginia's reliance interests, and those of the other States, related to decreased border crossings and fentanyl.  *Regents*, 140 S. Ct. at 1913.

## II.   The State of West Virginia is entitled to a preliminary injunction directing DHS to engage in a good-faith effort to re-implement the Migrant Protection Protocols or a similar policy

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 102–03 (4th Cir. 2022).

West Virginia is likely to succeed in showing that the October 29 Memoranda were arbitrary and capricious, as detailed above.  And West Virginia's injuries are irreparable and

ongoing.  West Virginia continually incurs unrecoverable response costs to the fentanyl crisis, and its citizens who fall victim to fentanyl suffer irreparable loss of life, happiness, and productivity, to name but a few.  A preliminary injunction would afford immediate relief.

The balance of the equities tips in West Virginia's favor.  *See Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (stating that balance of the equities is "reached by comparing the relevant harms to the plaintiff and defendant").  Currently, DHS personnel are overwhelmed at the southwestern border.  As DHS has concluded, MPP was a valuable tool to deter migrants from attempting illegally to enter the country.   Re-implementing MPP would have these salutary effects.  That would free up resources that DHS could use to fulfill its other missions, and enforcing immigration law is one of DHS's statutory mandates in the first place.

To be sure, the Supreme Court in *Biden v. Texas* cautioned courts to avoid "the danger of unwarranted judicial interference in the conduct of foreign policy."  142 S. Ct. at 2543.  For that reason, the Supreme Court evaluated as dubious another district court's attempt to enjoin DHS to re-implement MPP.  *Id.*  In doing so, however, the Supreme Court observed that "both countries wish to terminate" MPP.  *Id.*  But as DHS tells it, Mexico merely requested that DHS "implement[] . . . modifications designed to address some of the access-to-counsel, safety, and other humanitarian considerations" implicated by MPP—modifications that DHS planned (under protest) to implement under injunction by the district court.  *Explanation Memo*, *supra*, at 36–37.  Thus, in this case, the risk of the district court making an ill-advised intrusion into foreign policy is lessened because it was evidently DHS's admitted unwillingness to implement humanitarian measures that gave Mexico pause about MPP.  Moreover, unlike the district court in *Biden v. Texas*,

West Virginia is not asking the court to "supervise [DHS's] continuing negotiations with Mexico." 142 S. Ct. at 2543.

Lastly, the public interest would be best served by a preliminary injunction directing DHS to engage in a good-faith effort to re-implement MPP or a similar policy. The public-interest factor asks "whether there are policy considerations that bear on whether the order should issue." Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.4 (3d ed.). The answer to that query is clear and unequivocal. Fentanyl trafficking is a $1 trillion public crisis killing tens of thousands each year and causing untold suffering. The President has recognized it as a national emergency. Fentanyl trafficking only worsened after MPP was discontinued. The public interest certainly weighs in favor of DHS competently and wholeheartedly pursuing its statutory mandate of policing drug trafficking at the southwestern border, and the order requested here would put the agency back on course to do so.

## CONCLUSION

For the foregoing reasons, the State of West Virginia respectfully requests that the court grant the requested relief, specifically, that the court should find that DHS's termination of MPP was arbitrary and capricious, vacate it, and preliminarily enjoin DHS to engage in a good-faith effort to re-implement MPP or similar program.

Respectfully submitted,
STATE OF WEST VIRGINIA

By counsel,
PATRICK MORRISEY
 *ATTORNEY GENERAL*

/s/ *Curtis R. A. Capehart*
Douglas P. Buffington II (WV Bar # 8157)
 *Chief Deputy Attorney General*
Curtis R.A. Capehart (WV Bar # 9876)

*Deputy Attorney General*
OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL
State Capitol Complex
1900 Kanawha Blvd. E, Building 1, Room E-26
Charleston, WV 25305-0220
Telephone: (304) 558-2021
Facsimile: (304) 558-0140
Email:  Curtis.R.A.Capehart@wvago.gov

*Counsel for Plaintiff, STATE OF WEST VIRGINIA*

<u>DATE: March 13, 2023</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS DIVISION

**STATE OF WEST VIRGINIA**,

    Plaintiff,

                v.

**UNITED STATES DEPARTMENT OF
HOMELAND SECURITY;** and

**ALEJANDRO MAYORKAS**, in his official ca-
pacity as the Secretary of the United States De-
partment of Homeland Security,

    Defendants.

Case No. 2:21-CV-22

(Judge Kleeh)

## CERTIFICATE OF SERVICE

I hereby certify that, on this 13th day of March, 2023, I electronically filed the foregoing

"*Memorandum of Law Supporting Motion to Hold Unlawful and Set Aside Agency Action and for*

*Preliminary Injunction*" with the Clerk of Court and all parties using the CM/ECF System.


/s/ *Curtis R. A. Capehart*
Curtis R. A. Capehart
 *Deputy Attorney General*

27