**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS DIVISION**

| | |
|---|---|
| **STATE OF WEST VIRGINIA**, | |
| Plaintiff, | |
| v. | |
| **UNITED STATES DEPARTMENT OF HOMELAND SECURITY;** and | Case No. 2:21-CV-22 |
| | (Judge Kleeh) |
| **ALEJANDRO MAYORKAS**, in his official capacity as the Secretary of the United States Department of Homeland Security | |
| Defendants. | |

## SECOND AMENDED COMPLAINT

Plaintiff, STATE OF WEST VIRGINIA (the "State"), seeks judicial review, pursuant to the Administrative Procedures Act, 5 U.S.C. § 706, (hereinafter "the APA"), of the action by the United States Department of Homeland Security (the "DHS") and Secretary Alejandro Mayorkas (the "Secretary"), in his official capacity, embodied in the October 29, 2021, Memoranda terminating the Migrant Protection Protocols ("MPP") without considering the relevant factors, including, but not limited to, the impact of illegal fentanyl trafficking across the southwest border and states' reliance interests in DHS's policing of fentanyl trafficking, and without showing reasoned analysis regarding the consequences that would likely result from termination of the MPP. This lawsuit also seeks judicial review of the Defendants' termination of the MPP and implementation of the Parole Plus Alternatives to Detention (Parole + ATD) Policy impacting the DHS' mission and ultimate duty to protect the homeland and the residents of the United States and its ability to comply with existing law and its statutory obligations.

1

## I.     NATURE OF ACTION

1. The United States today is suffering from an unprecedented and increasing surge of drug overdose deaths resulting from fentanyl trafficked into this country across the southwest border from Mexico, both at and between ports of entry.

2. Despite the pressing emergency, the DHS suspended and then terminated a critical border security program, the Migrant Protection Protocols ("MPP").  DHS suspended the MPP without considering the relevant factors, including the impact this decision would have on fentanyl trafficking across the southwest border and into the rest of the Country and the ensuing addiction, death, and related consequences, in direct violation of the requirements of the Administrative Procedure Act (the "APA").

3. Additionally, the DHS has been using the Parole + ATD Policy to release aliens *en masse* into the interior of the United States, rather than on a case-by-case basis, in violation of existing law which further results in illegal fentanyl trafficking across the southwest border and into the interior of the United States, including West Virginia.

4. As a direct result, West Virginia is also suffering from an increased surge of fentanyl that was illegally trafficked across the southwest border from Mexico and ultimately entered West Virginia and resulted in overdose deaths to West Virginia residents.

## II.     JURISDICTION AND VENUE

5. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361 because this action arises under the Constitution, 5 U.S.C. §§ 702-703, and laws of the United States.

6. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities, the State of West Virginia is a resident of this judicial district, and no real property is involved in the action.

### III.    PARTIES

7. The State of West Virginia is a sovereign State of the United States of America. Attorney General Morrisey has state constitutional and statutory authority to represent the State in federal court. W. Va. Const. art. VII, § 1; W. Va. Code § 5-3-2; *see also* Syl. Pt. 4, *State ex rel. McGraw v. Burton*, 569 S.E.2d 99 (W. Va. 2002).

8. The Department of Homeland Security is an agency of the United States.

9. Alejandro Mayorkas is Secretary of the Department of Homeland Security and is named as a party in his official capacity.

10. The Secretary of the DHS is statutorily responsible for securing and managing our nation's borders and is empowered to issue regulations necessary to do so.

### IV.    STANDING

**Article III Standing**

11. The State of West Virginia has Article III standing to seek judicial review of the DHS' implementation of the Parole + ATD policy and its October 29, 2021, Memoranda terminating the MPP without considering the relevant factors, including the impact termination of the MPP would have on illegal fentanyl trafficking into the country. *Cf.  Department of Commerce v. New York*, 139 S. Ct. 2551, 2565-2566 (2019).  U.S. Const. art. 3, § 2, cl.1.

12. The State has standing to seek judicial review of DHS' arbitrary and capricious termination of the MPP without considering the relevant factors and that DHS' termination of the MPP was contrary to existing law in violation of the Administrative Procedures Act (APA).  Additionally, West Virginia has standing to seek judicial review of DHS' Parole + ATD Policy that violates § 706(2)(A) and (C) of the APA.

**West Virginia Has Standing Based On Its Special Solicitude**

13. West Virginia further has standing under the special solicitude doctrine because DHS

policies violate the Immigration and Nationalization Act (INA's) detention mandates by releasing non-citizens arriving at the southwest border into the United States *en masse* through non-detention policies, including the Parole + ATD Policy, thereby injuring the State's quasi-sovereign interests in protecting the health and well-being of its own residents from the destructive effects of illegal fentanyl trafficking and in protecting its own financial well-being. *See Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607-608 (1982). These quasi-sovereign interests are "sufficiently concrete to create an actual controversy" between the State and the Defendants.  *Id.* at 602.

14. West Virginia, like other States, is not a normal litigant for purposes of invoking federal jurisdiction, but instead is entitled to special solicitude in the standing analysis.  *See generally, Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007)

15. States, including West Virginia, cannot legislate or regulate immigration.  *See generally*, *Arizona v. United States*, 567 U.S. 387, 401 (2012).

16. Because of the federal government's monopoly on legislating and regulating policy and law regarding immigration, West Virginia does not have the ability to control illegal immigration into the State or the consequences thereof.

17. Large quantities of illegal fentanyl are smuggled into the country from Mexico, via illegal immigration.

18. This illegal fentanyl injures West Virginia financially, as well as the health and wellbeing of West Virginia's residents, thereby vesting the State with standing to represent and defend its residents. *See Missouri v. Illinois*, 180 U.S. 208, 241 (1901) ("it must surely be conceded that, if the health and comfort of the inhabitants of a State are threatened, the State is the proper party to represent and defend them.")

19. The federal government has the Constitutional and statutory obligation to control

immigration.

20. The federal government also has the statutory obligation to follow proper regulatory processes, especially the APA.

21. West Virginia has a quasi-sovereign interest in controlling and protecting its citizens' health and safety and a sovereign interest in protecting its own financial health. "The police power of a state is an attribute of sovereignty, co-extensive therewith and [w]ithin constitutional limits, the police power may be exercised to promote the safety, health, morals, and general welfare of society." *Hinebaugh v. James*, 119 W. Va. 162, 192 S.E. 177, 178 (1937).

22. The federal government's failure to properly control immigration and properly follow the APA damages the State's interests in in protecting the health and well-being of its own residents from the destructive effects of illegal fentanyl trafficking and in protecting its own financial well-being.

23. West Virginia is entitled to the same "special solicitude" as was granted to Massachusetts in *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007). Therefore, West Virginia has standing to pursue the federal government's violation of the APA. *See also Texas v. Biden*, 2021 WL 5882670 at *25.

## V.     FACTUAL BACKGROUND

### The Purpose of DHS and ICE

24. The Supreme Court has recognized that immigration officials have "broad discretion" in carrying out the immigration laws, see *Arizona v. United States*, 567 U.S. 387, 396, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). But that discretion must be exercised within the confines established by Congress because, as the Supreme Court has repeatedly held, Congress—not the President or Executive Branch officials—has the "complete and absolute power" over the subject of immigration and "plenary power" over the admission and exclusion of aliens. *See, e.g.,*

*Kleindienst v. Mandel*, 408 U.S. 753, 766, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) (quoting *Boutilier v. INS*, 387 U.S. 118, 123, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967)); Oceanic *Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 343, 29 S.Ct. 671, 53 L.Ed. 1013 (1909).

25. Congress has charged the DHS with primary responsibility *for administering and enforcing* the nation's laws related to its international borders.  *See* 6 U.S.C. § 111(b)(1); 8 U.S.C. § 1103(a)(1)(5).  (emphasis added)

26. Despite DHS' authority to administer and enforce existing immigration laws, DHS does not have the authority to legislate or make new laws.[1]  Moreover, the APA mandates that, if a reviewing court finds a final agency action "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with existing law" the court shall hold such action as unlawful and set aside, or vacate, that agency action.  *See* 5 U.S.C. § 706(2)(A).

27. The statutory authority and mission of DHS, as set forth in 6 U.S.C.A. §111, focuses almost exclusively on protecting the homeland.  That statute further provides that DHS will "monitor connections between illegal drug trafficking and terrorism, coordinate efforts to sever such connections, and otherwise contribute to efforts to interdict illegal drug trafficking."  6 U.S.C. §111(b)(1)(H).

28. Under DHS is U.S. Customs and Border Protection ("CBP"), an agency tasked with policing illegal border crossings and drug trafficking.  6 U.S.C.A. § 211(c).  Within CBP is the Office of Field Operations ("OFO"), a sub-agency charged with policing border crossings and drug trafficking at Points of Entry (POEs), *id.* § 211(g)(3), and another sub-agency, the U.S. Border Patrol ("USBP"), charged with the same responsibilities between POEs, *id.* § 211(e)(3).  The

---

[1] *See The Legislative Branch,* available at https://obamawhitehouse.archives.gov/1600/legislative-branch (last visited April 20, 2023) ("All legislative power in the government is vested in Congress, meaning that it is the only part of the government that can make new laws or change existing laws. Executive Branch agencies issue regulations with the full force of law, but these are only under the authority of laws enacted by Congress.")

relationship between those core functions—policing illegal border crossings and drug trafficking—is well-established.

29. The current mission statement of the U.S. Immigration and Customs Enforcement ("ICE") which is part of DHS, is to "[p]rotect America through criminal investigations and enforcing immigration laws to preserve national security and public safety."[2]

## The Migrant Protection Protocols Effectively Implemented These Purposes

30. The DHS established the Migrant Protection Protocols ("MPP") on December 20, 2018, in order to deter individuals without legal authorization or valid asylum claims from seeking to enter the United States by crossing the southwest border.

31. The purpose of MPP was to confront the border crisis of illegal migration and reduce the rate of illegal crossings which in turn would reduce the amount of drug smuggling across the border. The DHS' goal for MPP was to free up "[p]recious border security personnel and resources . . . to focus on protecting our territory[.]"[3]

32. The DHS elaborated on the purpose of MPP on Jan 25, 2019, via news release.[4] In a section titled "Why is the DHS Instituting MPP?" the DHS explained "[h]uman smugglers and traffickers exploit migrants and seek to turn human misery into profit. Transnational criminal organizations and gangs are also deliberately exploiting the situation to bring drugs, violence, and illicit goods into American communities." The DHS went on to state that one of the anticipated benefits of

---

[2] It is worth noting ICE's Missions Statement has changed since the Amended Complaint was filed here. As of December 20, 2021, ICE's Mission statement was "to protect America from *the cross-border crime and illegal immigration that threaten national security and public safety*. This mission is executed through the enforcement of more than 400 federal statutes and focuses on immigration enforcement and combating transnational crime." (emphasis added) https://www.ice.gov/mission (last visited April 10, 2023) References to "illegal" immigration as a "threat" to national security and public safety have been removed under the current administration.
[3] DHS, *Secretary Kirstjen M. Nielsen Announces Historic Action to Confront Illegal Immigration* (Dec 20, 2018), https://www.dhs.gov/news/2018/12/20/secretary-nielsen-announces-historic-action-confront-illegal-immigration (last visited April 17, 2023).
[4] DHS, *Migrant Protection Protocols* (Jan 25, 2019), https://www.dhs.gov/news/2019/01/24/migrant-protection-protocols# (last visited April 17, 2023).

MPP was "migrants with non-meritorious or even fraudulent claims will no longer have an incentive for making the journey" to the U.S. [5]

33. Under the MPP program, asylum applicants attempting to cross the southwest border were returned to Mexico for expedited processing of their claims, as authorized by the Immigration and Nationality Act, 8 U.S.C. § 1225(b)(2)(C), rather than held in detention or, as was most common, released into the United States under the guise of a statutory "parole."

34. By dramatically reducing the number of individuals without valid asylum claims released into the United States pending adjudications taking years and often resulting in individuals not appearing or *in absentia* removal, DHS—via the MPP—aimed at "reduc[ing] illegal migration by removing one of the key incentives that encourages people from taking the dangerous journey to the United States in the first place."[6]

35. One of the stated purposes of this deterrence program was to increase DHS's ability to focus resources and personnel on securing the border against threats such as drug trafficking.

## The MPP Program Decreased Irregular Border Crossings And Drug Smuggling

36. MPP was a success.  DHS assessed that apprehensions fell 65 percent from a peak in May 2019 through September 2019.  DHS, *Assessment of the Migrant Protection Protocols (MPP)* 2 (Oct. 28, 2019), https://tinyurl.com/yeyus2bd (last visited April 17, 2023).  Individuals processed under MPP could "be granted relief or protection within months, rather than remaining in limbo for years."  *Id.* at page 3.

37. Mark Morgan, Acting Commissioner of CBP from July 5, 2019, to January 20, 2021, concluded that MPP deterred illegal entry into the United States and meritless asylum claims, "shut down the driving force behind the . . . illegal immigration crisis . . . [and] allowed the government

---

[5] *Id.*
[6] *See supra*, note 4.

to better focus its resources on individuals who ha[d] legitimate asylum claims."[7]

38. Mr. Morgan stated that he, and other career officials within CBP, explained to the Biden Transition Team prior to January 20, 2021, "the effectiveness of the MPP program and the border crisis that would occur if it were to be suspended."[8]  Specifically, Mr. Morgan recounts that "Biden transition personnel were specifically warned that the suspension of the MPP, along with other policies, would lead to a resurgence of illegal aliens attempting to illegally enter [across the southwestern border].  They were warned smuggling organizations would exploit the rescission and convince migrants the U.S. borders are open.  They were warned the increased volume was predictable and would overwhelm Border Patrol's capacity and facilities, as well as [Health and Human Services] facilities." *Id.* ¶ 33.

39. And that is precisely what happened after DHS announced the January Suspension.  CBP data show an overwhelming increase in apprehensions at the southwestern border.[9]  Almost immediately, apprehensions far surpassed the crisis levels of 2018 and 2019, and fiscal year 2022 saw 2,206,436 encounters at the southwestern border, shattering previous records.[10]  Fiscal year 2023 has already seen 891,774 encounters in only five months.[11]  This includes historic levels of encounters at and between Points of Entry (POEs).[12]

40.       The use of more law enforcement resources—virtually all, by some accounts—to apprehend and process illegal migrants at the southwestern border has predictably led to lax

---

[7] *Declaration of Mark Morgan* was filed June 8, 2021, in the Northern District of Texas, *Texas v. Biden*, No. 2:21-cv-00067-Z at ¶ 24. A copy of this Declaration is attached hereto as Exhibit A.
[8] *Id.*, See *Decl. of Mark Morgan* ¶ 32; *see also id.* ¶ 31.
[9]      *See Southwest Land Border Encounters*, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited April 17, 2023).
[10] *See Southwest Land Border Encounters*, *supra* (individually check "Office of Field Operations" and "U.S. Border Patrol" under "Component" dropdown menu).
[11] *Id.*
[12] *Id.*

policing of drug trafficking.[13] [14]   By comparison, a DHS *Final Emergency Interim Report* concerning the 2018 illegal crossings crisis when apprehensions were much lower found that 40 percent of CBP officers at the southwestern border were occupied in dealing with the crisis.[15]   That included the necessary reassignment of Office of Field Operations officers from POEs to assist with the processing of migrants.  *Id,* at 1.   The report concluded that U.S. Border Patrol "[was] not able to effectively manage its other border security missions," including "monitoring the border for drug smuggling and other contraband," because of the amount of migration seen in 2018.  *Id.* at 1.   If illegal crossings climbed to higher levels, the report warned that DHS "[would] need to re-assign an increasing number of [officers from POEs] to assist [U.S. Border Patrol] in handing the surge in . . . migration," which would increasingly interfere with security at POEs.  *Id.*

41. Lax security is not lost on the cartels.  They are exploiting the crisis, and in some cases manipulating it, to traffic greater amounts of fentanyl into the country.[16] [17] [18] [19]   With even less manpower dedicated to combating drug trafficking, the amount of fentanyl seized at and between POEs skyrocketed after MPP was suspended in January 2021.  *See Footnote 19.*

42. Indeed, there was a drastic uptick in illegal immigration across the Mexican border in 2021, which coincided with the cancellation of the MPP, as measured by CPB encounters.  The

---

[13] Joel Rose, *Border Patrol apprehensions hit a record high. But that's only part of the story*, NPR (Oct. 23, 2021, 7:47 a.m.), https://tinyurl.com/2p8np9ac (last visited April 17, 2023).
[14] Anna Giaritelli, *Border Patrol agents warn of morale collapse amid crisis: 'Downtrodden, almost dead inside'*, Wash. Exam'r (Aug. 22, 2021, 6:01 a.m.), https://tinyurl.com/37vbwzdw (last visited April 17, 2023).
[15] Homeland Sec. Advisory Council: CBP Families and Children Care Panel, *Final Emergency Interim Report* 1, 8 (Apr. 16, 2019), https://tinyurl.com/fbdckz5c (last visited April 17, 2023).
[16] Letter from Rodney S. Scott, Former Chief, U.S. Border Patrol, to United States Congress (Sept. 11, 2021), https://tinyurl.com/2p8rans5 (last visited April 17, 2023)
[17] Yami Virgin, *DEA: Drug cartels exploit the migrant surge at the border*, KABB News (Oct. 5, 2021), https://tinyurl.com/bdfzjx8d (last visited April 20, 2023).
[18] Gabe Gutierrez and Al Henkel, *Fentanyl Seizures At U.S. Southern Border Rise Dramatically*, NBC News (June 29, 2021, 7:59 PM), https://www.nbcnews.com/politics/immigration/fentanyl-seizures-u-s-southern-border-rise-dramatically-n1272676. (last visited April 20, 2023).
[19] Janet Shamlian, *Fentanyl seizures skyrocket along U.S.-Mexico border*, CBS News (June 9, 2021, 7:59 p.m.), https://tinyurl.com/sha2ch9d (last visited April 20, 2023).

encounters jumped from 458,088 in FY 2020 to 1,734,686 in FY2021, 2,378,944 in FY 2022, and already 1,029,953 in the first five months of FY 2023.[20]  Notably, in 2022, 1,663,278, about 70%, of these illegal entrants were single adults, not families or children.  *Id.* (filter *Demographic* by *Single Adults*)

43. By contrast, there were only 458,088 total encounters in FY 2020.  *Id.*

44. The drastic increase in illegal immigration encounters after the MPP's suspension and ultimate termination in 2021 was coupled with a corresponding drastic increase in trafficking illegal drugs across the southwest border into the United States.

45. Federal agents saw "a staggering 4,000 percent increase in fentanyl seizures over the last three years"[21] and "[t]hose busts [were] not at ports of entry, where most smuggled drugs are typically found."[22]   Many of the fentanyl seizures following the Defendants' termination of the MPP have occurred between ports of entry[23], typically in backpacks.

46. The suspension of the MPP program in January 2021 also coincided with the drastic increase in fentanyl seizures at the border.  CBP reported 4,600 pounds of fentanyl was seized at the southwest border in FY2020.  After termination of the MPP, CBP reported seizures of 10,600 pounds in FY2021, 14,100 pounds in FY2022, and 13,800 pounds in the first six months of FY2023.[24]

## The Biden Administration Improperly and Without Analysis Terminated the MPP

### Pre-Election Vow to End the MPP Program

---

[20] *Stats and Summaries: Southwest Land Border Encounters*, CBP, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last modified Dec. 17, 2021) (last visited April 17, 2023)
[21] *See supra*, note 18.
[22] *See supra*, note 18.
[23] See *supra*, note 18.
[24] U.S. Customs and Border Protection, *Drug Seizure Statistics* https://www.cbp.gov/newsroom/stats/drug-seizure-statistics (select "Fentanyl" from "Drug Type" dropdown menu, and "Southwest Border" from "Region Filter" dropdown menu) (last visited April 20, 2023).

47. During his 2020 Presidential campaign, then-candidate Joe Biden "vowed to end Trump's restrictive asylum policies, beginning with a program known as 'remain in Mexico.'"[25]  Once elected, the Biden administration had already predetermined that it would terminate the MPP.

### *Inauguration Day Suspension Decision by the Acting DHS Secretary*

48. Indeed, on January 20, 2021, the first day of the Biden administration, without any time for any internal review or analysis of the MPP program, the Acting Secretary of DHS fulfilled President Biden's campaign promise.  He immediately, *that very day,* suspended MPP.[26]  This is the "Suspension Decision."

49. Upon information and belief, at the time of the action on January 20, 2021, DHS' Acting Secretary knew of the foregoing issue and, as a logical consequence of this, knew that his "suspension" would effectively terminate the MPP program because the suspension functionally ceased operations consistent with the agreement with the Government of Mexico ("GOM") facilitating MPP.  Consequently—and as now repeatedly mentioned by DHS—restarting MPP would require the administration to negotiate a new agreement with the GOM.[27]

### *Executive Order to Determine Whether to Terminate or Modify the MPP*

50. On February 2, 2021, President Biden issued an Executive Order directing the Secretary of DHS "to promptly review and determine whether to terminate or modify the program known as

---

[25] Ted Hesson, *Factbox: Here Are Six Things Joe Biden Will Likely Do On Immigration*, Thomson Reuters, https://www.reuters.com/article/us-usa-immigration-biden-factbox/factbox-here-are-six-things-joe-biden-will-likely-do-on-immigration-idUSKBN27O00R (last visited April 17, 2023). *See also Joe Biden Promises To Make America Immigration Friendly, Restore Diversity Visa Lottery Within 100 Days If Elected President*, Sahara Reporters, https://saharareporters.com/2020/07/09/joe-biden-promises-make-america-immigration-friendly-restore-diversity-visa-lottery ("Biden, who is Trumps biggest challenger for the top job, said he will, 'End these policies starting with Trump's Migrant Protection Protocols. . .'" (last visited April 17, 2023).

[26] DHS, *DHS Statement on the Suspension of New Enrollment in the Migrant Protection Protocols Program* (Jan. 21, 2021), *available at* https://www.dhs.gov/news/2021/01/20/dhs-statement-suspension-new-enrollments-migrant-protection-protocols-program (last visited April 17, 2023).

[27] DHS, *DHS Guidance regarding the Court-Ordered Reimplementation of Migrant Protection Protocols* December 2, 2021) available *at* https://www.dhs.gov/sites/default/files/2022-01/21_1202_plcy_mpp-policy-guidance_508.pdf. (last visited April 14, 2023)

the Migrant Protection Protocols."  Executive Order 14010 of February 2, 2021, § 4(ii)(B), 86 Fed.

Reg. 8267, 8269 (Feb. 2, 2021).  The President instructed the Secretary to review MPP and take

appropriate actions "consistent with public health and safety."  *Id.* at § 4(i).

51. Upon information and belief, DHS had improperly predetermined that it would terminate

the MPP, regardless of any such review.

### *Senators Raise Concerns Regarding Detrimental Effects of Increased Fentanyl Smuggling if DHS Terminates the MPP*

52. While the Secretary's supposed "review" of MPP was underway, the concern of fentanyl

coming across the southwest border was brought directly to the attention of the Secretary by

Senator Rick Scott of Florida at the Senate Hearing on Unaccompanied Minors at US-Mexico

Border on May 13, 2021.[28]

53. At another hearing on May 26, 2021, after stating that the Secretary was responsible for

"opioid and drug interdiction," Senator Shelly Moore Capito of West Virginia, ranking member

of the Homeland Security Appropriations Subcommittee, again brought the issue of fentanyl to the

Secretary's attention.  Senator Capito informed Secretary Mayorkas "[t]his is a big issue for me.

Drugs continue to pour across our border, including record amounts of fentanyl, which are

devastating states like West Virginia and killing a lot of our people."[29]

54. Despite the concerns raised by Senator Capito and Senator Scott regarding the increased

illegal fentanyl being trafficked across the southwest border and the devastating effect illegal

fentanyl has on West Virginia and its residents, DHS Secretary Alejandro Mayorkas terminated

---

[28] *DHS Actions to Address Unaccompanied Minors at the Southern Border: Hearing Before the Comm. on Homeland Sec. & Gov. Affairs*, 117th Cong. (2021) (statement of Senator Rick Scott) https://www.hsgac.senate.gov/hearings/dhs-actions-to-address-unaccompanied-minors-at-the-southern-border (last visited April 17, 2023).

[29] *Hearing on The FY 2022 Dept. of Homeland Sec. Budget Before the Subcomm. On Homeland Sec.* 117th Cong. (2021) (statement by Senator Shelley Moore Capito).  *https://www.capito.senate.gov/news/press-releases/video-capito-to-mayorkas-dhs-budget-request-highly-concerning-amid-border-crisis-of-the-administrations-own-making.* At one minute and twenty seconds.  (last visited April 10, 2023)

the MPP Program on June 1, 2021, providing some discussion and explanation of the Termination Decision in the June Termination Memorandum.[30]

### *June Memorandum Terminating the MPP*

55. The formal termination of the MPP by the Secretary on June 1, 2021 (the "Termination Decision") was made without any consideration of how the termination would impact drug trafficking and the flow of illegal fentanyl across the southwest border into this country, despite this precise issue being raised to the Secretary prior to the termination.   The Secretary issued a seven-page memorandum explaining the Termination Decision on June 1, 2021 (the "June Memorandum").

56. The June Memorandum focused on "the Administration's broader strategy and policy objectives. . . ."  It addressed concerns about the MPP enrollees' lack of housing, income, and safety if they were returned to Mexico.   The June Memorandum found that "preserving MPP . . . would not be consistent with this Administration's vision and values. . ."   DHS' June Memorandum also purportedly considered the negative consequences that might result from the decision to terminate MPP.  More specifically, the June Memorandum found:

> "[A]ny benefit of maintaining or modifying MPP are far outweighed by the benefits of terminating the program.   Furthermore, termination is most consistent with the Administration's broader policy objectives and the Department's operational needs. . . . Because my decision is informed by my assessment that MPP is not the best strategy for implementing the goals and objectives of the Biden-Harris Administration, I have no intention to resume MPP in any manner similar to the program as outlined." [31]

57. It is important to note that the June Memorandum did not acknowledge, consider, or discuss

---

[30] DHS, *Memorandum on Termination of the Migrant Protection Protocols Program* (June 1, 2021), *available at* https://www.dhs.gov/sites/default/files/publications/21_0601_termination_of_mpp_program.pdf (last visited April 12, 2023).
[31] *Id.*

the impact termination of the MPP would have on illegal trafficking of fentanyl across the southwest border and into the United States.  The decision was based more on the alleged impact to illegal immigrants "and the goals and objectives of the Biden-Harris Administration" than on the impact the decision would have to the security of the United States homeland and the U.S. citizens the DHS is tasked with protecting from the cross-border crime and illegal immigration that threaten national security and public safety.

58. DHS' termination of the MPP was a major change that increased the "pull factor" attracting individuals without a lawful right to enter the United States or a legitimate asylum claim to nonetheless travel to and across the southern border into this country, diverting the attention and limited resources of the Border Patrol from its primary responsibilities.

59. The termination of the MPP resulted in additional burdens and distractions to the Border Patrol, which decreased the security of the southwestern border against illegal fentanyl trafficking between ports of entry, leading directly to both increased numbers of smuggling attempts and increased rates of success in evading Border Patrol.

60. In an analogous, high-profile case decided just one year before DHS terminated MPP, the Supreme Court held DHS acted arbitrarily and capriciously in terminating the Deferred Action for Childhood Arrivals (DACA) Program because DHS failed to consider an important aspect of the problem.  *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020).

61. Despite the alarms raised by Senator Scott and Senator Capito, the prominence of the *Regents* decision, the CBP warnings to the Biden Transition Team, and the President's instructions in his Executive Order to consider public health and safety (the "EO Health and Safety Directive"), DHS failed to consider illegal fentanyl drug trafficking, among other relevant factors, in its Termination Decision and the June Memorandum.

*States Object to DHS' June Termination of the MPP*

62. After the Suspension Decision, Texas and Missouri sued President Biden and other federal officials in their official capacities, as well as related agencies, on April 13, 2021, seeking to enjoin the suspension of the MPP.  *See Texas v. Biden*, No. 2:21-cv-00067 (N.D. Tex. Aug. 13, 2021). That action was later modified to focus on the Termination Decision, which superseded the Suspension Decision.

63. On June 7, 2021, West Virginia Attorney General Patrick Morrisey objected by letter to the Defendants' dereliction of duty and failure to consider fentanyl drug trafficking in the Termination Decision in violation of the APA.[32]  Attorney General Morrisey's letter informed the Secretary that his "action and accompanying justification memorandum entirely overlook[ed] a critical aspect of a major problem facing our country, the issue of illegal drug trafficking and fentanyl."  *See* Morrisey Letter.[33]

64. As emphasized in Attorney General Morrisey's letter:

"This is a pressing and urgent matter impacting West Virginia and every State suffering from fentanyl abuse and illegal drug trafficking.  Lives are being lost every day.  There is no time for delay."[34]

65. Attorney General Morrisey requested that DHS respond by June 20, 2021, admonishing the Secretary that  "[t]here should be no need for a lawsuit to make ending the fentanyl flood one of your priorities."[35]  DHS never responded to Attorney General Morrisey's letter.

66. Meanwhile, the concerns of Attorney General Morrisey and others that the formal termination of MPP would aggravate the illegal fentanyl trafficking problem began to be borne

---

[32] *See* Letter from Patrick Morrisey to Alejandro Mayorkas (June 7, 2021) ("Morrisey Letter"). https://ago.wv.gov/Documents/2021.06.07%20Letter%20to%20Secretary%20Mayorkas.pdf (last visited on April 12, 2023)
[33] *Id*.
[34] *Id*.
[35] *Id*.

out almost immediately.  Not long after Attorney General Morrisey's letter, Gloria Chavez, Chief Border Patrol Agent for the El Paso Sector, emphasized that "[f]or the first time, we're starting to see these tactics where fentanyl is being smuggled *between* ports of entry" at that portion of the border.[36]

67. On August 13, 2021, the Texas court issued an injunction against the enforcement of the Termination Decision (the "Texas Court Order"), finding it to be, among other things, arbitrary and capricious.[37]  DHS then appealed that ruling.

68. Having received no response to the Morrisey Letter, the State of West Virginia consequently filed its original Complaint on August 19, 2021.  *See* Complaint, ECF No. 1.

69. The Defendants sought additional time to file a responsive pleading to the original Complaint based on its intent to file a more detailed explanation of the Termination Decision.

### *DHS' Response to Texas Court Injunction*

70. After issuance of the Texas Court Order on August 13, 2021, DHS had to either abandon its termination of the MPP or take one of two actions:

a.  Give a fuller explanation of the Agency's reasoning at the time of the original agency action; or

b.  Take new agency action, which means full compliance with relevant sections of the APA and engaging in *new* reasoned decision making without a pre-determined out-come.  The agency was "bound to deal with the problem afresh, performing the function delegated to it by Congress." *Sec. & Exch. Comm'n v. Chenery Corp*., 332 U.S. 194, 201, 67 S. Ct. 1575, 1579, 91 L. Ed. 1995 (1947); *see also Islander E. Pipeline Co., LLC v. Connecticut Dep't of Env't Prot.*, 482 F.3d 79, 105 (2d Cir. 2006) ("Any effort by the [agency] to pursue a "strategy" to justify a foreordained [conclusion] would be incompatible with a reviewing agency's mandate to use its expertise to come to a reasoned decision supported by substantial evidence. . . .  To the extent some evidence indicates a greater concern with mounting a public relations campaign . . . than with neutrally evaluating the record evidence, that evidence further supports the conclusion that the Denial was arbitrary

---

[36] *See supra,* note 18 (emphasis added).
[37] Memorandum Opinion and Order, *Texas v. Biden*, No. 2:21-CV-067-Z (N.D. Texas Aug. 13, 2021), ECF No. 94, 2021 WL 3603341.

and capricious.")

71. DHS purported to follow the second option in a new termination memorandum in October 2021, stating that "the Secretary has *considered anew* whether MPP should be maintained, terminated or modified…" DHS, *Memorandum on Termination of the Migrant Protection Protocols* at 2, 4 (Oct. 29, 2021) (the "October Termination Memorandum") (emphasis added).[38] DHS also issued a second related memorandum that day, this one focused on explaining the first.[39] The DHS *Explanation of the Decision to Terminate the Migrant Protection Protocols* (Oct. 29, 2021) (the "Explanation Memorandum") was to help explain the October Termination Memorandum.

72. However, as detailed below, in what appears to reflect a predetermined outcome, DHS announced its decision to terminate MPP well before it published its new Memoranda on October 29, 2021, and well before it had access to the October 28, 2021 data upon which its complete analysis and termination decision of October 29, 2021 supposedly relied.

### DHS' September and October Statements Regarding Plan to Terminate the MPP Without Benefit of the Data It Ultimately Relied Upon

73. Specifically, on September 29, 2021—a full month before its October Memoranda—DHS issued a press release very clearly stating that it *would* terminate the MPP Program "in the coming weeks."[40]

74. This decision was repeated on October 15, 2021, when DHS announced via Twitter that

---

[38] DHS, *Memorandum on Termination of the Migrant Protection Protocols* (Oct. 29, 2021), *available at* https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-memo.pdf (last visited April 20, 2023).

[39] DHS, *Explanation of The Decision to Terminate the Migrant protection Protocols* (Oct. 29, 2021), *available at* https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-justification-memo-508.pdf (last visited April 20, 2023).

[40] DHS, *DHS Announces Intention to Issue New Memo Terminating MPP* (Sept. 29, 2021), *available at* https://www.dhs.gov/news/2021/09/29/dhs-announces-intention-issue-new-memo-terminating-mpp (last visited April 20, 2023).

"DHS will be issuing a memo terminating MPP…"[41]

75. Media reported on this, as well. For example, on October 19, 2021, Catholic News Service reported DHS' predetermined intention to terminate MPP: "On Twitter, DHS said that "separately, as announced previously, DHS also will be issuing a memo terminating MPP[.]"[42]

76. However, DHS could not have completed its "new" analysis by October 15, 2021—let alone September 29, 2021, when its decision was disclosed online—because, at that time, DHS did not have the data it allegedly relied upon in the October Termination Memorandum.[43]

77. DHS did not consider the impact on U.S. citizens or DHS' core statutory mission to "monitor connections between illegal drug trafficking and terrorism, coordinate efforts to sever such connections, and otherwise contribute to efforts to interdict illegal drug trafficking," or even the President's directives in his Executive Order to consider public health and safety. DHS also ignored the concerns raised by Attorney General Morrisey and Senators Capito and Scott, but it did achieve the predetermined outcome established in the Biden Administration's campaign promise to terminate the MPP.

### DHS' October Termination Memorandum

78. On October 29, 2021, DHS issued the "October Termination Memorandum", which stated that Secretary Mayorkas "once more assessed whether MPP should be maintained, terminated, or modified" and concluded that he was "hereby terminating MPP."[44]

79. On October 29, 2021, the DHS' also issued its 39-page "Explanation Memorandum".[45] In

---

[41] DHS, Twitter Thread (Oct. 15, 2021) available at https://twitter.com/DHSgov/status/1448863237949337600 (last visited April 20, 2023). (scroll up to view thread)

[42] Rhina Guidos, *After Court Order, DHS Officials Aim To Resume 'Remain In Mexico' Policy*, National Catholic Reporter (Oct. 19, 2021), https://www.ncronline.org/news/justice/after-court-order-dhs-officials-aim-resume-remain-mexico-policy (last visited April 12, 2023).

[43] *See supra*, note 39, at pages 16, 18, and 22 (referencing data obtained on Oct. 28, 2021).

[44] *See supra*, note 38.

[45] *See supra*, note 49.

the Explanation Memorandum, DHS spent only one page out of 39 pages addressing the core mission of DHS and ICE (i.e. protecting the homeland) and dismissed all concerns regarding the propriety of terminating the MPP Program with very little hard data.  Additionally, the data provided in the Explanation Memorandum was either misleading or insufficient as it addressed fentanyl and other illegal drug trafficking problems.

80. Further, only two sentences in the entire document even mention the deadly fentanyl epidemic: "Meanwhile, hard narcotics, including cocaine, methamphetamine, heroin, and fentanyl, are historically smuggled through ports of entry and thus have very little connection to MPP's implementation.  Seizure trends for hard drugs at ports of entry have been mixed, with fentanyl and methamphetamine seizures increasing substantially year on year since FY18, cocaine seizures remaining largely flat, and heroin seizures substantially higher in FY19 and FY21 than in FY18 and FY20."  October Termination Memorandum at 25-26.

81. However, that data as to fentanyl was inaccurate, out of date, or otherwise wrong.  Fentanyl is now smuggled in large part between ports of entry, which was also the case when the Defendants issued the October Termination Memorandum.[46]  Further, even very small amounts of fentanyl smuggled between ports of entry are vastly stronger, more lethal, and much more profitable than copious amounts of marijuana and other narcotics that typically have been smuggled between ports of entry. *Id.*  The October Termination Memorandum virtually ignored this reality and the resulting harm to Americans generally and West Virginians specifically.

82. The October Termination Memorandum also dismissed the States' reliance concerns without any discussion or analysis.

83. The States must rely on DHS to protect them from the dangers that DHS and ICE are

---

[46] *See supra,* note 18.

charged with confronting per their respective mission statements, in particular to enforce immigration law and protect the States from the harmful consequences of illegal immigration. *See Arizona v. United States*, 567 U.S. 387, at 394-400.  With the power to regulate immigration, comes the responsibility to enforce the immigration laws enacted by Congress. *Id.* at 416.

84. By virtue of the federal government's role and responsibilities vis-à-vis border security and immigration, West Virginia has no option but to rely on the federal government to actually enforce the law.  DHS's mission includes the obligation to "contribute to efforts to interdict illegal drug trafficking," and its termination of the MPP Program and implementation of the Parole + ATD Policy as described herein has caused West Virginia to sustain concrete and particularized injuries.

85. Indeed, Attorney General Morrisey explained West Virginia's reliance interest in his June 7 Letter, writing, "[a]s a State, West Virginia must rely on the federal government to secure the border against this deadly scourge [of fentanyl]."[47]

86. The October Termination Memorandum dismissed this most fundamental reliance interest, even though the illegal drug trafficking across the southwest border and its obvious real consequences to lives and resources had not slackened but demonstrably increased at that time.

87. The October Termination Memorandum justified the Defendants' conclusion to terminate MPP not based on the values of DHS' and ICE's statutorily-defined missions or the need to mitigate harm to the American public and the States, but rather on the Defendant's alleged difficulty in administering the MPP program, the MPP purportedly taking resources away from other border control efforts, and the MPP allegedly presenting an unacceptable risk of harm to anyone remaining in Mexico while their asylum claims were being processed and evaluated.[48]

88. DHS' termination of MPP did not properly consider the impact of the MPP termination on

---

[47] *See supra*, note 32.
[48] *See supra*, note 38.

illegal trafficking of fentanyl into our country or the resulting harm to the health and welfare of the homeland's residents, including but not limited to residents of West Virginia, and is arbitrary, capricious, and an abuse of discretion.

## Parole + ATD Policy

89. The Parole + ATD Policy informally began on or around July 31, 2021, and was formalized in a July 18, 2022 memorandum jointly issued by CBP and ICE titled "Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations." (the "July Memo") [49]

90. The July Memo states that, pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. § 1182(d)(5)(A), the Secretary of Homeland Security has the authority to parole certain noncitizens into the United States "temporarily ... on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id.* at page 2.

91. That code section states, in relevant part, "**The Attorney General** may, . . . , in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis **for urgent humanitarian reasons or significant public benefit** any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole . . . have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States. *See* 8 USCA § 1182(d)(5)(A) (emphasis added).

92. The DHS's Parole + ATD Policy is contrary to law, and it is the DHS' duty to detain illegal immigrants pending processing and paroling with rare exception only. The expanded

---

[49] U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection Policy on the Use of Parole Plus Alternatives to detention to Decompress Border Locations.    (July 18, 2022) available at, https://litigationtracker.justiceactioncenter.org/sites/default/files/2023-03/flnd%20-%203-2021-cv-01066%20-%20July%2018,%202022%20Parole%20and%20ATD%20memo_0.pdf (last visited April 13, 2023). (

paroling is allowing increased illegal trafficking of fentanyl into the United States due to the sheer volume of immigrants being released into the country through the program since 2021.

93. In *Florida v. U.S.* 2023 WL 2399883, at page 29 (March 8, 2023), the U.S. District Court for the Northern District of Florida held that DHS' Parole + ATD Policy that was formalized in the July Memo" is "contrary to law in three ways: (1) it does not contemplate a return to custody once the purposes of parole have been served; (2) it does not comply with the case-by-case requirement; and (3) it does not limit parole to urgent humanitarian reasons or significant public benefit." The Biden Administration decided not to appeal the court's ruling.[50]

94. However, Florida did not argue that DHS failed to consider the impact Parole + ATD had on illegal trafficking of fentanyl into the interior of the country; that has yet to be determined by a court. As such, it is important that this Court review the challenges to Parole + ATD raised by the State to prevent further impact this policy would have on West Virginia.

**Fentanyl and the Southwestern Border**

95. The United States is facing a national crisis fueled by the illegal trafficking of fentanyl across the nation's southwestern border with Mexico.

96. The Commission on Combating Synthetic Opioid Trafficking ("Opioid Commission") was established under Section 7221 of the National Defense Authorization Act for Fiscal Year 2020 and was charged with examining aspects of the synthetic opioid threat to the United States. The Opioid Commission was composed of bipartisan members of Congress, executive branch officials, and private sector researchers.

97. In February 2022, the Opioid Commission summarized the current opioid epidemic and its

---

[50] Tampa Bay Times, Biden administration opts against appealing Florida immigration case ruling. (March 16, 2023) *available at* *https://www.tampabay.com/news/florida-politics/2023/03/16/biden-immigration-detention-moody-desantis-border-lawsuit/* (last visited April 20, 2023)

"primary driver," fentanyl, as "a slow-motion weapon of mass destruction":

> Cumulatively since 1999, drug overdoses have killed approximately 1 million Americans.  That number exceeds the number of U.S. service members who have died in battle in all wars fought by the United States.  Even worse is that the United States has never experienced the level of drug overdose fatalities seen right now.  In just the 12 months between June 2020 and May 2021, more than 100,000 Americans died from drug overdose—more than twice the number of U.S. traffic fatalities or gun-violence deaths during that period.  Some two-thirds of these deaths—about 170 fatalities each day, primarily among those ages 18 to 45—involved synthetic opioids.  The primary driver of the opioid epidemic today is illicit fentanyl . . . . Comm'n on Combating Synthetic Opioid Trafficking, *Final Report*, at ix (Feb. 2022) (hereinafter "*Opioid Comm'n Final Report*")[51]

98.  The fentanyl crisis and the United States' southwestern border with Mexico are inextricably linked.  Mexican cartels are the principal suppliers of illegal fentanyl in the United States, and they traffic illegal fentanyl into the country "primarily across the southwestern border" with Mexico.  *Opioid Comm'n Final Report*, *supra*, at 5; *see also id.* at xi, 8–9.

99.  After crossing the border, illegal fentanyl is distributed throughout the country, including into West Virginia.  One publication found that fentanyl smuggled from Mexico is commonly transported to "Chicago and then spreads to cities like Toledo, Columbus, Cincinnati, and south to West Virginia." [52]

100.  Cross-border trafficking can be further analyzed based on location such as at ports of entry and between ports of entry.[53]

---

[51] *Opioid Comm'n Final Report* - https://tinyurl.com/3ctjx3b2 (Feb. 2022), at ix (last visited April 20, 2023).

[52] Wilson Center Mexico Institute, *Mexico's Role in the Deadly Rise of Fentanyl*, pages 31-32 (February 2019), https://www.wilsoncenter.org/sites/default/files/media/documents/publication/fentanyl_insight_crime_final_19-02-11.pdf (last visited April 20, 2023).

[53] Commission on Combating Synthetic Opioid Trafficking *Opioid Comm'n Final Report –Technical Appendixes*, *supra*, at C-19, available at https://www.rand.org/content/dam/rand/pubs/external_publications/EP60000/EP68839/RAND_EP68839.pdf (last visited April 20, 2023)

101. Fentanyl seizures along the southwest border have substantially increased every fiscal year since at least FY2019, from 2,600 pounds in FY2019 to 14,100 pounds in FY2022.[54]  The Office of Field Operations is the federal law enforcement agency tasked with securing the United States' borders *at POEs*, while U.S. Border Patrol is tasked with securing the borders *between POEs*.[55]

102. The area between POEs includes the remainder of the United States' 1,954-mile land border with Mexico.  Drug traffickers use persons, including illegal migrants, crossing into the United States between POEs by foot to smuggle drugs into the country. Reports indicate that this practice is increasing.[56]  Indeed, illegal fentanyl seizures by U.S. Border Patrol between POEs have risen every fiscal year since at least FY2019. [57]

## West Virginia Has Been Injured By Increased Illegal Fentanyl Crossing The Border And Flowing To West Virginia.

103. Fentanyl is produced in both Mexico and China, and illegally trafficked across the southwest border into the United States.[58]

104. While much of the illegal fentanyl trafficked into the U.S. is manufactured in China, most of it still reaches the U.S. through the Mexican border.  *Id*. at 9.

---

[54] U.S. Customs and Border Protection*, Drug Seizure Statistics FY 2022*.  https://www.cbp.gov/newsroom/stats/drug-seizure-statistics-fy22  (check "Office of Field Operations" from "Component" dropdown menu, "Fentanyl" from "Drug Type" dropdown menu, and "Southwest Border" from Region Filter" dropdown menu)(last visited April 20, 2023).

[55] 6 USC §211(e)(3) and 6 USC §211(g)(3). *See also,* Alicia Carriquiry, *Understanding Undocumented Migration: Survey and Modeling Options to Estimate Flows* (October 2013). https://sites.nationalacademies.org/cs/groups/dbassesite/documents/webpage/dbasse_085714.pdf, at Slide 7 (pdf page 13) (last visited April 20, 2023).

[56] Andrew R. Arthur, *NPR Can't Figure Out Link Between Illicit Drugs and Illegal Migrant Tsunami*, Ctr. for Immigr. Stud. (Aug. 23, 2022), https://tinyurl.com/y62yr9h9 (collecting reports discussing use of persons crossing border to smuggle drugs)(last visited April 20, 2023).

[57] U.S. Customs and Border Protection, *Drug Seizure Statistics FY 2023*.  https://www.cbp.gov/newsroom/stats/drug-seizure-statistics (check "U.S. Border Patrol" from "Component" dropdown menu)(last visited April 20, 2023)

[58] Wilson Center Mexico Institute, *Mexico's Role in the Deadly Rise of Fentanyl*, pages 12-13 (February 2019), https://www.wilsoncenter.org/sites/default/files/media/documents/publication/fentanyl_insight_crime_final_19-02-11.pdf (last visited April 20, 2023).

105. As mentioned above, once in the U.S., a typical distribution path for illegal fentanyl is to Chicago, and then to "Toledo, Columbus, Cincinnati and south to West Virginia." *Id.*, at 31-32.

106. According to the CBP statistics, the amount of illegal fentanyl being seized at the southwest border by USBP and OFO annually has drastically increased from 2019 to the present. For Fiscal Year 2019, 2,600 pounds of fentanyl were seized compared to 14,100 pounds of fentanyl seized in FY 2022. That is a 442% increase over a three year period.[59] Additionally, the rapid increase appears to still be expanding exponentially, as CBP reports having already seized 13,800 pounds of fentanyl during the first six (6) months of FY 2023.[60] In other words, the amount of fentanyl seized by CBP during the first six (6) months of FY 2023 was 5.3 times larger than the amount of fentanyl it seized in all of FY2019.

107. Upon information and belief, increased illegal fentanyl smuggling across the border in turn increases both the amount of fentanyl consumed in West Virginia and the number of West Virginians killed or otherwise harmed by this lethal poison.

108. As a result, West Virginia has suffered financial damages by virtue of (i) increased medical care costs of the State to take care of those who overdose on fentanyl (such as Emergency Medical Services ("EMS") responses, hospital care, drug treatment centers and naloxone/narcan treatments); (ii) increased foster care costs resulting from parental incarcerations and overdose deaths; (iii) increased law enforcement costs to track down, arrest, prosecute and incarcerate fentanyl dealers; and (iv) costs to care for babies born with opioid addictions.

109. Fentanyl from Mexico kills West Virginians every single day. In 2021 alone, 1,134 West

---

[59] U.S. Customs and Border Protection, *Drug Seizure Statistics* https://www.cbp.gov/newsroom/stats/drug-seizure-statistics (select "Fentanyl" from "Drug Type" dropdown menu, and "Southwest Border" from "Region Filter" dropdown menu) (last visited April 20, 2023).

[60] U.S. Customs and Border Protection *Drug Seizure Statistics*. *Overview*, https://www.cbp.gov/newsroom/stats/drug-seizure-statistics  (filter by "Fentanyl" from "Drug Type" dropdown menu, and "Southwest Border" from Region Fliter" dropdown menu) (last visited April 20, 2023)

Virginias died from fentanyl overdoses.[61]  This was approximately 75% of the 1,507 total drug overdose deaths in West Virginia during 2021.  Nationally, in 2021, there were 71,238 fentanyl related deaths, up from 57,834 fentanyl related in 2020.[62] In other words, in one year, illegal Mexican fentanyl killed nearly as many Americans as died in the 20 years of the Vietnam War.[63]

110. In addition to the 1,134 fentanyl overdose deaths in West Virginia in 2021, there were untold additional non-lethal fentanyl overdoses.

111.  In 2022 in West Virginia, EMS responded to 9,042 suspected drug overdoses.  Moreover, there were 6,916 emergency room visits related to drug overdoses in 2022 and 7,958 in 2021.[64] Based on the data above showing fentanyl related overdose deaths of 75% of all overdose deaths, it is also likely that a similar percentage of the EMS responses and Emergency Room ("ER") encounters related to drug overdoses  result from fentanyl usage.

112. The typical cost for each EMS response is about $1,211, [65] and the typical emergency room visit cost, without admission or treatment, related to drug overdoses is at least $504. [66]  If admitted, the cost can be between $11,731 and $20,500.[67]

113. Based on those figures, the immediate costs from these 2 categories are massive.  EMS costs from fentanyl for 2021 were likely about $8,213,002.  Costs for fentanyl ER visits were likely

---

[61] WV DHHR, *Fatal Overdoses in West Virginia – Overview*, https://dhhr.wv.gov/office-of-drug-control-policy/datadashboard/Pages/default.aspx (last visited April 10, 2023).
[62] CDC, U.S. Overdose Deaths In 2021 Increased Half as Much as in 2020 – But Are Still Up 15% (May 11, 2022) https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2022/202205.htm  (last visited April 10, 2023).
[63] Archives.gov, *Vietnam War U.S. Military Fatal Casualty Statistics* (January 2018). https://tinyurl.com/2pxkpsmt (last visited April 13, 2023).
[64] WV DHHR, *Emergency Room (ER) Visits Related to Overdoses*, https://dhhr.wv.gov/office-of-drug-control-policy/datadashboard/Pages/default.aspx (last visited April 10, 2023).
[65] Andrew Hurst, *Ambulance Rides Have Cost $1,189 on Average Since 2010 – Totaling More Than $46 Billion*, ValuePenguin (Sept. 13, 2021), https://www.valuepenguin.com/cost-ambulance-services (last visited April 18, 2023).
[66] *Opioid Overdoses Costing U.S. Hospitals an Estimated $11 Billion Annually*, Premier Inc. (Jan. 3, 2019), https://www.premierinc.com/newsroom/press-releases/opioid-overdoses-costing-u-s-hospitals-an-estimated-11-billion-annually (last visited April 13, 2023).
[67] *Id.*

between $2,614,248 and $106,335,500.  It is likely that the State of West Virginia and its medical providers would bear much of these costs because drug users often have no health insurance or are enrolled members in the State's Medicaid program.

114. In 2020, over 7,100 West Virginia children were in foster care during an average month,[68] at least 85% of which resulted from drug use.[69]  As of 2020, nearly 75% of drug overdose deaths resulted from fentanyl or fentanyl analogs.[70]  While explicit percentage statistics on fentanyl usage resulting in placement in foster care are not available, a conservative estimate of even 50% would suggest that about 3,000 foster care placements result from fentanyl usage.  Because of the large number of placements, some of these are out-of-state placements, which cost the State between $300 and $1,500 per day per child.[71]  In-state placements are less expensive, and the total daily expenditure is harder to calculate, but the cost of payments to the foster care families alone (excluding medical care, therapy and administrative costs) is at least $31 per day per child.[72]

115. In addition, the approximate cost to care for babies born with opioid addiction (as of 2017) was $66,000 per year[73], most of which is paid by the State of West Virginia.  In 2019, there were 761[74] such addicted babies, many of which (likely three-quarters, or 571, based on the above cited

---

[68] WV DHHR, *Foster Care Placements Report*, https://dhhr.wv.gov/bcf/Reports/Documents/2021%20January%20Legislative%20Foster%20Care%20Placements%20Report.pdf (last visited April 13, 2023).

[69] WV DHHR, *West Virginia 2021 Annual Progress and Services Review*, at page 241, *available at* https://dhhr.wv.gov/bcf/Reports/Documents/West%20Virginia%20APSR%202021.pdf (last visited April 13, 2023).

[70] National Institute on Drug Abuse, *West Virginia: Opioid-Involved Deaths and Related Harms*, https://nida.nih.gov/download/21991/west-virginia-opioid-involved-deaths-related-harms.pdf (last visited April 10, 2023)

[71] Amelia Ferrell Knisely et al., *West Virginia's Reliance On Out-Of-State Group Homes Leaves Some Foster Kids In Unsafe, Abusive Situations*, WV Public Broadcasting (Sept. 21, 2021, 12:54 PM), https://www.wvpublic.org/government/2021-09-21/west-virginias-reliance-on-out-of-state-group-homes-leaves-some-foster-kids-in-unsafe-abusive-situations (last visited April 14, 2023).

[72] *Id.*

[73] *The Opioid Crisis: Impact on Children and Families: Hearing Before the S. Comm. On Health, Educ., Labor, and Pensions*, 135th Cong. (2018) (Opening statement by Senator Lamar Alexander), *available at* https://www.govinfo.gov/content/pkg/CHRG-115shrg28659/html/CHRG-115shrg28659.htm (last visited April 17, 2023).

[74] U.S. Dep't of Health and Hum. Servs. – Agency for Healthcare Rsch. And Quality, *Neonatal Abstinence Syndrome (NAS) Among Newborn Hospitalizations*, https://datatools.ahrq.gov/hcup-fast-stats (last visited April 13, 2023).

statistics) suffered addiction from fentanyl-related maternal addictions, resulting in a cost to the State of as much as $37,700,000.

116. Law enforcement time, resource use, and other costs from increased fentanyl entering the State are difficult to quantify but are real and considerable.

117. As an example, the West Virginia state-wide average cost per inmate for FY 2018 was $70.90 per day.[75]  The specific number of inmates whose incarceration stems from fentanyl-related activity is unspecified at present, but that number is certainly significant.

118. The cost and impact on families affected by each fentanyl illegal usage, overdose, incarceration, or death, while not a direct monetary cost to the State, are immeasurable.

## Illegal Mexican Fentanyl is Killing West Virginians

119. West Virginia has battled an opioid epidemic within the state for many years.

120. The CDC determined West Virginia had the highest rate of drug overdose deaths in the nation in 2014.[76]  West Virginia continued to have the highest drug overdose death rate from 2015 to 2020, the last year for which data is available.[77]

121. In recent years, fentanyl has become the deadliest drug in the State of West Virginia.  In 2021, 75% of all drug-related deaths in West Virginia were connected with fentanyl.[78]   Further, fentanyl-related deaths of 1,134 in 2021 had increased by almost 1000% over fentanyl-related deaths of 135 in 2015.[79]

---

[75] WV Div. of Corr., *Annual Report: FY2018* 42 (Dec. 2018), https://dcr.wv.gov/resources/Documents/annual_reports/WVDOC%2018%20Annual%20Report.pdf (last visited April 13, 2023).  These costs might be assessed against the defendant, but realistically, many defendants will never pay those costs.

[76] Rose Rudd et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, (Jan. 1, 2016), www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm (last visited April 13, 2023).

[77] CDC, *Drug Overdose Mortality Rate by State*, (Feb. 12, 2021), www.cdc.gov/nchs/pressroom/sosmap/drug_poisoning_mortality/drug_poisoning.htm.  (last visited April 13, 2023)

[78] *See supra*, note 54 (last visited on April 10, 2023).

[79] *Id.*

122. Fentanyl is about 100 times more potent than morphine.[80]   A lethal dose of fentanyl can be as small as two milligrams depending on the person's body size, tolerance, and past usage.[81] That means one kilogram (equivalent to 2.2 pounds) of fentanyl contains up to 500,000 potentially lethal doses.[82]

123. On March 22, 2023, local and federal law enforcement had the largest drug bust in West Virginia history that included roughly twenty pounds of fentanyl, which is the equivalent of 4.5 million lethal doses of fentanyl.[83]

124. Drug trafficking organizations have a tremendous motivation to produce and traffic fentanyl.  Due to the potency of fentanyl, drug traffickers can bring in massive profits from relatively small amounts.[84]

125. According to the DEA's 2017 Drug Threat Assessment, one kilogram of pure fentanyl can result in revenues of $1.28 million to $1.92 million, as compared to only $80,000 in revenue for one kilogram of heroin.[85]

126. This results from the potency of pure fentanyl, as one kilogram of pure fentanyl can be diluted to generate 16 to 24 kilograms of product, each of which is equivalent in value to one kilogram of heroin.  *Id.*

127. Upon information and belief, fentanyl smuggled in vehicles at ports of entry into this country are typically already diluted bricks or pressed into pills, given low concern over space and

---

[80] DEA, *Facts about Fentanyl,* www.dea.gov/resources/facts-about-fentanyl (last visited April13, 2023)
[81] *Id.*
[82] *Id.*
[83] MetroNews *Local and Federal Law Enforcement Crack Down on Largest Meth Bust in State* (March 22, 2023) available at https://wvmetronews.com/2023/03/22/local-and-federal-law-enforcement-crack-down-on-largest-meth-bust-in-state/ (last visited April 13, 2023).
[84] Gabe Gutierrez and Al Henkel, *Fentanyl Seizures At U.S. Southern Border Rise Dramatically*, NBC News (June 29, 2021, 7:59 PM), https://www.nbcnews.com/politics/immigration/fentanyl-seizures-u-s-southern-border-rise-dramatically-n1272676.  (last visited April 20, 2023).
[85] DEA, 2017 National Drug Threat Assessment 62 (Oct. 2017), *available at* https://www.dea.gov/sites/default/files/2018-07/DIR-040-17_2017-NDTA.pdf (last visited April 13, 2023).

weight.

128. However, a new and pressing threat comes in the form of pure fentanyl carried by individuals, typically in backpacks, across the southwest border *between* points of entry.[86]

129. A single backpack can easily contain 10 kilograms or more of pure fentanyl, with a street value of roughly $4.23 million[87] and enough potentially lethal doses to kill 5,000,000 Americans.

130. Seizure statistics show dramatic increases in fentanyl seizures both at and between points of entry.

131. Importantly, CBP statistics do not adjust for purity of the seized substance, so one pound reported seized between ports of entry of pure fentanyl can be equivalent to nearly 25 pounds of diluted fentanyl bricks or fentanyl pills reported as seized at a port of entry.

132. The threat of fentanyl backpacked between ports of entry is not hypothetical.

133. For example, on December 19, 2020, CBP's Integrated Fixed Tower system detected "three subjects traveling northbound from a drainage gate along the International Boundary Fence . . . between the United States and Mexico." Criminal Complaint in *U.S. v. Morales Rodriguez*, No. 21-941 (D. Ariz. Dec. 21, 2020).[88]

134. A Border Patrol Agent was dispatched to intercept them. *Id.* As he approached within a half mile of their coordinates, the Integrated Fixed Tower system camera operator observed the three individuals stop walking. *Id.*

---

[86] Bethany Blankley, *Law enforcement pushes back against Democrats' claims about fentanyl and southern border* (February 11, 2023) https://www.washingtonexaminer.com/news/law-enforcement-pushes-back-against-democrats-claims-about-fentanyl (48% of 700 pounds of fentanyl seized in the Tucson Sector of the southwest border was seized "in the field after 'being backpacked across the border.'" (last visited April 13, 2023)

[87] Joshua Rhett Miller, *'Historic' amount of fentanyl seized in Mexico: authorities* (July 7, 2022), New York Post, https://nypost.com/2022/07/07/historic-amount-of-fentanyl-seized-in-mexico/ (1,196 pounds of fentanyl = 543.64 kilograms which reportedly had street value of roughly $230M. or approximately $423,074 per kilogram) (last visited April 20, 2023)

[88] Criminal Complaint, *U.S. v. Morales Rodriguez*, No. 21-941 (D. Ariz. Dec. 21, 2020)(The criminal complaint detailing this is available for viewing in PACER)

135. The camera operator guided the agent to the location where the three individuals had last been seen.  *Id.*

136. When he arrived, the agent found "three individuals dressed in camouflage clothing," "wearing carpet booties" (used to disguise footprints in the desert) and "attempting to conceal themselves under some brush."  *Id.*

137. The three subjects "then got up and ran in different locations."  *Id.* The agent apprehended one of the individuals and the backpack he was carrying, which contained 14.32 kilograms of methamphetamine.  *Id.*

138. The agent also seized a second backpack that likely had been carried by one of the two individuals that escaped.[89]

139. These are the two backpacks seized by the agent that day:[90]



140. It is unknown whether there was a third backpack that got away with the two individuals who were not apprehended.

141. Some of the fentanyl being illegally trafficked into the U.S. across the southwest border ultimately finds its way to West Virginia resulting in overdoses to West Virginia residents and

---

[89] CBP, *Border Patrol Seizes $3M in Narcotics* (Dec. 21, 2020), *available at* cbp.gov/newsroom/local-media-release/border-patrol-seizes-3m-narcotics.  (last reviewed on April 13, 2023)
[90] *Id.*

substantial economic damages to the State of West Virginia, its residents and its medical providers.

**This Court Can Redress This Problem**

142. The Court can vacate or postpone the effective date of the October Memoranda terminating the MPP as arbitrary and capricious and contrary to existing law.

143. Additionally, the Court can vacate the Parole + ATD Policy and issue an injunction as the July Memorandum implementing the policy failed to consider the relevant factors, failed to give cogent explanations for the decision to terminate the MPP policy, and failed to provide a reasoned decisionmaking basis to support the policy.   Additionally, the Defendants' issuance and implementation of the Parole + ATD Policy violated the APA and is contrary to both Part II of Subchapter II of the INA and DHS' statutory obligations to detain undocumented migrants, as it does not contemplate a return to custody once the purposes of parole have been served, it does not comply with the case-by-case requirement and instead has resulted in the release of undocumented migrants *en masse*, and it does not limit parole to instances where urgent humanitarian reasons or significant public benefit that would justify parole have been demonstrated to exist.

144. Vacating the October Memoranda and the July Memorandum implementing the Parole + ATD Policy will help alleviate the smuggling of illicit fentanyl across the Mexico-U.S. border and thereby help to alleviate the resulting harms to West Virginia, its citizens and medical providers described hereinabove.

145. "When establishing redressability, a plaintiff need only show that a favorable ruling could potentially lessen its injury; it need not definitely demonstrate that a victory would completely remedy the harm." See generally, *Texas v. United States*, 40 F.4th 205 (2022)

146. The injury and financial costs to West Virginia would be eased if the Court issues the injunctive relief detailed below and vacates both the October Memoranda and the Parole + ATD

Policy, thereby redressing West Virginia's harm to a meaningful degree.

## VI.    CAUSES OF ACTION

## COUNT I – THE OCTOBER 29, 2021 MEMORANDA TERMINATING THE MPP PROGRAM WAS ARBITRARY AND CAPRICIOUS BECAUSE IT FAILED TO CONSIDER THE RELEVANT FACTORS IN VIOLATION OF THE APA

Plaintiff realleges, adopts, and incorporates by reference the foregoing paragraphs as though fully set forth herein.

147. In *Biden v. Texas*, 142 S.Ct. 2528, at 2548 (2022) (*Biden III*), the Supreme Court expressly left open the opportunity for the District Court to consider whether the October Memoranda comply with Section 706 of the APA and satisfy the *State Farm* standard[91] or, rather, that the October Memoranda were arbitrary and capricious.

148. The Supreme Court found that the October Memoranda constituted final agency action that superseded the June Memorandum.  As such, the October Memoranda were subject to judicial review.

149. On remand, Texas and Missouri filed a motion for a stay, pursuant to the APA, seeking to postpone the effective date of the agency action pending judicial review of the October Memoranda.  The District Court in the Northern District of Texas held that a stay postponing the effective date of agency action was not barred by the INA's general prohibition of injunctive relief by lower courts and that a stay was available even through the October Memoranda had already taken effect.  The Court granted the stay finding that the States were likely to succeed on the merits of the claim that the October Memoranda failed to adequately consider several relevant factors.

150. Consequently, West Virginia seeks judicial review under the APA for the DHS' failure to review relevant factors in addition to and distinct from those raised by Texas and Missouri in

---

[91] *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 46-57 (1983).

the Northern District Court of Texas, as well as those raised by Florida in the Northern District Court of Florida.

151. The Supreme Court held in *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 46-57 (1983) that, "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the acts found and the choice made.""[92]  The Court held that, "in reviewing that explanation, a court must consider whether the decision was based on a consideration of relevant factors and whether there was a clear error of judgment. . . . Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in a view or the product of agency expertise.  The reviewing court should not attempt itself to make up for such deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given." [93]  And, lastly, "We have frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner, [94] and we reaffirm this principle again today."

152. In *State Farm,* the Court found that the agency arbitrarily and capriciously revoked a safety standard when it gave no consideration whatever to modifying the existing standard before revoking it completely and that the agency failed to give the requisite "reasoned analysis" for revoking the safety standard.

153. In the case at hand, as has been detailed more fully herein, the DHS failed to consider

---

[92] *Id.* at 43, citing Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct.239, 245-246, 9 L.Ed.2d 207 (1962).
[93] *Id.* at 43. citing, *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947).
[94] *Id*., at 48-49, citing, *Atchison, T & S.F.R. Co. v. Wichita Bd. of Trade* and other cases.

several relevant factors, including but not necessarily limited to the following:

    a.  The benefits of MPP;

    b.  The impact to illegal fentanyl trafficking that would result with the termination of the MPP;

    c.  How terminating the MPP would affect DHS' ability to fulfill its statutory duties mandating detention under the INA and only paroling immigrants on a case-by-case basis and not *en masse*;

    d.  The reliance interests that the States, including West Virginia, have in DHS's restricting illegal immigration and the resulting illegal trafficking of fentanyl, and the costs resulting to States when the DHS fails to meet its obligations and duties under existing law; and

    e.  The DHS' actual experience after suspending the Migrant Protection Protocols in January 2021 up until the termination of the MPP with the October Memoranda.

154. The APA states, in relevant part, that, "The reviewing court **shall** . . . hold unlawful and set aside agency action . . . that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (emphasis added).

155. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). That is, agency action must reflect "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015). And reasoned decisionmaking is not present when an agency fails to account for "the relevant factors" or exhibits "a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

156. Although arbitrary-and-capricious review is "deferential," *Prometheus Radio*, 141 S. Ct. at 1158, "it is not toothless," *Ortez-Cruz v. Barr*, 951 F.3d 190, 198 (4th Cir. 2020). *See also Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 856 (5th Cir. 2022) (stating that after the Supreme Court's decision in *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020), district court review of

agency action "has serious bite").

157. Courts should "engage in a searching and careful inquiry" of whether the agency:

> [r]elied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Mayor of Balt. V. Azar*, 973 F.3d 258, 275 (4th Cir. 2020) (en banc).  In promulgating a rule or enacting a new policy, an agency has the burden to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quotation marks omitted).

*RELEVANT FACTORS WHICH THE DHS FAILED TO CONSIDER, FOR WHICH IT FAILED TO GIVE A COGENT EXPLANATION FOR, AND FOR WHICH FAILED TO PROVIDE A REASONED DECISIONMAKING BASIS TO SUPPORT ITS OCTOBER MEMORANDA*

## A. DHS failed to adequately consider the relationship between the Migrant Protection Protocols and illegal fentanyl trafficking

158. There are multifaceted problems with DHS's conclusion in the October Memoranda that MPP and illegal fentanyl trafficking are unrelated.  *Explanation Memo*, *supra*, at 25–26.  Below are three examples of how the DHS failed to engage in reasoned decisionmaking or provide a cogent explanation when analyzing how the October Memoranda would affect fentanyl trafficking at the southwestern border.

159. *First*, DHS measured illegal fentanyl trafficking activity through the arbitrarily narrow lens of amounts seized at the border instead of including amounts of illicit fentanyl seized between points of entry.  In fact, DHS admitted that the amount seized is "not necessarily indicative of trafficking data"—the very problem DHS purported to analyze.  *Id.* at 25.  In other words, DHS concedes the irrelevance of seizure amounts as a measure of aggregate trafficking activity.  That

concession alone is enough to conclude that DHS failed to draw a "rational connection between the facts found and the choice made." *Mayor of Balt.*, 973 F.3d at 275.

160. The amount of fentanyl seized is a poor indicator of trafficking activity for a number of reasons. The Opioid Commission explained that "drug seizure data are not random samples," *Opioid Comm'n Final Report Appendixes*, *supra*, at B-25, which is the hallmark of reliability. Instead, the amount seized is "likely to be biased as seizure events are a function of the flows of drugs, the interdiction efforts in any given day, and traffickers' countermeasures." *Id.* Further, the Opioid Commission noted that measuring illegal fentanyl trafficking by the amount seized is "not well positioned to the synthetic opioid problem" because "the ever-changing nature of chemical variations" and the relatively smaller volume of fentanyl smuggled (compared to heroin, marijuana, and other illicit drugs) make fentanyl trafficking more amenable to countermeasures to avoid detection. *Id.* at B-25 to -26. DHS's past experience in having to shift personnel and relax trafficking enforcement as it encountered more illegal aliens at the border following its termination of the MPP and its implementation of the Parole + ATD Program also suggests that drug seizure data will be less reliable as a reflection of overall illegal trafficking activity and that illicit fentanyl trafficking activity will increase. DHS's sole focus on seizures at the border as justification for its termination of MPP and its implementation of the Parole + ATD Policy is therefore unreasonably and inexplicably narrow.

161. To comply with the APA, DHS was required to account for a variety of other data relevant to illegal fentanyl trafficking activity at the southwestern border. For example, overdose rates provide insight about both the demand for fentanyl trafficked by the cartels and the volume of illegal fentanyl being successfully trafficked and delivered to American residents, including West Virginians. Rates of law enforcement and health care response costs are also useful indicators of

illicit fentanyl consumption and illegal trafficking activity traceable to the border.  Seizure amounts in the interior of the country reflect the amount of illicit fentanyl that has been successfully trafficked across the southwestern border undetected.  Moreover, contemporary statements by DEA personnel and representatives claim that illicit trafficking volumes of fentanyl have increased along with the surge in illegal border crossings.[95]  DHS' failure to consider other data indicative of illicit fentanyl trafficking activity at the southwestern border – including but not necessarily limited to the volume of illegal fentanyl that was being interdicted by USBP between points of entry – arbitrarily limited its ability to truly and objectively evaluate the very real problem of illegal drug trafficking.  *Roe v. Dep't of Def.*, 947 F.3d 207, 220 (4th Cir. 2020) (explaining that an "agency must examine the relevant data" to comply with the APA).  Such a narrow view of the problems that would be impacted by the termination of the MPP and the implementation of the Parole + ATD Policy prevented it from engaging in the "reasoned decisionmaking" required by the APA. *Michigan*, 576 U.S. at 750.

162. *Second*, DHS used outdated information to suggest that illicit fentanyl is not smuggled *between* POEs, contrary to other evidence, including but not limited to the experiences described by USBP Tucson Sector Border Patrol Chief John Modlin, who indicated that his agents seized more than 700 pounds of fentanyl in 2022, about half of which was in the field, meaning not at ports of entry.[96]

163. If an agency chooses to rely on "data [that] are either outdated or inaccurate, it should, at the very least, analyze the new data or explain why it nevertheless chose to rely on the older data." *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 473 (4th Cir. 2013).

---

[95] Yami Virgin, *DEA: Drug cartels exploit the migrant surge at the border*, KABB News (Oct. 5, 2021), https://tinyurl.com/bdfzjx8d  (last visited April 17, 2023)

[96] *See supra*, note 86.

Otherwise, the agency will have "fail[ed] to consider important aspects of the issue before the agency" in violation of the APA. *Defenders of Wildlife v. Dep't of the Interior*, 931 F.3d 339, 360 (4th Cir. 2019) (finding agency action violated the APA because it relied upon outdated data). At bottom, "an agency cannot ignore new and better data." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) (emphasis omitted).

164. The October Memoranda stated that "fentanyl [is] *historically* smuggled through [POEs] and thus ha[s] very little connection to MPP's implementation." *Explanation Memo*, *supra*, at 25 (emphasis added). That may (or may not) have been the case historically; DHS did not show its work on historical fentanyl smuggling. But by the time DHS issued the October Memoranda, data and reports from DHS agencies clearly demonstrated that traffickers were smuggling substantial and increasing amounts of illicit fentanyl *between* POEs. DHS' failure to consider illicit fentanyl smuggling between POEs, or to explain why it relied on historical rather than contemporaneous data, shows a "fail[ure] to consider an important aspect of the problem" in violation of the APA's arbitrary-and-capricious requirement. *Mayor of Balt.*, 973 F.3d at 275.

165. *Third*, and relatedly, DHS masked the seizure of illicit fentanyl between POEs by lumping fentanyl together with all "hard narcotics". *Explanation Memo*, *supra*, at 25. In doing so, DHS created a false impression that not only was illicit fentanyl not being smuggled between POEs, but also that the entire problem of illicit drug smuggling between POEs was becoming less severe.

166. The DHS "cannot simply . . . ignore inconvenient facts." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009); *cf. Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 619 (D.C. Cir. 2017) ("Reliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking."). It is certainly "an important aspect of

the problem" that traffickers are increasingly smuggling illicit fentanyl, the nation's number one

overdose killer, between POEs.  *Mayor of Balt.*, 973 F.3d at 275.

### B. DHS failed to adequately consider its actual experience regarding the beneficial effects of the MPP before it suspended and terminated the MPP and the detrimental results afterward

167. The DHS' October Memoranda improperly failed to account for the most relevant factor

before it: the agency's actual experience confronting illicit fentanyl trafficking at the southwestern

border after DHS issued the January Suspension.  If a federal agency is evaluating a policy change,

there should be no better guide than its own nine months of experience after provisionally

implementing that change.  But at no point do the October Memoranda square with the agency's

actual experience at the southwestern border after the January Suspension.

168. For example, DHS claimed that "[n]ot only has MPP failed to deliver many of its

promised benefits, but the burden and attention required to reimplement and maintain MPP will

undermine [DHS'] efforts to address irregular migration and achieve lasting reform of the asylum

system through other means."  *Explanation Memo*, *supra*, at 30.  Thus, in terminating MPP, DHS

purportedly aspired to, among other things, better manage the flow of illegal migration and

implement an allegedly more orderly asylum process without considering the impact such a policy

change would have on illicit fentanyl trafficking across the southwestern border, and the harms

resulting therefrom.  *See id.,* at 30–36.

169. On those measures, reality after the January Suspension draws DHS's reasoning into

serious question as the circumstances on the ground had worsened significantly.  Illegal border

crossings rapidly reached record levels, and reports and prior experience with crisis-level border

encounters indicated that DHS personnel at the border were overwhelmed with migrants and

asylum seekers.  Additionally, its policing of illegal drug trafficking declined, and the cartels

exploited the illegal migration crisis to traffic greater amounts of illicit fentanyl into the country.

170. DHS had all of these data and reports at its disposal but proceeded in the October Memoranda as though it were starting from scratch and without the benefit of the known negative consequences from suspending MPP.  The October Memoranda stated that DHS "has considered anew whether MPP should be maintained, terminated, or modified."  *Explanation Memo*, *supra*, at 4; *see also Biden v. Texas*, 142 S. Ct. at 2544 (finding that the October Memoranda were "new agency action" that "mark[ed] the consummation of the agency's decisionmaking process" and "dealt with the problem afresh" (emphasis and quotation marks omitted) (alteration in original)). But considering the problem anew does not mean writing on a blank slate.  Rather, reasoned decisionmaking required DHS to consider "the relevant data" before it, including its own very recent experience.  *Mayor of Balt.*, 973 F.3d at 275; *cf. Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) (explaining that "an agency cannot ignore evidence contradicting its position").

171. Indeed, the Supreme Court recently admonished DHS for a separate attempt to shift policy without regard to circumstances arising after the policy's implementation.  *See Regents*, 140 S. Ct. at 1915 (stating that DHS was "not writing on a blank slate" when it changed policy).

172. The most relevant data before DHS was its experience at the border after suspending MPP. DHS's failure to account for that data makes the October Memoranda arbitrary and capricious.  *Cf. Wild Va. V. U.S. Forest Serv.*, 24 F.4th 915, 928 (4th Cir. 2022) (faulting agency for "erroneously fail[ing] to account for real-world data" that ran counter to the reasons for its action).

**C.  DHS failed to adequately consider how terminating the MPP would affect its ability to fulfill its statutory duties**

173. The October Memoranda claim that "fentanyl [is] historically smuggled through [POEs] and thus ha[s] very little connection to MPP's implementation." *Explanation Memo*, *supra*, at 25. The October Memoranda also "presumed—as is likely—that MPP contributed to a decrease in

migration flows." *Id.* at 23.  It thus appears that DHS also presumed that the rate of illegal border crossings is uncorrelated with the Defendants' ability to carry out its statutory mandate to police POEs.  *See* 6 U.S.C.A. § 211(g)(3)I (providing that it is the duty of the Defendants' to "prevent illicit drugs . . . from entering the United States").  Indeed, in a section titled "Relationship between Implementation of MPP and Statutory Mandates," DHS failed to mention any of its statutory mandates related to drug trafficking.  *See Explanation Memo*, *supra*, at 26–29.

174. Contrary to the October Memoranda, experience shows that crisis-level illegal border crossings directly affect the Defendants' ability to staff POEs and carry out its law enforcement mission.  During the 2018 and 2019 border crisis, CBP's OFO officers were reassigned from POEs to assist with processing, caring for, and transporting individual migrants.[97]  CBP warned that higher rates of border crossings would increasingly hamper the Defendants' ability to police the border.[98]  Indeed, in light of the unprecedented increase in encounters at the border after the January Suspension, reports suggest DHS's ability to process migrants has been overrun since at least mid-2021. House Committee on Oversight and Accountability, *Border Patrol Chiefs: Biden's Border Crisis is "Overwhelming"*, (February 7, 2023), https://oversight.house.gov/release/border-patrol-chiefs-bidens-border-crisis-is-overwhelming/ (last visited April 21, 2023).

175. Ultimately, DHS failed to grapple with the principle that, as an institution with finite resources, increasing resources allocated to processing illegal border crossers—which was predicted and which DHS experienced following the January Suspension—necessarily required the agency to decrease resources allocated to other functions, like policing for illicit fentanyl trafficking. The DHS is not excepted from that principle.  DHS' "[c]onclusory explanation for"

---

[97] U.S. CBP, *Temporary re-assignment of CBP officers to Border Patrol Sectors*. (March 27, 2019)  available at, https://www.cbp.gov/newsroom/speeches-and-statements/temporary-re-assignment-cbp-officers-border-patrol-sectors (last visited April 17, 2023)
[98] *Decl. of Mark Morgan* at ¶ 33.

why terminating MPP would not affect its ability to police drug trafficking at POEs "do[es] not

suffice to meet the deferential standards of [the court's] review." *Genuine Parts Co.*, 890 F.3d at

312.  In essence, in issuing the October Memoranda, the DHS "offered an explanation for its

decision that runs counter to the evidence before [it]."  *Id., quoting State Farm*, 463 U.S. at 43,

103 S.Ct. 2856. As such, the DHS' October Memoranda are arbitrary and capricious, pursuant to

the *State Farm* standard, and, as such, violate the APA and must be vacated or, alternatively, the

effective date of the October Memoranda must be postponed.

**D. DHS failed to adequately consider the reliance interests that the States, including West Virginia, have in DHS' policing of illicit fentanyl trafficking**

176. "When an agency changes course," like DHS did when it terminated MPP, "it must be

cognizant that longstanding policies may have engendered serious reliance interests that must be

taken into account." *Regents*, 140 S. Ct. at 1913 (quotation marks omitted).  "It would be arbitrary

and capricious to ignore such matters." *Id.*

177. The October Memoranda denied that there were any fentanyl-related reliance interests

associated with MPP. *See Explanation Memo*, *supra*, at 25.  That, as detailed above, is inaccurate.

Fentanyl is principally trafficked—in greater amounts and with greater ease since DHS suspended

MPP—across the southwestern border, causing untold financial cost and human suffering.  As

Attorney General Morrisey explained to Secretary Mayorkas, West Virginia is facing a worsening

fentanyl crisis, and the States must rely on DHS to enforce the nation's laws at the southwestern

border.  Secretary Mayorkas, for his part, did not speak with any state or local officials from West

Virginia about what the State's reliance interests might be.  *See id.* at 24 (stating that Secretary

Mayorkas spoke with only "state and local officials from across the [southwestern border]").  The

October Memoranda's "because we said so" approach for discarding West Virginia's reliance

interests related to illegally trafficked fentanyl is not enough to satisfy the APA. *Id.*; *see also Texas*

*v. United States*, 40 F.4th 205, 228 (5th Cir. 2022) (per curiam) ("Stating that a factor was considered . . . is not a substitute for considering it." (alteration in original)) *citing*, *Getty v. Fed. Sav. & Loan Ins. Corp., 805 F.2d 1050, 1055* (D.C. Cir. 1986).   Rather, courts "must make a searching and careful inquiry to determine if [the agency] actually *did* consider it." *Id.* (emphasis in the original.) "It [was] arbitrary and capricious to ignore" the fentanyl-related reliance interests of West Virginia and other States associated with the MPP. *Regents*, 140 S. Ct. at 1913.

178.   Otherwise, the October Memoranda pay short shrift only to generalized reliance interests of the States, which DHS might contend encompasses those related to fentanyl.   In a weak attempt to give the appearance of addressing the States' reliance interests, the October Explanation Memorandum essentially dismissed the States' reliance interest as "marginal" and "outweighed" by the Biden Administration's "other considerations and policy concerns":

> "Meanwhile, the fact that some noncitizens might reside in the United States rather than being returned to Mexico and thus access certain services or impose law enforcement costs is not, in the Secretary's view, a sufficiently sound reason to continue MPP. Federal immigration policy virtually always affects the number of people living within the States. Notably, not all of those burdens are borne by border States—many noncitizens proceed to interior States; others are detained by the federal government. In this case, the Secretary has made the judgment that any marginal costs that might have been inflicted on the States as a result of the termination of MPP are outweighed by the other considerations and policy concerns; it is also the Secretary's view that the other policies and initiatives being pursued by this Administration will ultimately yield better outcomes than MPP."

> *Explanation Memo*, *supra*, at 26.

179.   However, considering only a portion of the financial impact, it is fair to say that the States, including West Virginia, have more than just a "marginal" reliance interest in DHS's efforts at policing illicit fentanyl trafficking at its source, which primarily is the southwestern border.   DHS' diminished policing efforts at the border naturally leads to increased costs borne by the States. "[A]gainst the weight of all the evidence before it," DHS "cannot simply state it believes"—or

simply judges or views—the States' reliance interests and costs to be small or unjustified "without further support." *Mayor of Balt.*, 973 F.3d at 276 (quotation marks omitted).

180. Additionally, DHS categorically attempts to minimize the States' reliance interests in MPP's efficacy. *Explanation Memo*, *supra*, at 26. DHS states it is "unaware of any State that has materially taken any action in reliance on" MPP. *Id.* That position shows a fundamental misunderstanding of the nature of the States' reliance interests at stake when an agency takes action that substantially changes the status quo. In *Regents*, the Supreme Court described the gamut of reliance interests related to DHS' Deferred Action for Childhood Arrivals (DACA) program, spanning from financial interests to personal hardship to conferred benefits. *See* 140 S. Ct. at 1913–14; *cf. Arizona v. United States*, 567 U.S. 387, 397–98 (2012) (explaining some of the myriad ways illegal migration creates consequences borne by the States). Reliance interests are intrinsically abstract: they must be "legitimate" and "significant." *Regents*, 140 S. Ct. at 1913, 1915. The financial and human costs suffered by West Virginia and its citizens from the illicit trafficking of fentanyl and its subsequent abuse, as well as resources spent in mitigation efforts, certainly engender legitimate and significant reliance interests in DHS' more effective policing of the southwestern border under MPP.

181. DHS similarly claims that the States' reliance interests are categorically "undermined" by the "discretionary" nature of both MPP and the agency's "decisions to detain or parole individuals into the country." *Explanation Memo, supra, at 26.* However, the Supreme Court recognized in *Regents* that DACA was a discretionary program but still faulted DHS for failing to consider reliance interests. *Id.* at 1910, 1913–15. Additionally, DHS insists that the "small percentage of noncitizens encountered along the [southwestern border] who were enrolled in MPP . . . undercut[s] any claimed reliance interest." *Explanation Memo*, *supra*, at 26. But DHS's assertion

itself is undercut by the October Memoranda's recognition that MPP was instrumental in deterring migrants from attempting to cross the southwestern border in the first place.  *Id.* at 23.

182. However, the Supreme Court has held that, "[w]hen an agency changes course, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account'."  *Regents*, 140 S. Ct. at 1913, citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. ——, ——, 136 S.Ct. 2117, 2126, 195 L.Ed.2d 382 (2016), *quoting Fox Television*, 556 U.S. at 515, 129 S.Ct. at 1800.  The *Regents* court further stated, "It would be arbitrary and capricious to ignore such matters." *Id. citing Fox Television*, at 515, 129 S.Ct. 1800.

183.  Using the *Regents* rationale, it was arbitrary and capricious for DHS to "ignore" the reliance interests of West Virginia and other States related to decreased border crossings and illegal trafficking of fentanyl across the southwestern border.

184.  Federal administrative agencies are required to engage in "reasoned decision-making." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998).  "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Id.* at 374.  Additionally, the U.S. Supreme Court has held that, "agency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983))

185. DHS' October Memoranda explaining its decisions to terminate the MPP failed to consider the relevant factors and failed to reasonably explain or provide a reasoned basis for the agency's action.  It gave little, if any, consideration to how terminating the MPP, with its significantly decreased number of border encounters, would impact illegal cross-border trafficking of narcotics, including fentanyl.

186. The DHS' Termination Decision, as manifested in and explained by the October Memoranda was arbitrary, capricious, and an abuse of discretion. It failed to consider relevant factors and a critical aspect of discontinuing the MPP: the impact of such a decision on deadly illicit fentanyl trafficking; the consequences and costs of that impact on illicit fentanyl trafficking; and the ability of DHS to secure the border against that trafficking. As such, the October Memoranda should be vacated or the effective date must be postponed.

## COUNT II – OCTOBER MEMORANDA TERMINATING MPP WERE CONTRARY TO EXISTING LAW, 8 U.S.C.A. 1225, WHICH MANDATES DETENTION

187. Plaintiff realleges, adopts, and incorporates by reference the foregoing paragraphs as though fully set forth herein.

188. APA allows judicial review to prohibit agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A) and (C).

189. Federal law directs the government to detain virtually all aliens applying for admission into the United States. "If the examining immigration officer determines that an alien seeking admission is not **clearly and beyond a doubt** entitled to be admitted, **the alien shall be detained** for a proceeding under section 1229a of this title." 8 U.S.C. § 1225(b)(2)(A) (emphasis added).

190. That statute continues, stating that for aliens "arriving on land (whether or not at a designated port of arrival) from a foreign territory contiguous to the United States," the government may opt to "return the alien to that territory pending" removal proceedings under section 1229a. See generally 8 U.S.C. § 1225(b)(2)(C).

191. These provisions give the government an exclusive choice for aliens not "clearly and beyond a doubt entitled to be admitted" who "arriv[e] on land ... from a foreign territory contiguous

to the United States": Either detain the alien pending removal proceedings, or otherwise return the alien to the country from which he or she arrived pending removal proceedings.

192. Indeed, "Congress expressly authorized the MPP program by [this] statute." *Texas v. Biden*, 2021 WL 5882670, at *3.

193. The government claims that it lacks the capacity to detain the vast majority of the tens of thousands of aliens now arriving on land from Mexico, a foreign territory contiguous to the United States, who are not clearly and beyond a doubt entitled to admission to the United States. However, this Court should not countenance that excuse, as the Defendants are largely responsible for that diminished capacity because they submitted a budget request to Congress that would **decrease** DHS' illegal alien detention capacity by 25%[99] and they affirmatively have degraded their detention capacity by cancelling contracts with private detention facilities and closing detention facilities.[100]

194. Through MPP, the government was capable of addressing this dilemma by electing to return aliens not clearly and beyond a doubt entitled to admission to Mexico pending removal proceedings.  By discontinuing the MPP, DHS has created its own problem, causing it to fail to meet its statutory obligations to detain or otherwise return aliens pending removal proceedings.

195. Because the DHS terminated the MPP and is refusing to detain many of these aliens, at least tens of thousands of them instead will be illegally released into the United States, where a great many will fail to appear for statutorily required removal proceedings in continued violation of the country's immigration laws.[101]

---

[99] Eileen Sullivan, *Biden to Ask Congress for 9,000 Fewer Immigration Detention Beds*, NEW YORK TIMES (March 25, 2022), https://nyti.ms/3vOI00F (last visited April 20, 2023).
[100] *Id. See also*, Priscilla Alvarez, *Biden Administration to close two immigration detention centers that came under scrutiny*, CNN (May 20, 2021), https://cnn.it/3KcxGol (last visited April 20, 2023).
[101] Stef W. Kight, *Scoop: 50,000 migrants released; few report to ICE, available at* https://www.axios.com/2021/07/27/migrant-release-no-court-date-ice-dhs-immigration ("Although they are told to report to Immigration and Customs Enforcement office instead, just 13% have shown up so far. . .")

196. This near certainty of release incentivizes illegal immigration by aliens without valid asylum claims. Unfortunately, approximately 87% of the aliens who have been released by the Defendants without having shown that they are "clearly and beyond a doubt" entitled to enter the United States, let alone remain in it, have failed to report to an ICE office as directed and simply disappeared into the interior of the country.[102]

197. The June Termination Memorandum, the October Memoranda, and implementation of the Parole + ATD policy confirm that Defendants will unlawfully fail to detain illegal aliens and will continue to unlawfully release illegal aliens into the interior of the United States, notwithstanding Section 1225's directives.

198. Federal statute allows for the <u>Attorney General</u> – not the Secretary of the DHS – to temporarily parole certain aliens "**<u>only</u> on a case-by-case basis** for urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A).

199.  When Congress enacted the Homeland Security Act, it changed the heading for 8 USC §1103 to "Power and duties of the Secretary, the Under Secretary, and the Attorney General," clearly demonstrating its intent to maintain the Attorney General's active involvement in the country's protection of its borders.

200. It is important to note that Congress amended 8 USC §1182(d)(13) and (14) on January 5, 2006, **specifically changing "Attorney General" to Secretary of Homeland Security wherever it appeared in those two subsections.**  However, Congress chose to leave "Attorney General" in place throughout the remainder of 8 USC §1182(d), including (d)(5)(A), which is the code section that CBP and ICE cited in the July 2022 Memo as the basis *for the DHS Secretary's* authority to parole noncitizens.

---

[102] *Id.*

201. Upon information and belief, the Secretary of the DHS is not statutorily authorized to grant parole to aliens pursuant to 8 USC §1182(d)(5)(A), as Congress did not affirmatively divest the Attorney General of that power when it enacted the Homeland Security Act, and it subsequently has not taken any further affirmative action to do so. As noted above, Congress recognized in 2006 that the Attorney General remained statutorily vested with all the powers enumerated in that subsection – which is entitled "**Temporary admission of nonimmigrants**" – yet took action only to transfer the powers spelled out in §1182(d)(13) and (14) to the Secretary of DHS, implicitly demonstrating Congressional intention for all the other powers arising from that subsection to be exercised by the Attorney General.

202. Additional support for this conclusion can be found in the concurring opinion authored by Justice Thomas in *Department of Homeland Security v. Regents of Univ. of Cal.*, 591 U.S. ____, 140 S.Ct. 1891, 207 L.Ed.2d 353 (2020): "In addition, the statutes permit the Attorney General to grant temporary 'parole' into the United States 'for urgent humanitarian reasons or [a] significant public benefit,' 8 U.S.C. §1182(d)(5)(A). . ." *Id.* at 140 S.Ct. 1891, 1922-1923.

203. Even if Congress had intended to vest the Secretary of the DHS with all the powers outlined in 8 USC §1182(d), including the limited, discretionary parole authority arising under §1182(d)(5)(A), the Defendants cannot use that limited, discretionary power to parole aliens *en masse*, as such practice is entirely contrary to the explicit "case-by-case" requirement that Congress embedded in the statute. Unquestionably, DHS cannot pervert this limited, case-by-case exception into a blanket exemption allowing the agency to avoid its statutory obligation to enforce Section 1225.

204. The actions taken by DHS as described hereinabove to terminate MPP therefore violates 8 U.S.C. § 1225 and is contrary to existing law. As such, this Court should vacate the October

Memoranda terminating the MPP or postpone the effective date of the October Memoranda.

**COUNT III – THE PAROLE + ATD POLICY RELEASING ALIENS EN MASSE WITHOUT DETENTION, RATHER THAN ON A CASE-BY-CASE BASIS, IS SUBJECT TO INJUNCTIVE RELIEF AND VACATUR, AS THE DEFENDANTS ARE NOT STATUTORILY AUTHORIZED TO EXERCISE THE PAROLE POWERS OUTLINED IN 8 U.S.C. §1182(d)(5)(A), AND THE PAROLE + ATD POLICY VIOLATED BOTH PART II OF THE INA AND § 706(2)(A) & (C) OF THE APA.**

205. Plaintiff realleges, adopts, and incorporates by reference the foregoing paragraphs as though fully set forth herein.

206. The Parole + ATD Policy was formalized in the aforementioned July Memo jointly issued by CBP and ICE on July 18, 2022, and titled, "Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations." [103]

207. In the July Memo and elsewhere, DHS has asserted that the Parole + ATD policy is based on 8 U.S.C.A. §1182(d)(5), which is contained in **Part II** of Subchapter II of the INA, not Part IV of that Subchapter II.  As such, this Court has authority to award the Plaintiff injunctive relief in this matter because the Parole + ATD policy violates § 706(2)(A) and (C) of the APA, as explained further below.

208. The placement of 8 U.S.C.A. §1182(d)(5) within Part II of Subchapter II is significant for this Court's review of the Parole + ATD policy in this case.  Per 8 U.S.C §1252(f)(1), only the Supreme Court has "jurisdiction or authority to enjoin or restrain the operation of the provisions of P**art IV** of (Subchapter II)" of Title 8 of the United States Code (emphasis added).  *See also Biden v. Texas*, 142 S.Ct. 2528 (2022) (*Biden III*), where the U.S. Supreme Court held that,

---

[103] U.S. Immigration and Customs Enforcement and U.S. Customs and Border Protection Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations (July 18, 2022) available at, https://litigationtracker.justiceactioncenter.org/sites/default/files/2023-03/flnd%20-%203-2021-cv-01066%20-%20July%2018,%202022%20Parole%20and%20ATD%20memo_0.pdf (last visited April 21, 2023).

"Section 1252(f)(1) deprives (lower) courts of the power to issue a specific category of remedies: those that 'enjoin or restrain' the operations of (Part IV of Subchapter II, e.g. 8 U.S.C. Code §§ 1221-1232)." *Id.* at 2532.

209. It is important to note that there are "significant differences" between two equitable remedies available for violations of the APA: vacatur of a rule and an injunction. The Supreme Court has observed "that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997). "Vacatur, by contrast, is the ordinary remedy—again, precisely the remedy demanded by the APA's text when a rule is held to violate the APA." *Cook County, Illinois v. Wolf*, 498 F.Supp.3d 999, 1007 (2020), *citing* 5 U.S.C. §706(2) (providing that the court <u>shall</u> "set aside" the challenged "agency action" if it is adopted "in excess of statutory . . . authority" or is "arbitrary [and] capricious") (emphasis added).

210. In March 2023, the U.S. District Court for the Northern District of Florida distinguished the remedies available in litigation regarding the statutory provisions at issue in *Biden III* – which were located in Part IV – from the remedies available in litigation regarding other sections of the INA that fall outside Part IV's parameters. *See Florida v. U.S.* 2023 WL 2399883 (March 8, 2023). In so doing, the Florida court held that, "§ 1182(d)(5), which is the statute on which the Parole + ATD policy is based, **is contained in *part II* of the INA, <u>not</u> part IV**, and any indirect impact that vacatur of that policy might have on how DHS exercises its authority under part IV of the INA does not equate to the Court having 'enjoin[ed] or restrain[ed]' the operations of that part." *Id.* at 35 (emphasis added).

211. Because the Defendants have admitted that the Parole + ATD Policy is based on 8

U.S.C.A. §1182(d)(5), which is contained in Part II of Subchapter II, as opposed to Part IV of that Subchapter, this Court is empowered to either vacate that Policy through the equitable remedy of vacatur, or to enjoin the Defendants from continuing to implement that Policy.

212. The July Memo states that pursuant to section 212(d)(5)(A) of the INA, 8 U.S.C. § 1182(d)(5)(A), the Secretary of Homeland Security has the authority to parole certain noncitizens into the United States "temporarily ... on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *Id.*  The July Memo essentially established "new marching orders" for immigration officials to use to determine whether to detain non-citizens.[104]  It instructed agents how to exercise discretionary authority under the INA and set new parole eligibility criteria for non-citizens at the southwest border. *Id.* at 32.

213. The Parole + ATD Policy that was formalized in the July Memo is arbitrary and capricious as it was implemented without considering the relevant factors, including but not limited to the demonstrably negative impact the Parole + ATD Policy had on illegal trafficking of fentanyl into the interior of the country as well as the impact the Policy would have on West Virginia in relation to the increased illegal trafficking of fentanyl and the resulting consequences, deaths, and costs to the State and its residents.

214. The Defendants have a statutory duty to detain illegal immigrants pending processing and paroling such immigrants only in rare cases.[105]  The extended, continued use of the Parole + ATD Policy is contrary to existing law and the Defendants' statutory obligation to detain such illegal immigrants.  It also is unquestionably allowing increased illegal trafficking of fentanyl into the United States, as demonstrated by the statistics cited hereinabove.

---

[104] *Florida v. U.S. 2023 WL 2399883*, at 32, *quoting City of Dania Beach, Fla. V. FAA,* 485 F.3d 1181, 1188 (D.C. Cir. 2007).
[105] *See generally*  8 U.S.C. § 1225(b)(2)(A) and 8 U.S.C.A §1182(d)(5)(A)

215. Additionally, the Parole + ATD Policy that was formalized in the July Memo violates 8 U.S.C. § 1182(d)(5)(A) in at least these three additional ways: (1) it does not contemplate a return to custody once the purposes of parole have been served; (2) it does not comply with the case-by-case requirement; and (3) it does not limit parole to urgent humanitarian reasons or significant public benefit.

216. The pertinent statute, namely 8 USCA § 1182(d)(5)(A) states, in relevant part, "The Attorney General may, . . . , in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis **for urgent humanitarian reasons or significant public benefit** any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole . . . have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States" (emphasis added).

217.  In the *Florida v. U.S.* case cited above, the Florida court held that the Parole + ATD Policy that was formalized in the July Memo is "contrary to law in three ways: (1) it does not contemplate a return to custody once the purposes of parole have been served; (2) it does not comply with the case-by-case requirement; and (3) it does not limit parole to urgent humanitarian reasons or significant public benefit." *Florida v. U.S.* 2023 WL 2399883, at 29.

218. However, Florida did not argue in that case that DHS failed to consider the impact that the Parole + ATD Policy had on illegal trafficking of fentanyl into the interior of the country.  If that matter is subsequently appealed and overturned on other grounds, it is important for this Court to review the challenges to the Parole + ATD Policy that Attorney General Morrisey is raising on behalf of the State of West Virginia for the devastating impact it will continue to have on the State

if this court does not issue an injunction and/or vacate the Parole + ATD Policy.

219. The District Court in *Florida v. U.S.* reached a similar conclusion to the ruling in *Cook County, Illinois v. Wolf, supra,* holding that, "Vacatur is 'a less drastic remedy' than an injunction, and the Fifth Circuit concluded that §1252(f)(1) does not preclude vacatur under the APA because vacatur 'does nothing but re-establish the status quo absent the unlawful agency action' and 'neither compels nor restrains further agency decision-making'." *Id., citing Texas v. United States,* 40 F.4th at 220.

220. This Court should vacate the July Memo formalizing the Parole + ATD Policy and enjoin the Defendants from continuing to implement the Parole + ATD Policy, as said Policy violates both U.S.C. § 1182(d)(5)(A) within Part II of Subchapter II and §§ 706(2)(A) & (C) of the APA.

## COUNT IV – FAILURE TO TAKE CARE TO ENFORCE THE LAW

221. Plaintiff realleges, adopts, and incorporates by reference the foregoing paragraphs as though fully set forth herein.

222. The United States Constitution requires the President to "take Care that the Laws be faithfully executed," (the "Take Care Clause"). U.S. CONST. art. II, § 3.

223. DHS and its officers are bound by this directive. *See* U.S. CONST. art. II, § 1, cl. 1 (vesting "[t]he executive Power" in the President). "At a minimum, the Clause means that the President may neither breach federal law nor order his or her subordinates to do so, for defiance cannot be considered faithful execution."[106] As stated in one scholarly article, "the meaning of the Clause requires the President to 'be like a fiduciary, who must pursue the public interest in good

---

[106] William P. Marshall and Saikrishna B. Prakash, National Constitution Center, *Common Interpretation of Article II, Section 3, available at* https://constitutioncenter.org/the-constitution/articles/article-ii/clauses/348 (last visited April 20, 2023).

faith republican fashion rather than pursuing his self-interest, and who must diligently and steadily execute Congress's commands.'"[107]

224. The Defendants' suspension, discontinuation, or evasion of the MPP and their implementation of the Parole + ATD Policy violate the Take Care Clause. They do so by (a) violating a statutory framework obligating DHS to detain or otherwise return aliens as described hereinabove, and (b) predictably allowing (and encouraging) more aliens to illegally enter into the United States. This then results in more aliens violating immigration law requirements once released into the interior without first going through the statutory methodology for qualifying refugees before such release.

225. "The duty to execute the laws faithfully means that the President may not—whether by revocation, suspension, dispensation, inaction, or otherwise—fail to honor and enforce statutes to which he or his predecessors have assented, or which may have been enacted over his objection." Christopher N. May, *Presidential Defiance of "Unconstitutional" Laws: Reviving the Royal Prerogative*, 21 Hastings Const. L.Q. 865, 873-74 (1994).

226. U.S. immigration law requires that the government detain any alien who is not "clearly and beyond a doubt entitled to be admitted" pending removal proceedings,[108] or, alternatively for aliens "arriving on land ... from a foreign territory contiguous to the United States," optionally "return the alien to that territory pending" removal proceedings.[109]

227. The October Termination Memorandum of the MPP and the implementation of the Parole + ATD Policy confirm that Defendants will unlawfully prioritize alternatives to detention,

---

[107] Evan D. Bernick, *Faithful Execution: Where Administrative Law Meets The Constitution*, Georgetown Law Journal Vol. 108:1 (2019), at page 6, *quoting* Andrew Kent, Ethan J. Leib & Jed Handelsman Shugerman, *Faithful Execution and Article II*, 132 HARV. L. REV. 211, 2192 (2019), available at https://www.law.georgetown.edu/georgetown-law-journal/wp-content/uploads/sites/26/2019/11/Faithful-Execution-Where-Administrative-Law-Meets-the-Constitution.pdf
[108] 8 U.S.C. § 1225(b)(2)(A)
[109] 8 U.S.C. § 1225(b)(2)(C)

unlawfully fail to detain illegal immigrants, and unlawfully release illegal aliens into the interior of the United States, notwithstanding the Congressional directives in Section 1225(b)(2)(C) and their ability to avoid these statutory violations by continuing to implement the MPP.

228. Unconstitutional agency action or inaction violates the APA.  *See* 5 U.S.C. § 706.

229. This constitutional violation is also actionable independent of the APA.  Federal courts have long exercised the power to enjoin federal officers from violating the Constitution, pursuant to their inherent equitable powers. *See Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015) (discussing "a long history of judicial review of illegal executive action, tracing back to England").

## VII.   PRAYER FOR RELIEF

**WHEREFORE**, the State of West Virginia respectfully requests that the Court:

A.  Declare that the Defendants' termination of MPP violates 5 U.S.C. § 706, because, among other things, it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law for failing to consider the relevant factors, failing to give cogent explanations for, and failing to provide a reasoned decisionmaking basis to support its October Memoranda terminating the MPP.

B.  Declare that the termination of MPP violates 5 U.S.C. § 706, because, among other things, it is contrary to constitutional right, power, privilege, or immunity; and in excess of statutory jurisdiction, authority, limitations, or short of statutory right and violates 8 U.S.C. § 1225.

C.  Vacate or postpone the effective date of the October Memoranda terminating the MPP because it violates 5 U.S.C. § 706;

D.  Issue preliminary and permanent injunctive relief against the Parole + ATD Policy as violating 5 U.S.C. § 706, because, among other things, it is (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power,

privilege, or immunity; and (c) in excess of statutory jurisdiction, authority, limitations, or short of statutory right and violates 8 U.S.C. § 1225;

E.   Vacate the Parole + ATD Policy as violating 5 U.S.C. § 706, because, among other things, it is (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; and (c) in excess of statutory jurisdiction, authority, limitations, or short of statutory right and violates 8 U.S.C. § 1225

F.   Order the Defendants to take care to follow the law, specifically 8 U.S.C. § 1225.

G.   Award Plaintiff costs and attorneys' fees; and

H.   Grant such other relief as the Court may deem just and proper.

Respectfully submitted,

PATRICK MORRISEY
  *West Virginia Attorney General*

/s/ *Curtis R.A. Capehart*
Douglas P. Buffington II (WV Bar # 8157)
  *Chief Deputy Attorney General*
Brent Wolfingbarger (WV Bar # 6402)
  *Senior Deputy Attorney General*
Curtis R.A. Capehart (WV Bar # 9876)
  *Deputy Attorney General*
Chanin Wolfingbarger Krivonyak (WV Bar # 7247)
  *Deputy Attorney General*
OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
State Capitol
Building 1, Room E-26
Charleston, WV 25305-0220
Telephone: (304) 558-2021
Facsimile: (304) 558-0140
Email: Curtis.R.A.Capehart@wvago.gov

*Counsel for Plaintiff, STATE OF WEST VIRGINIA*

DATE: April 21, 2023

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS DIVISION

**STATE OF WEST VIRGINIA**,

    Plaintiff,

           v.

**UNITED STATES DEPARTMENT OF
HOMELAND SECURITY;** and

**ALEJANDRO MAYORKAS**, in his official
capacity as the Secretary of the United States
Department of Homeland Security,

    Defendants.

Case No. 2:21-CV-22

(Judge Kleeh)

## CERTIFICATE OF SERVICE

I hereby certify that, on this 21st day of April 2023, I electronically filed the foregoing

"*Second Amended Complaint*" with the Clerk of Court and all parties using the CM/ECF System.

/s/ Curtis R. A. Capehart
Douglas P. Buffington II (WV Bar # 8157)
  *Chief Deputy Attorney General*
Brent Wolfingbarger (WV Bar # 6402)
  *Senior Deputy Attorney General*
Curtis R.A. Capehart (WV Bar # 9876)
  *Deputy Attorney General*
Chanin Wolfingbarger Krivonyak (WV Bar # 7247)
  *Deputy Attorney General*
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25305-0220
Email: Curtis.R.A.Capehart@wvago.gov
Telephone: (304) 558-2021
Facsimile: (304) 558-0140

*Counsel for Plaintiff, STATE OF WEST VIRGINIA*